**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 10, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellant,

v.

JAMES OLIVER REESE,

      Defendant-Appellee.

No. 10-2030

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. 1:09-CR-02982-JEC-1)**

---

Elizabeth D. Collery, Appellate Section, Criminal Division, United States Department of Justice, Washington, D.C., (Lanny A. Breuer, Assistant Attorney General; Greg D. Andres, Acting Deputy Assistant Attorney General; Kenneth J. Gonzales, United States Attorney, District of New Mexico; Louis E. Valencia, Assistant United States Attorney, District of New Mexico, with her on the briefs), for Plaintiff-Appellant.

Jason Bowles of Bowles and Crow, (B. J. Crow of Bowles and Crow; William Marchiondo of Marchiondo Law Office, with him on the brief), Albuquerque, New Mexico, for Defendant-Appellee.

---

Before **BRISCOE,** Chief Judge, **HOLLOWAY,** and **MURPHY**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

---

This appeal presents a single issue, whether the district court erred in granting defendant James Reese's motion to dismiss an indictment which charged Reese with three counts of possessing firearms while subject to a domestic protection order, in violation of 18 U.S.C. § 922(g)(8). Reese successfully raised an as-applied challenge to the indictment on the grounds that § 922(g)(8) violated his Second Amendment right to keep and bear arms. The United States now appeals. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse the decision of the district court and remand for further proceedings.

I

*Factual background*

In July 2003, Reese, his then-wife Jennifer Reese (Jennifer), and their three minor children moved to Honolulu, Hawaii, where Reese served in the Navy. In August 2004, Reese and Jennifer separated. On November 29, 2004, Jennifer filed in the State of Hawaii Family Court of the First Judicial Circuit (Hawaii Family Court) an "Ex Parte Petition For A Temporary Restraining Order For Protection And Statement" on behalf of herself and her three minor children. Aplt. App. at 104. In the petition, Jennifer alleged that she and Reese were "intimate partners" as defined by 18 U.S.C. § 921(a)(32), Aplt. App. at 105, that Reese had "physically harmed, injured or assaulted" her by "pushing, grabbing, [and] shoving her" as well as "breaking [her] finger" by "holding [her] hand against [a] doorknob," id., that Reese had "pointed a handgun at [her]" and

2

threatened to kill her, id., and that Reese "ha[d] subjected [her] to extreme psychological abuse by . . . yelling, refusing to allow sleep or waking repeatedly, repeated phone calls, threaten[ing] to take children if [she] left him," id. at 106. Jennifer further alleged that Reese was "an alcoholic," "ha[d] a history of domestic violence," was "extremely controlling," "ha[d] a bad temper," and "d[id] not accept the separation." Id. Jennifer also alleged that Reese owned firearms that could be used to threaten, injure or abuse another person. Less than a week after filing the motion for protective order, Jennifer formally filed for divorce in the Hawaii Family Court.

On February 23, 2005, the Hawaii Family Court held a hearing on Jennifer's motion for protective order. During the hearing, Reese "denie[d] [Jennifer's] allegations of domestic abuse," but nevertheless "agreed to [the imposition] of a restraining order . . . ." Id. at 109. Consequently, the Hawaii Family Court did not hear evidence from the parties or make any findings regarding Jennifer's allegations. Instead, the Hawaii Family Court concluded that Jennifer and Reese were "intimate partners," as defined in 18 U.S.C. § 921(a)(32), and issued a protective order in favor of Jennifer and against Reese. The order, which expressly stated it did not expire "until further order of the court," Aplt. App. at 109, prohibited Reese, in pertinent part, from (a) threatening or physically abusing Jennifer or their minor children, (b) contacting Jennifer or their minor children, and (c) "possessing, controlling, or transferring ownership

3

of any firearm, ammunition, firearm permit or license for the duration of th[e]

Order or extension thereof," id. at 112.  The order further revoked "[a]ll

permits/licenses" that Reese had for firearms and required Reese to "immediately

turn over all firearms, ammunition, permits and/or licenses to the Honolulu Police

Department . . . for the duration of th[e] Order or extension thereof." Id.  The

order also stated that "[t]he terms and conditions of this Order were explained by

the Court to the parties in open court" and that "[t]he parties acknowledged that

they understood the terms and conditions of the order and the possible criminal

sanctions for violating it." Id.

On March 17, 2005, the Hawaii Family Court held a final hearing on

Jennifer's divorce petition, at the conclusion of which it found that the "marriage

[wa]s irretrievably broken" and thus "dissolved" the marriage. Id. at 138.  The

Hawaii Family Court also signed a copy of a motion to amend the protective order

that Reese had filed on February 23, 2005.  In that motion, Reese's attorney

handwrote a number of sentences modifying the terms under which Reese could

contact Jennifer and the minor children.  Most notably, the last handwritten

sentence stated as follows: "The order for protection shall expire in 50 years or

until either party modifies the same." Id. at 116.

In mid-2005, Jennifer and the three minor children moved to Maryland.  At

some point thereafter, Jennifer remarried.  Reese relocated to Milan, New

Mexico, and began working with his father, Oliver Reese, at his mining and

4

exploration business in Milan.  Reese also remarried.

In May 2009, Jennifer called Brandon Garcia, a special agent with the
Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF).  Jennifer "was
concerned because she thought her children were . . . scheduled to visit . . . their
father, . . . Reese, in Milan, and she had reason to believe that he had firearms and
was under an order of protection and prohibited from possessing firearms, and she
was fearful for her children's safety."  Id. at 63.  Jennifer subsequently e-mailed
Garcia a copy of the protective order issued by the Hawaii Family Court.  Garcia
"pulled some background information and looked into it as best [he] could," but
"didn't find anything that would show that [Reese] was currently in possession of
firearms . . . ."  Id.  Accordingly, Garcia called Jennifer back and "told her if
there was anything [he] could do in the future to give [him] a call, but as of [that
moment, he] couldn't really do anything."  Id. at 63-64.

On June 27, 2009, a New Mexico State Police officer, Aaron Hammond,
was dispatched to the New Mexico Police Department in Milan (Milan Police
Department) "to take a report of domestic violence or domestic disturbance
occurrence or report that had occurred the prior night . . . ."  Id. at 32.  At the
police department, Hammond encountered Reese's new wife, Danielle Boucher-
Reese (Danielle), sitting with her disabled son, who was in a wheelchair.
Danielle was "noticeably upset" and "had been crying."  Id.  Hammond observed
that there were "bruises on [Danielle's] arms and on her hands" and that "she was

5

noticeably trembling and shaking." Id.  Hammond proceeded to interview

Danielle, who "related a sequence of events of the previous night in which she

and her family[, Danielle's two sons and Reese's seventeen-year-old daughter,

J.M.,] were traveling from their residence in the Milan area to Albuquerque." Id.

at 33.  According to Danielle, she and Reese began arguing while en route to

Albuquerque.  At a certain point, Reese stopped the car, Danielle got out, and she

and Reese proceeded to "g[e]t into a fight on the side of the road." Id.

Ultimately, Reese "forced [Danielle] back in the vehicle, took away her cell

phone, and wouldn't let her call the police." Id.  J.M. "used her cell phone to

contact her mother[, Jennifer,] back in Maryland," and Jennifer in turn contacted

the Albuquerque police "to find out if they were all okay." Id.  According to

Danielle, the Albuquerque police pulled their car over in Albuquerque, but "she

was too terrified to tell the police what was going on because she felt that he may

hurt herself and her boys." Id. at 34.  Danielle indicated that "[w]hen they did

make it back to their residence later that night, she packed up the van and wanted

to take both of her boys with her," but Reese "only allowed her to take her older

disabled son and wouldn't let her take her two-year-old [son] with her." Id.  J.M.

also remained in the residence with Reese.  Danielle further indicated that she

spoke with Jennifer later that evening and learned, for the first time, about

Reese's alleged mistreatment of Jennifer and the existence of the protective order.

Danielle then discussed the protective order with Hammond, and Danielle

informed Hammond that there "were [guns] all over the[ir] house" and that she had "been purchasing guns for [Reese] because he ha[d] asked [her] to." Id. at 36. Danielle also described "a Smith & Wesson .50 cal[iber] Magnum handgun," which she said she had just purchased for Reese at a gun show in Arizona. Id.

Danielle consented to Hammond entering her residence and examining the guns. However, "she was concerned about [Hammond's] safety going into the house because she thought . . . Reese would become violent with [Hammond] if . . . [Hammond] knew of the [protective] order against [Reese]." Id. Danielle was also concerned about Reese abusing the children in the residence.

Hammond, together with an officer from the Milan Police Department, went to Reese's residence. Hammond knocked on the door of the residence, and Reese responded. Hammond "asked [Reese] if he wanted to go in and talk, and [Reese] said he would prefer if [they] could stand out . . . on the porch" of the residence. Id. at 38-39. Reese "said nothing had happened" the night before. Id. at 39. Reese conceded, upon questioning by Hammond, that he had "several" firearms in his house. Id. Hammond advised Reese of his Miranda rights and, with Reese's consent, continued the questioning. When asked by Hammond if he was "aware of a [protective] order that prohibit[ed] [him] from having firearms," Reese responded, "Not that I'm aware of." Id. at 40. Hammond then placed Reese under arrest, handcuffed him, and escorted him to Hammond's patrol car. As Hammond did so, he again asked Reese, "Are you aware of a [protective]

7

order out of Hawaii?" Id. at 41.  Reese responded, "Where did you get that?"  Id.

Hammond then asked Reese, "Do you want to read the [protective] order?," to

which Reese responded, "No.  I know what it says."  Id.

After placing Reese in the backseat of his patrol car, Hammond entered

Reese's residence in order to check on the children inside.  According to

Hammond, he'd "never seen . . . a house so full of just hunting material in [his]

entire life."  Id. at 43.  "In almost every corner of the house there was something

to do with either archery, hunting, reloading, military clothing, equipment."  Id.

"There w[ere] three display cases of knives" and "Ziploc bags of different kinds

of ammunition."  Id.  In the master bedroom of the house, Hammond observed "a

gun laying in a partially opened gun bag next to a gun safe."  Id.

After checking on the children inside Reese's residence, Hammond

"contacted Danielle . . . and . . . a victim's advocate for her, . . . and advised them

that [he] had . . . Reese in custody and for her to come and get her children with

the victim's advocate."  Id. at 44.  Danielle and the victim's advocate arrived at

the residence within a short time and began "packing up the children's belongings

and clothes . . . to take."  Id.  As Danielle was going through the items in the

residence, she asked Hammond if he wanted to look inside of a large combination

safe located in the master bedroom.  Danielle proceeded to open the safe and

removed from it the Smith & Wesson .50 caliber Magnum handgun that she had

purchased for Reese.  Also contained in the safe were approximately twenty-three

8

additional firearms.

Shortly after Danielle and the victim's advocate arrived, an individual named Eddie Tan (Tan) arrived at the residence in his own vehicle. Hammond later learned that Reese, while sitting in the back of the patrol car, had used his cell phone (by dialing with his toes) to call Tan to request that he come to the residence. Tan "advised that he was there to get the keys to the business." Id. at 47. After questioning Reese and obtaining his express consent, Hammond accompanied Tan to Reese's pickup truck, which was parked at the residence. Tan first looked for the keys inside a black backpack that was located in the back cab of the truck. As Tan unzipped the backpack, he said, "Oops, I don't think you're supposed to see that." Id. at 48. Hammond, who was taller than Tan, "could see the grips of a handgun within the backpack that . . . Tan had opened up." Id. Tan proceeded to open another backpack located inside the cab of the truck, and as he did so, he stated, "Oh, you probably don't want to see that one either." Id. at 49. Hammond observed "the grip to another handgun" inside this second backpack. Id. Tan then opened one of the front doors to the cab of the truck, and Hammond observed "boxes and bags of ammunition" contained "in the panels on the door . . . ." Id. Tan subsequently "found the keys that he was looking for in the center console area" of the truck. Id. Hammond in turn "inventoried th[e] two guns" he had observed in the backpacks. Id.

After completing his inventory of the firearms found at Reese's residence

and in Reese's truck, Hammond transported Reese to police headquarters in Milan.  As Hammond completed the necessary paperwork (e.g., booking paperwork, criminal complaints, and statements of probable cause), he spoke with Reese, who was seated nearby.  Reese "rant[ed] about his ex-wife and how she had done this to him . . . ." Id. at 51.  Reese also stated that he had "been collecting [firearms his] whole life" and that he couldn't "live without [his] guns." Id. at 52.

On June 29, 2009, Jennifer, Danielle, and Danielle's mother all telephoned ATF Special Agent Garcia regarding the incident that had occurred involving Reese.  Garcia in turn contacted Hammond, who provided him with additional details of the events leading up to Reese's arrest.  Based upon the information provided to him, Garcia prepared an affidavit for a search warrant for both Reese's residence and his place of business.  Garcia presented the affidavit to a magistrate judge, who issued the requested search warrant on June 30, 2009.  The warrant was executed the following day, July 1, 2009, by ATF agents and three New Mexico state police officers.  Approximately thirty-three firearms were seized from Reese's place of business.

*Procedural background*

On July 2, 2009, a criminal complaint was filed in federal district court charging Reese with one count of possessing firearms while subject to a domestic protection order, in violation of 18 U.S.C. § 922(g)(8).  On October 8, 2009, a

federal grand jury indicted Reese on three counts of possessing firearms while subject to a domestic protection order, in violation of § 922(g)(8).  The first two counts alleged that Reese's possession of weapons occurred on or about June 27, 2009 (the two counts focused on Reese's possession of different weapons).  The third count alleged that Reese's possession of weapons occurred "[f]rom on or about June 27, 2009, to on or about July 1, 2009 . . . ."  Aplt. App. at 11.

At some point after the indictment was returned, Reese filed a motion with the Hawaii Family Court seeking to modify the protective order.  That motion was apparently denied by the Hawaii Family Court due to the pending criminal charges against Reese.

On November 9, 2009, Reese moved to dismiss the indictment on the grounds that § 922(g)(8) was unconstitutional on its face and as applied to him.  The bulk of Reese's motion was devoted to arguing that the fifty-year duration of the protective order issued by the Hawaii Family Court violated his Second Amendment rights.  The motion also asserted that § 922(g)(8) was unconstitutional on its face and as applied to Reese.  With respect to this latter argument, the motion emphasized that Reese had not been previously convicted of a felony or of a domestic violence misdemeanor.

On January 6, 2010, the district court held a hearing on Reese's motion to dismiss.  At the outset, the district court tentatively concluded "that 18 United States Code Section 922(g)(8) is constitutional on its face" and thus asked the

parties "to focus on [the] as-applied argument . . . ." Aplt. App. at 18.  Reese's

counsel argued that the Hawaii protective order was not "reasonable in scope and

time" because of its fifty-year duration.  <u>Id.</u> at 20.  Reese's counsel further argued

that the Hawaii protective order was problematic because it was not accompanied

by any "findings of abuse" or any "conviction . . . ."  <u>Id.</u>  The government argued,

in response, that Reese was effectively "attacking the order of protection

collaterally," something he was precluded from doing "if the order of protection

[wa]s facially valid . . . ."  <u>Id.</u> at 22.

On January 13, 2010, the district court issued a written decision granting

Reese's motion.  The district court determined at the outset that "the

constitutionality of § 922(g)(8) w[ould] be determined 'depending upon the

government's ability to satisfy whatever level of means-end scrutiny is held to

apply.'" Aplt. App. at 97 (quoting <u>United States v. Skoien</u>, 587 F.3d 803, 809 (7th

Cir. 2009)).  Turning to Reese's arguments, the district court rejected Reese's

assertion that § 922(g)(8) was unconstitutional on its face.  In doing so, the

district court concluded that "there [we]re indeed circumstances in which the

statute's limitation on possession of firearms [wa]s narrowly tailored and,

therefore, constitutionally valid."  Aplt. App. at 99.  With respect to Reese's as-

applied challenge, however, the district court agreed with Reese.  <u>Id.</u>  According

to the district court, "the 50-year Order of Protection" was not "narrowly tailored

to serve the governmental interest of reducing domestic violence."  <u>Id.</u>  The

district court also emphasized that Reese and Jennifer "live[d] across the United States" from each other and "ha[d] no in-person contact." Id.  Consequently, the district court dismissed all three § 922(g)(8) counts pending against Reese.

## II

In its appeal, the government challenges the district court's conclusion that 18 U.S.C. § 922(g)(8) is unconstitutional as applied to Reese because it violates his individual right to keep and bear arms as contained in the Second Amendment. "We review challenges to the constitutionality of a statute de novo." United States v. Dorris, 236 F.3d 582, 584 (10th Cir. 2000).

The statute under which Reese was indicted, § 922(g)(8), provides as follows:

> (g)  It shall be unlawful for any person—
> * * *
> (8) who is subject to a court order that—
> (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;
> (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and
> (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or
> (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury[,]

\* \* \*

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(8).  The term "intimate partner," as employed in § 922(g)(8), "means, with respect to a person, the spouse of the person, a former spouse of the person, an individual who is a parent of a child of the person, and an individual who cohabitates or has cohabitated with the person."  18 U.S.C. § 921(a)(32).

It is beyond dispute that Reese falls within the scope of § 922(g)(8).  To begin with, the parties agree that Reese was, and remains, subject to a protective order issued by the Hawaii Family Court.  Further, it is undisputed that the protective order (a) was issued after a hearing of which Reese received actual notice and in which Reese had an opportunity to participate, (b) correctly noted that Reese and Jennifer qualified as "intimate partners" under 18 U.S.C. § 921(a)(32), (c) expressly restrains Reese from threatening or physically abusing Jennifer or their minor children, and (d) explicitly prohibits the use, attempted use, or threatened use of physical force by Reese against Jennifer or their minor children that would reasonably be expected to cause bodily injury (because it prohibits Reese from "physically abusing" Jennifer or their minor children).

Although Reese argued before the district court that § 922(g)(8) violated the Second Amendment and was unconstitutional on its face, the district court concluded otherwise, and Reese does not challenge this conclusion on appeal.  In

14

other words, Reese effectively concedes that the categorical ban set forth in §

922(g)(8) does not, on its face, violate the Second Amendment and is

presumptively lawful.  Thus, we are left to address Reese's alternative argument,

with which the district court agreed, that § 922(g)(8), as applied to Reese, is

unconstitutional under the Second Amendment.

The Second Amendment provides: "A well regulated Militia, being

necessary to the security of a free State, the right of the people to keep and bear

Arms, shall not be infringed."  U.S. Const. amend. II.  Approximately two years

ago, in District of Columbia v. Heller, 128 S. Ct. 2783 (2008), the Supreme Court

held that several "District of Columbia [statutes] prohibit[ing] . . . the possession

of usable handguns in the home violate[d] the Second Amendment . . . ."  128 S.

Ct. at 2787-88.  In doing so, the Court concluded that the Second Amendment

"confer[s] an individual right to keep and bear arms."  Id. at 2799; see id. at 2797

(concluding that the operative clause of the Second Amendment "guarantee[s] the

individual right to possess and carry weapons in case of confrontation").  The

Court noted, however, that this right "[wa]s not unlimited."  Id. at 2816.

Although the Court declined to "undertake an exhaustive historical analysis . . . of

the full scope of the Second Amendment," id., it emphasized that "nothing in [its]

opinion should be taken to cast doubt on longstanding prohibitions on the

possession of firearms by felons and the mentally ill, or laws forbidding the

carrying of firearms in sensitive places such as schools and government buildings,

or laws imposing conditions and qualifications on the commercial sale of arms," id. at 2816-17.  In other words, the Court suggested that the core purpose of the right was to allow "law-abiding, responsible citizens to use arms in defense of hearth and home."[1]  Id. at 2821.

Heller thus "suggests a two-pronged approach to Second Amendment challenges" to federal statutes.  United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010); see United States v. Skoien, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc).[2]  Under this approach, a reviewing court first "ask[s] whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee."  Marzzarella, 614 F.3d at 89.  "If it does not, [the court's] inquiry is complete."  Id.  "If it does, [the court] must evaluate the law under some form of means-end scrutiny."  Id.  "If the law passes muster under that standard, it is constitutional."  Id.  "If it fails, it is invalid."  Id.

Applying that approach here, there is little doubt that the challenged law, § 922(g)(8), imposes a burden on conduct, i.e., Reese's possession of otherwise

---

[1] In June of 2010, the Supreme Court held that the Second Amendment right to keep and bear arms is fully applicable to the States by virtue of the Fourteenth Amendment.  McDonald v. City of Chicago, 130 S. Ct. 3020 (2010).

[2] In Skoien, the Seventh Circuit, sitting en banc, effectively adopted a similar analytical framework in addressing a Second Amendment challenge to § 922(g)(9).  In doing so, the en banc court, upon review of the panel's opinion, rejected both the approach and the result adopted by the panel.  Notably, the district court in this case relied on the panel opinion in Skoien and did not have the benefit of the Seventh Circuit's subsequent en banc ruling.

legal firearms, that generally falls within the scope of the right guaranteed by the Second Amendment.  Thus, we must proceed to the second part of the analysis and "evaluate [§ 922(g)(8)] under some form of means-end scrutiny." Id.

The Supreme Court did not specify in Heller precisely what level of scrutiny a reviewing court must apply to a challenged law.  128 S. Ct. at 2817-18 (holding that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," the District of Columbia's challenged ban "would fail constitutional muster").  Instead, the Court indicated only that the rational basis test is not appropriate for assessing Second Amendment challenges to federal laws.  Id. at 2816 n.27 ("Obviously, the [rational basis] test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms.").  Thus, we must apply some level of heightened scrutiny and, in doing so, must look to analogous cases for guidance on precisely what level to apply.

In recent months, both the Third and Seventh Circuits have applied intermediate scrutiny to Second Amendment challenges to federal firearm laws. In Marzzarella, the Third Circuit, citing analogous First Amendment cases, concluded that "[w]hether or not strict scrutiny may apply to particular Second Amendment challenges, it is not the case that it must be applied to all Second Amendment challenges."  614 F.3d at 96.  In other words, the Third Circuit

17

concluded, "the Second Amendment can trigger more than one particular standard of scrutiny," depending, at least in part, upon "the type of law challenged and the type of [Second Amendment restriction] at issue." Id. at 97.  The Third Circuit in turn concluded that the specific statute it was reviewing, 18 U.S.C. § 922(k), which prohibits the possession of firearms with obliterated serial numbers, "should be evaluated under intermediate scrutiny" because "[t]he burden imposed by the law d[id] not severely limit the possession of firearms," as did "[t]he District of Columbia's handgun ban" that was at issue in Heller.  Id.  Turning again to analogous First Amendment cases, the Third Circuit framed the intermediate scrutiny inquiry in this way:  whether the challenged law served a "significant," "substantial," or "important" governmental interest, and, if so, whether the "fit between the challenged [law] and the asserted objective [wa]s reasonable, not perfect."  Id. at 98.  And, finally, the Third Circuit concluded that "[t]hose requirements [we]re met" because the purpose of § 922(k), i.e., "preserving the ability of law enforcement to conduct serial number tracing . . . constitute[d] a substantial or important interest," id., and § 922(k) "fit[] reasonably with that interest," id., by "[r]egulating the possession of unmarked firearms—and no other firearms," id. at 99.

In Skoien, the Seventh Circuit sitting en banc, applied a similar test and reached a similar result with respect to a different statute, 18 U.S.C. § 922(g)(9), which prohibits any person "who has been convicted in any court of a

18

misdemeanor crime of domestic violence" from possessing firearms.  In doing so, the Seventh Circuit first inferred from Heller "that exclusions [on firearm possession] need not mirror limits that were on the books in 1791" and "that some categorical disqualifications are permissible: Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court." Skoien, 614 F.3d at 641.  In turn, the Seventh Circuit, citing cases involving analogous constitutional rights, concluded that § 922(g)(9) was subject to intermediate scrutiny and framed the inquiry in this way:  whether the statute was "substantially related to an important governmental objective."  Id.  In answering that inquiry, the Seventh Circuit held that "the goal of § 922(g)(9), preventing armed mayhem, [wa]s an important governmental objective" and that "[b]oth logic and data establish[ed] a substantial relation between § 922(g)(9) and this objective."  Id. at 642.

The initial question we must address is whether intermediate scrutiny is also appropriate for the statute challenged by Reese.  To be sure, § 922(g)(8) is arguably more restrictive than § 922(k), the statute at issue in Marzzarella, in that it prohibits the possession of all types of firearms.  On the other hand, however, § 922(g)(8) is less restrictive than § 922(k) in that it applies only to a narrow class of persons, rather than to the public at large.  And, in that regard, § 922(g)(8) is substantially similar to § 922(g)(9), the statute at issue in Skoien.  Specifically,

19

both statutes prohibit the possession of firearms by narrow classes of persons

who, based on their past behavior, are more likely to engage in domestic violence.

Based upon these characteristics, we conclude that § 922(g)(8), like the statutes at

issue in Marzzarella and Skoien, is subject to intermediate scrutiny.

"To pass constitutional muster under intermediate scrutiny, the government

has the burden of demonstrating that its objective is an important one and that its

objective is advanced by means substantially related to that objective."  United

States v. Williams, 616 F.3d 685, 692 (7th Cir. 2010).  Here, the government

asserts that the objective of § 922(g)(8) is to keep firearms out of the hands "of

people who have been judicially determined to pose a credible threat to the

physical safety of a family member, or who have been ordered not to use, attempt

to use, or threaten to use physical force against an intimate partner or child that

would reasonably be expected to cause bodily injury," Aplt. Br. at 21, because

"[s]uch persons undeniably pose a heightened danger of misusing firearms," id. at

21-22.  Reese does not seriously dispute the assertion.  Moreover, the Seventh

Circuit's decision in Skoien, though focused on § 922(g)(9) rather than §

922(g)(8), points to evidence that is highly relevant to, and supportive of, the

government's assertion that the restriction imposed by § 922(g)(8) is substantially

related to an important government objective:

> That firearms cause injury or death in domestic situations also has
> been established.  Domestic assaults with firearms are approximately
> twelve times more likely to end in the victim's death than are

20

assaults by knives or fists.  Linda E. Saltzman, James A. Mercy, Patrick W. O'Carroll, Mark L. Rosenberg & Philip H. Rhodes, Weapon Involvement and Injury Outcomes in Family and Intimate Assaults, 267 J. Am. Medical Ass'n 3043 (1992).  Part of this effect stems from the fact that some would-be abusers go buy a gun, see Susan B. Sorenson & Douglas J. Wiebe, Weapons in the Lives of Battered Women, 94 Am. J. Pub. Health 1412 (2004), and much from the fact that guns are more lethal than knives and clubs once an attack begins.  See [Franklin E. Zimring, Firearms, Violence, and the Potential Impact of Firearms Control, 32 J.L. Med. & Ethics 34 (2004) (collecting studies)].  The presence of a gun in the home of a convicted domestic abuser is "strongly and independently associated with an increased risk of homicide."  Arthur L. Kellermann, et al., Gun Ownership as a Risk Factor for Homicide in the Home, 329 New England J. Medicine 1084, 1087 (1993).  See also, e.g., Jacquelyn C. Campbell, et al., Risk Factors for Femicide in Abusive Relationships: Results from a Multisite Case Control Study, 93 Am. J. Pub. Health 1089, 1090 (2003); James E. Bailey, et al., Risk Factors for Violent Death of Women in the Home, 157 Archives of Internal Medicine 777 (1997); Douglas J. Wiebe, Homicide and Suicide Risks Associated with Firearms in the Home: A National Case-Control Study, 41 Annals of Emergency Medicine 771 (2003).  And for this purpose the victims include police as well as spouses, children, and intimate partners.  Responding to a domestic-disturbance call is among an officer's most risky duties.  Approximately 8% of officers' fatalities from illegal conduct during 1999 through 2008 arose from attempts to control domestic disturbances.  FBI, Law Enforcement Officers Killed and Assaulted 2008 Table 19 (2009).

    Finally, the recidivism rate is high, implying that there are substantial benefits in keeping the most deadly weapons out of the hands of domestic abusers.  For example, a study of persons arrested for misdemeanor domestic violence in Cincinnati concluded that 17% of those who remained in the area were arrested again for domestic violence within three years.  John Wooldredge & Amy Thistlethwaite, Reconsidering Domestic Violence Recidivism: Individual and Contextual Effects of Court Dispositions and Stake in Conformity vi (1999).  The full recidivism rate includes violence that does not lead to an arrest.  Estimates of this rate come from survey research and range from 40% to 80% "when victims are followed longitudinally and interviewed directly."  Carla Smith Stover,

> Domestic Violence Research, 20 J. Interpersonal Violence 448, 450
> (2005).  See also Julia C. Babcock, et al., Does Batterers' Treatment
> Work? A Meta-Analytic Review of Domestic Violence Treatment, 23
> Clinical Psychology Rev. 1023, 1039 (2004) (estimating a 35%
> recidivism rate based on partners' reports).  Skoien cites, as if it were
> favorable, a study showing that within three years of conviction 48%
> of domestic abusers "suspended" their abusive conduct-which means
> that the other 52% did not, and that even the 48% may have
> committed new crimes within three years after conviction.  John H.
> Laub & Robert J. Sampson, Understanding Desistance from Crime,
> 28 Crime & Justice 1, 31 (2001).  No matter how you slice these
> numbers, people convicted of domestic violence remain dangerous to
> their spouses and partners.

614 F.3d at 643-44.

Our next task is to "determine whether § 922(g)([8]) is substantially related

to this objective in [Reese]'s case."  Williams, 616 F.3d at 693.  As to this

question, the government asserts that Reese cannot "demonstrate that he belongs

to a severable subcategory of persons as to whom the statute is unconstitutional."

Aplt. Br. at 34.  More specifically, the government asserts that Reese is subject to

a protective order that undisputedly satisfies the requirements of § 922(g)(8),

including "the procedural protections specified by Congress," id. at 35, and Reese

is precluded from collaterally attacking, in the context of this federal criminal

proceeding, the merits or validity of the underlying protective order.

We agree with the government.  It is undisputed that Reese is subject to a

protective order issued by the Hawaii Family Court and that the protective order

satisfies the requirements of § 922(g)(8) because (a) it was issued after a hearing

for which Reese received actual notice and in which Reese had an opportunity to

participate, (b) it restrains Reese from harassing, stalking, or threatening Jennifer

or their minor children, and (c) by its terms it explicitly prohibits the use,

attempted use, or threatened use of physical force against Jennifer or their minor

children.  See 18 U.S.C. § 922(g)(8)(A), (B), and (C)(ii).  Although there was no

underlying finding by the Hawaii Family Court regarding the legitimacy of

Jennifer's allegations of past abuse and, in turn, no factual "finding that [Reese]

represent[ed] a credible threat to the physical safety of" Jennifer or their minor

children, id. § 922(g)(8)(C)(i), no such findings were necessary for § 922(g)(8) to

apply to Reese because the protective order explicitly prohibited the use,

attempted use, or threatened use of physical force against Jennifer and their minor

children, id. § 922(g)(8)(C)(ii).  See United States v. Emerson, 270 F.3d 203,

213-14 (5th Cir. 2001) ("If the requirements of [§] 922(g)(8)(A) and (B) are

fulfilled, then by its terms [§] 922(g)'s firearms disability attaches if *either* clause

(C)(i) *or* clause (C)(ii) applies.").  Moreover, no such findings were necessary

because Reese agreed, during the hearing on Jennifer's motion for protective

order, to the imposition of the protective order.[3]  We thus conclude that the

---

[3] By agreeing to the imposition of the protective order, Reese arguably waived his Second Amendment rights, since the order expressly prohibited him from possessing firearms and indeed required him to turn over any firearms and ammunition to Hawaii law enforcement officials.  Moreover, it is clear from the record that Reese was well aware of the restrictions placed on him by the protective order as well as the impact of that protective order under federal firearms laws.

prosecution of Reese under § 922(g)(8) is consistent with the government's intended purpose in implementing that statute.[4]

The government is also correct in noting that the overwhelming weight of federal case law precludes a defendant in a § 922(g)(8) prosecution from mounting a collateral attack on the merits of the underlying state protective order. Although not every circuit has expressly addressed the question, every circuit that has done so has agreed "that protective orders satisfying the Section 922(g)(8) requirements are analogous to felony convictions for the purposes of the statute's restraint on the possession of firearms" and that, consequently, a defendant may not challenge the validity of the underlying state court protective order in a § 922(g)(8) prosecution.  United States v. DuBose, 598 F.3d 726, 733 (11th Cir. 2010); see United States v. Wescott, 576 F.3d 347, 354 (7th Cir. 2009); United States v. Arledge, 220 F. App'x 864, 867 (10th Cir. 2007)[5]; United States v. Young, 458 F.3d 998, 1005 (9th Cir. 2006); United States v. Hicks, 389 F.3d 514,

---

[4] Even if we were to apply a strict scrutiny test requiring the government to prove that § 922(g)(8) is narrowly tailored to further a compelling interest, see Federal Election Comm'n v. Wis. Right To Life, Inc., 551 U.S. 449, 476 (2007), we are persuaded, for essentially the reasons outlined above, that the government could satisfy these requirements.  In particular, the government's interest in preventing armed domestic violence is compelling and the specific requirements outlined in § 922(g)(8) are narrowly tailored to ensure that only persons subject to specific types of domestic protection orders are subject to restrictions on their Second Amendment rights.

[5] We have not, to date, issued a published decision reaching this conclusion.

534 (5th Cir. 2004); United States v. Baker, 197 F.3d 211, 216-17 (6th Cir. 1999);

Emerson, 270 F.3d at 263-64; see also Seling v. Young, 531 U.S. 250, 263-64

(2001) ("Permitting respondent's as-applied challenge would invite an end run

around the Washington Supreme Court's decision that the Act is civil in

circumstances where a direct attack on that decision is not before this Court.");

Lewis v. United States, 445 U.S. 55, 60-61 (1980) (holding that, under the plain

meaning of the federal statute prohibiting felons from possessing firearms, "the

fact of a felony conviction imposes a firearm disability until the conviction is

vacated or the felon is relieved of his disability by some affirmative action").

Although Reese argued below, and the district court agreed, that the

underlying protective order in this case was infirm due to its purported fifty-year

length and because Reese no longer presented a legitimate threat to Jennifer due

to the significant distance between their current residences, those concerns are

simply not relevant in these federal criminal proceedings, even for purposes of

considering Reese's as-applied challenge to § 922(g)(8).  Instead, any such

challenges could and should have been raised by Reese in the Hawaii Family

Court.

As for the district court's as-applied analysis, the court erred in focusing on

the underlying protective order issued by the Hawaii Family Court instead of the

challenged federal statute.  For the reasons explained above, it was improper for

the district court to engage in what was effectively a collateral review of the

protective order.  Moreover, the district court made no attempt to engage in the type of scrutiny that is typically considered in as-applied challenges to federal laws.  Thus, the district court's order granting Reese's motion to dismiss the indictment must be reversed and the case remanded for further proceedings, i.e., to allow Reese's prosecution under the indictment.

REVERSED and REMANDED for further proceedings.