**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 10-cv-02408-RPM

TAB BONIDY, and
NATIONAL ASSOCIATION FOR GUN RIGHTS,

      Plaintiffs,

      v.

UNITED STATES POSTAL SERVICE,
PATRICK DONAHOE, Postmaster General, and
MICHAEL KERVIN, Acting Postmaster, Avon, Colorado,

      Defendants.[1]

---

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[2]**

---

[1] On September 5, 2012, the Court ordered the dismissal of Debbie Bonidy's claims with prejudice, pursuant to the Stipulation of Dismissal of Debbie Bonidy's Claims filed on September 4, 2012. Furthermore, effective September 1, 2012, Michael Kervin assumed the position of Acting Postmaster of Avon, Colorado. Accordingly, Mr. Kervin is automatically substituted for Mr. Ruehle as defendant in this case pursuant to Federal Rule of Civil Procedure 25(d). Defendants have amended the case caption to reflect these two changes.

[2] After consulting with plaintiffs' counsel, defendants are filing this document (and attachments) as a Level 1 restricted document to allow plaintiffs an opportunity to file a motion to restrict public access. Pursuant to Local Civil Rule 7.2(D), if no motion to restrict access is filed within fourteen days, the filing will be open to public inspection. Defendants reserve the right to oppose any such motion.

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND .............................................. 3

STATEMENT OF UNDISPUTED FACTS ................................................................. 6

       A.      The United States Postal Inspection Service ............................... 6

       B.      The Postal Service's Commitment to a Violence-Free Workplace ........... 7

       C.      United States Postal Service Property and Functions ................................. 9

       D.      Criminal Activity and Violence Targeting Postal Property
              and Personnel ......................................................................................... 11

       E.      Avon, Colorado Post Office ..................................................................... 14

       F.      The Bonidys ............................................................................................ 15

PROCEDURAL BACKGROUND............................................................................. 17

STANDARD OF REVIEW ...................................................................................... 18

ARGUMENT ......................................................................................................... 18

   I.     THE SECOND AMENDMENT RIGHT TO BEAR ARMS ............................. 18

       A.      District of Columbia v. Heller, 554 U.S. 570 (2008)................................. 18

       B.      United States v. Reese, 627 F.3d 792 (10th Cir. 2010) ............................. 19

   II.    THE USPS REGULATION DOES NOT BURDEN CONDUCT
        PROTECTED BY THE SECOND AMENDMENT. ........................................... 21

       A.      The USPS Regulation Comports With Historical Understandings
              of the Second Amendment Right. ............................................................. 21

       B.      The Second Amendment Does Not Protect a Right to Possess
              Firearms in Sensitive Places. ................................................................... 25

       C.      United States Postal Service Property, Including Post Office
              Parking Lots, Is a Sensitive Place Under Heller. ...................................... 27

i

D.   To the Extent the USPS Regulation Imposes a Burden on a Constitutionally-Protected Right, Any Such Burden Is Minimal and Does Not Warrant Heightened Scrutiny. ........................................... 32

III.   EVEN IF THE USPS REGULATION IMPLICATES PLAINTIFFS' SECOND AMENDMENT RIGHT, IT IS CONSTITUTIONAL. ....................... 36

A.   The USPS Regulation Is a Permissible Regulation Enacted by the Postal Service As the Proprietor of Postal Property. ......................... 36

B.   Even If Heightened Scrutiny Were Applicable, Intermediate Scutiny Would Be the Appropriate Level of Review .............................. 39

C.   The USPS Regulation Is Substantially Related to an Important Governmental Objective. .......................................................... 42

1.   Intermediate Scrutiny Review ........................................... 42

2.   The Fit Between the USPS Regulation and the Postal Service's Important Objectives Satisfies Heightened Review. .......... 44

3.   The Fact that the Bonidys Have Concealed Carry Permits Has No Bearing on the Constitutional Analysis. ...................................... 46

CONCLUSION ..................................................................................... 50

Defendants, the United States Postal Service ("Postal Service" or "USPS"), Postmaster General Patrick R. Donahoe, and Avon, Colorado Acting Postmaster Michael Kervin (collectively, "Postal Service" or "defendants"), by undersigned counsel, hereby move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## INTRODUCTION

Like many other federal agencies, the Postal Service has long prohibited firearms and explosives on its property pursuant to its constitutional and statutory authority as property owner. See 39 C.F.R. § 232.1(*l*) ("USPS regulation") (prohibiting carrying and storage of firearms, dangerous or deadly weapons, and explosives on postal property).  This regulation in its current form dates back to the statutory creation of the modern United States Postal Service in the early 1970s.  The regulation applies uniformly to all persons on Postal Service property – customers and employees alike.  As the Nation's third-largest employer, the Postal Service has a firm and longstanding commitment to providing a violence-free workplace, and the USPS regulation is an important part of that commitment.  The uniform prohibition against firearms on Postal Service property is also a critical part of the risk management and violence prevention strategy relied on by the United States Postal Inspection Service, the law enforcement entity within the Postal Service responsible for safeguarding the entire United States postal system, including the 645,000 employees who process and deliver the mail and the millions of customers who use it.

Plaintiffs contend that the USPS regulation violates their Second Amendment right to keep and bear arms because they wish to arm themselves when they visit their local Post Office in Avon, Colorado and park in the adjacent customer parking lot owned and operated by the Postal Service.  However, plaintiffs' contention fails under both parts of the two-prong test adopted by the Tenth Circuit for addressing Second Amendment challenges to federal firearms

1

restrictions in <u>United States v. Reese</u>, 627 F.3d 792 (10th Cir. 2010).  First, the USPS regulation does not burden conduct falling within the scope of the Second Amendment's guarantee.  Since the Founding era, the right to keep and bear arms has never been understood as an absolute or unlimited right.  Rather, reasonable time, place, and manner restrictions on firearm possession and use in the interest of public safety have always been seen as compatible with a robust Second Amendment right.  The Supreme Court made clear in <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008), that – however far the Second Amendment right extends – it does not extend to sensitive places such as government property.  For the numerous reasons detailed herein, United States Postal Service property is a "sensitive place" under <u>Heller</u>, and therefore the USPS regulation is presumptively lawful.

Even if the Court were to determine that the regulation does burden conduct within the scope of the Second Amendment's guarantee, the regulation easily passes constitutional muster under the second prong of the Tenth Circuit's two-part test.  As an initial matter, consistent with Supreme Court precedent, any burden imposed by the USPS regulation on a constitutionally-protected interest is so minimal that this Court need not engage in heightened constitutional scrutiny to uphold the law.  But even if the Court engages in such review, the USPS regulation easily survives the "reasonableness" test employed by courts reviewing regulations enacted by the government in its capacity as proprietor of government property, or even the somewhat more stringent intermediate scrutiny test employed by the Tenth Circuit and numerous other courts evaluating other kinds of firearms regulations.  Because the USPS regulation is sufficiently tailored to the compelling government interest in protecting public safety and preventing firearm violence on Postal Service property, the regulation passes muster under any applicable standard. The Court should therefore enter summary judgment for defendants.

## STATUTORY AND REGULATORY BACKGROUND

The United States Constitution authorizes Congress "To establish Post Offices and post Roads[.]" U.S. Const., art. I, § 8, cl. 7. This power "embraced the regulation of the entire postal system of the country." Ex Parte Rapier, 143 U.S. 110, 113 (1892). While Congress was tasked with "furnish[ing] mail facilities for the people of the United States, it is also true that mail facilities are not required to be furnished for every purpose." Id. The Constitution further provides that Congress "shall have the Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States. . . ." U.S. Const. art. IV, § 3 cl. 2.

Congress has prescribed the "general powers" of the Postal Service, including the power "to adopt, amend, and repeal such rules and regulations as it deems necessary to accomplish the objectives [of title 39]." 39 U.S.C. § 401(2). For example, Congress has mandated that the Postal Service shall "provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people . . . [and] provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities." 39 U.S.C. § 101(a); see also id. § 403(a) ("The Postal Service shall . . . provide adequate and efficient postal services at fair and reasonable rates and fees."). To fulfill these mandates, the Postal Service is charged with maintaining "an efficient system of collection, sorting, and delivery of the mail nationwide" and "establish[ing] and maintain[ing] postal facilities of such character and in such locations, that postal patrons throughout the Nation will, consistent with reasonable economies of postal operations, have ready access to essential postal services." Id. § 403(b).

In addition to its general regulatory authority, Congress has authorized the Postal Service to "prescribe regulations necessary for the protection and administration of property owned or occupied by the Postal Service and persons on the property" and to "include reasonable penalties . . . for violations of the regulations." 18 U.S.C. § 3061(c)(4)(A). This authority is delegated to the Chief Postal Inspector, who issues instructions and regulations for security requirements within the Postal Service. See 39 C.F.R. § 231.1(b). The Postal Service has promulgated regulations governing conduct on postal property, which apply to "all real property under the charge and control of the Postal Service, to all tenant agencies, and to all persons entering in or on such property." 39 C.F.R. § 232.1(a). The Conduct on Postal Property regulations were enacted in their current form in 1972, following the statutory creation of the Postal Service in 1971. 37 Fed. Reg. 24346 (Nov. 16, 1972). The regulations have been amended several times since their enactment, most recently on December 17, 2010. 75 Fed. Reg. 78915 (Dec. 17, 2010).

The provision challenged by plaintiffs states:

> Weapons and explosives. Notwithstanding the provisions of any other law, rule or regulation, no person while on postal property may carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, or store the same on postal property, except for official purposes.

39 C.F.R. § 232.1(*l*).[3] This provision has existed in substantially similar form since 1972. The conduct regulations further provide: "Whoever shall be found guilty of violating the rules and

---

[3] The Conduct on Postal Property regulations also prohibit or restrict, among other things: "[i]mproperly disposing of rubbish, spitting, creating any hazard to persons or things, throwing articles of any kind from a building, climbing upon the roof or any part of a building, or willfully destroying, damaging, or removing any property or any part thereof. . . ." 39 C.F.R. § 232.1(c). The regulations also prohibit on postal premises: "[t]he possession, sale, or use of any 'controlled substance' (except when permitted by law)," id. § 232.1(g)(1); "the sale or use of any alcoholic beverage," id.; smoking, id. § 232.1(g)(2); gambling, id. § 232.1(f); and "[d]ogs and other animals, except those used to assist persons with disabilities. . . ." Id. § 232.1(j).

regulations in this section while on property under the charge and control of the Postal Service is subject to a fine as provided in 18 U.S.C. 3571 or imprisonment of not more than 30 days, or both." Id. § 232.1(p)(2).[4]

This regulation applies uniformly to customers and Postal Service employees, except for trained Postal Inspectors or Postal Service Security Force personnel carrying agency-issued firearms for official purposes. Id. § 232.1(*l*); Declaration of Keith Milke ("Milke Decl.") ¶¶ 11, 44 (attached as Ex. A-1); Declaration of Dean J. Granholm ("Granholm Decl.") ¶¶ 13, 17 (attached as Ex. A-2).

---

[4] In addition to this Postal Service-specific authority, federal law generally prohibits knowing possession of a firearm or other dangerous weapon in a federal facility. See 18 U.S.C. § 930(a). Federal law also prohibits the possession of a firearm "in a Federal court facility," id. § 930(e)(1), and permits federal courts to "regulat[e], restrict[], or prohibit[] the possession of weapons within any building housing such court or any of its proceedings, or upon any grounds appurtenant to such building." Id. § 930(f). Numerous departments and agencies throughout the Federal Government have promulgated firearms and weapons restrictions that are similar to the USPS regulation. See, e.g., 31 C.F.R. § 407.13 (Department of Treasury) ("No person while on the property shall carry firearms, or other dangerous or deadly weapons, or explosives, either openly or concealed, except for official purposes."); 38 C.F.R. § 1.218(a)(13) (Department of Veterans Affairs) ("No person while on property shall carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, except for official purposes."); 32 C.F.R. §§ 1903.1, 1903.10 (Central Intelligence Agency) (prohibiting "[k]nowingly possessing or causing to be present a weapon on an Agency installation," including "incident to hunting or other lawful purposes," defined as "property within the Agency Headquarters Compound and the property controlled and occupied by the Federal Highway Administration located immediately adjacent to such Compound, and property within any other Agency installation and protected property (i.e., property owned, leased, or otherwise controlled by the Central Intelligence Agency)"); 32 C.F.R. §§ 234.1, 234.10 (Department of Defense) (prohibiting "possessing, carrying, or using" a weapon while on the "Pentagon Reservation," defined as "Area of land and improvements thereon . . . includ[ing] all roadways, walkways, waterways, and all areas designated for the parking of vehicles"); 36 C.F.R. § 504.14 (Smithsonian Institution Building and Grounds) ("No person while on the premises shall carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, except for official purposes."); 36 C.F.R. § 702.7 (Library of Congress) ("Except where duly authorized by law, and in the performance of law enforcement functions, no person shall carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, while on the premises.").

## STATEMENT OF UNDISPUTED FACTS[5]

**A.     The United States Postal Inspection Service**

1.      The Postal Inspection Service is a federal law enforcement, crime prevention, and security agency within the United States Postal Service responsible for safeguarding every element of the postal system, including the 645,000 postal employees who process and deliver the mail and the millions of customers who use it.  Milke Decl. ¶ 5.

2.      The Inspection Service is tasked with protecting Postal Service property, employees, and customers from criminal attack, securing the nation's mail system from criminal misuse, and working to ensure public trust in the mail.  Id. & Ex. Milke-2.  (Pub. 278, U.S. Postal Inspection Service:  A Guide for the U.S. Congress (Feb. 2008)).

3.      In addition, the Inspection Service is tasked with ensuring the physical safety and security of all Postal Service property; conducting thorough personnel security clearances for all Postal Service employees and contractors; investigating and mitigating threats to Postal Service employees; and ensuring a violence-free workplace.  Milke Decl. ¶ 7.

4.      Postal Inspectors enforce more than 200 federal laws involving the criminal use of the U.S. Mail, postal system, and personnel, including robbery; mail fraud; mail theft; obstruction or delay; destruction of authorized mail depositories; and assaults on clerks or carriers.  See 18 U.S.C. Part I, Ch. 83; Milke Decl. ¶ 6.

5.      The Postal Inspection Service also maintains a Security Force staffed by approximately 700 uniformed Postal Police Officers ("PPOs") assigned to critical postal facilities throughout the country.  Id. ¶ 8.

---

[5] These paragraphs are referenced below as "SOF ¶ __."

6.      Postal Inspectors and PPOs are authorized to carry agency-issued firearms while officially employed pursuant to 18 U.S.C. § 3061(c)(2).  Id. ¶ 11.  Internal policy provides that PPOs may only carry Inspection Service-owned firearms and only while performing their official duties.  Id. ¶¶ 11, 44.  Both Inspectors and PPOs are required to undergo annual threat management training and to qualify twice yearly in firearms handling.  Id. ¶ 11.  Threat management training includes firearms, defensive tactics, and officer survival courses.  Id.

**B.      The Postal Service's Commitment to a Violence-Free Workplace**

7.      As one of the nation's largest employers, the Postal Service has long been committed to achieving a violence-free workplace through comprehensive policies, preventative measures, and threat management strategies.  Id. ¶ 13 & Ex. Milke-11 (Publication 108, Threat Assessment Team Guide (June 2011)).

8.      In response to multiple incidences of firearm violence at Postal Service facilities, the Postal Service announced in 1995 its unequivocal and pronounced opposition to all forms of violent behavior, including those involving firearms:  "In order to ensure the effective and uniform application of [the firearm] prohibition, the bringing, storing or in any way possessing of a firearm within postal installations is cause for immediate removal from postal employment without regard to past record or other elements of progressive discipline."  Milke Decl. ¶ 12 & Ex. Milke-3 (Policy Statement on Firearms in the Workplace, Postal Bulletin 21900 (Aug. 17, 1995)) at 1.

9.      The Postal Service thereafter commissioned a report on workplace violence, which was the most comprehensive survey ever conducted of workplace violence in the United States.  Milke Decl. ¶ 12 & Ex. Milke-4 (National Center on Addiction and Substance Abuse at Columbia University, *Report of the United States Postal Service Commission on a Safe and*

7

*Secure Workplace* (Aug. 2000)).  This study included an intensive examination of every workplace homicide between 1986 and 2000 in which postal employees were perpetrators or victims.  Id.  The Commission found firearms to be a pervasive presence in workplace homicides by both employees and non-employees.  Id.  Firearms were used in all Postal Service homicides with multiple victims, and the Commission concluded that "the widespread use of guns made some attacks—especially those with multiple victims—more deadly."  Id.  Based on its findings, the Commission's Report made policy recommendations which have since been implemented by the Postal Service, including strategies for identifying and managing threats.  Id.

10.     The prohibition on firearms on postal property is a critical component of the Postal Service's risk-management and violence prevention strategies.  Milke Decl. ¶ 13.  The Postal Service has a policy of Zero Tolerance for violence by or against its employees.  Id. ¶¶ 13, 35 & Ex. Milke-5 (Publication 45, Achieving a Violence-Free Workplace Together:  Workplace Violence Prevention Program (Nov. 2011)).  Under this policy, every act or threat of violence, regardless of the initiator, elicits an immediate and firm response, including removal from Postal Service employment (if applicable), as well as arrest and criminal prosecution.  Milke Decl. ¶ 35.

11.     Through the Workplace Violence Prevention Program, the Postal Service provides its employees with tools and resources essential to teach prevention and response measures to deal with threats.  Id.  Postal Inspectors conduct "stand up talks" for employees at postal facilities, and produced a training video entitled "Workplace Violence: Stop It Before It Happens," that reinforces steps employees can take to resolve conflicts before they escalate to violence.  Id.  The Postal Service provides training for managers and supervisors in workplace violence awareness.  Id. & Ex. Milke-11 at 2.

8

12.     The Postal Service has established Threat Assessment Teams ("TATs") at each postal district, which include Postal Inspectors and other postal employees.  Milke Decl. ¶ 36.  A TAT's goals are to identify individuals who have shown signs of violence toward others in the workplace or toward themselves, or who have committed acts of physical violence; to assess the risk posed by the overall circumstances of the threatening words or actions; to manage any reported incidents to reduce risk to employees, customers, and the organization; to contribute toward a safe workplace for all postal employees; and to help reduce incidents of inappropriate behavior and resolve conflicts.  Id.

13.     The presence of or access to firearms is a critical factor that the Inspection Service considers in assessing the credibility of threats, both from within the Postal Service (i.e., employees) and from outside sources.  Id. ¶¶ 37, 42 & Ex. Milke-11 at Ex. 2-6a (Risk Indicators), 3-2.2 (Priority Risk Scale).

**C.     United States Postal Service Property and Functions**

14.     The Postal Service has approximately 32,000 retail and delivery facilities throughout the United States.  Milke Decl. ¶ 5.

15.     Many of these facilities are co-located with other federal, state, and local government entities, including United States Courthouses.  Declaration of Gabriel Benvenuto ("Benvenuto Decl.") ¶ 2 (attached as Ex. A-3) & Ex. Benvenuto-1.  Of the real property owned by the Postal Service, 94 buildings are leased to other entities of the United States Government, which are occupied, in turn, by a total of 229 federal tenant entities.  Id.  These include: Congress, the Administrative Office of the United States Courts, United States Marshals Service, Department of Justice (including, among other components, Federal Bureau of Investigation, Bureau of Alcohol Tobacco, Firearms & Explosives, Drug Enforcement Administration,

Executive Office of United States Attorneys), Department of Homeland Security, Internal Revenue Service, and Social Security Administration.  Id.  The Postal Service leases an additional 66 buildings to state, county, and local government tenants.  Id.

16.     In addition, the Postal Service leases from the General Services Administration and the Department of Defense more than 4 million square feet of property in a total of 300 federal buildings.  Declaration of Marion Reader ("Reader Decl.") (attached as Ex. A-4) ¶ 2 & Ex. Reader-1.

17.     Some Postal Service facilities are in areas with a high crime rate and some are not.  Granholm Decl. ¶ 9.  Some have customer parking lots and some do not.  Id. ¶ 10.  Some of those with parking lots have drop boxes where customers can deposit mail from their vehicle or on foot without entering the Post Office.  Id.  Some Post Offices utilize mobile retail vans in the customer parking lot, where regular retail operations have been disrupted due to natural disasters or renovations.  Id.

18.     In addition to the standard postal business of mailing and receiving packages and letters, the Postal Service provides a variety of services to other federal government agencies pursuant to inter-agency agreements.  Id. ¶ 11.  For example, the Postal Service accepts passport applications through an agreement with the U.S. State Department, accepts Selective Service registrations through an agreement with the Selective Service System, and acts as a depository for burial flags pursuant to an agreement with the Department of Veterans Affairs.  Id.

19.     Post Offices also provide a variety of other services to the public, including conducting voter registration and issuing United States government-guaranteed money orders.  Id. ¶ 12.  Through the issuance of domestic money orders, as well as international money orders and the electronic transfer of money to certain Latin American countries, Post Offices provide a

valuable service to the "unbanked" – i.e., people without a banking relationship who rely on non-bank check cashers or money transfer services.  Id.

**D.      Criminal Activity and Violence Targeting Postal Property and Personnel**

20.      The U.S. Mail and Postal Service property are frequent targets of unlawful activity, including mail theft, mail fraud, mailing suspicious or prohibited items (including narcotics and firearms), robbery, burglary, and money laundering.  Milke Decl. ¶ 16.  Criminals target the United States Postal Service because of the valuable information and property contained in or transmitted through the mail.  Id.

21.      In 2010, for example, the Inspection Service initiated over 6,000 criminal investigations and arrested over 6,000 suspects for crimes against the Postal Service or involving the U.S. Mail, including 2,275 arrests for mail theft, 508 investigations of assaults and threats, 1,075 investigations involving the mailing of controlled substances and drug-related proceeds, 75 investigations of robberies, 129 investigations of burglaries, and 68 investigations of vandalism and arson.  Id. ¶ 17.  In addition, in 2010, the Postal Inspection Service engaged in revenue-protection efforts identifying over $110 million in postal revenue losses.  Id.

22.      The Postal Service delivered more than 177 billion pieces of mail in 2010.  Id. ¶ 22.  Because valuable goods and information are often sent through the Postal Service, mail theft is a significant problem.  Id.

23.      Robbers and burglars generally target mail containing valuables, including financial information, checks, jewelry, illegal drugs, cash, money orders, and stamps.  Id. ¶¶ 19, 20.  In one example, in January 2010, two armed suspects robbed a postal truck driver after he arrived at a postal station in Cambridge, Massachusetts.  Id. ¶ 19.  The Inspection Service identified three suspects who were planning another robbery at the nearby Charlestown,

Massachusetts Post Office.  Id.  After conducting surveillance at the Charlestown Post Office,

Inspectors arrested the three individuals, seizing weapons and narcotics, and the case was

referred for federal prosecution.  Id.

24.     Robberies can and do occur in Post Office parking lots; in some instances

customers returning to their vehicles with valuables obtained through the U.S. Mail or retail

postal services may be subject to predation from armed perpetrators surveilling the lot from their

vehicles.  Id. ¶ 48.  This occurred in several recent incidents.  Id.

25.     Narcotics traffickers and dealers often use the U.S. Mail to engage in illicit drug-

related activities.  Id. ¶ 23.  The Inspection Service interdicts mailings of illegal drugs and drug

proceeds and investigates organized narcotic distribution groups to protect postal employees and

customers from the violence related to drug trafficking.  Id. & Ex. Milke-7 & Milke-8 (U.S.

Postal Inspection Service Press Release, *Postal Inspectors Cause 'Dis-Comfort' in Southern*

*Texas* (June 25, 2009); Department of Justice, U.S. Attorney's Office Southern District of Texas,

Press Release, *Sending Parcels of Marijuana Through U.S. Mail Results in Prison Term for*

*Three* (Sept. 21, 2010)).

26.     Postal Inspectors work with numerous other federal agencies, including the

Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the Federal Bureau of

Investigation (FBI), and the Drug Enforcement Administration (DEA) as part of the Organized

Crime Drug Enforcement Task Force to identify, disrupt, and dismantle drug-trafficking rings

and related money laundering activities.  Id. & Ex. Milke-9 (U.S. DEA, Domestic Field Division,

Dallas, Press Release, *Participants in Major Marijuana, Money Laundering Operations Between*

*North Texas and U.S. Virgin Islands Arrested* (April 12, 2012)).  In FY 2011, Inspectors, along

with their law enforcement partners, made 1,327 drug trafficking arrests, and seized from the

mail 31,000 pounds of illegal narcotics and over $14.6 million in drug trafficking proceeds. Milke Decl. ¶ 23.

27.     Postal Service parking lots have become sites for criminal activity due to the increased use of the U.S. Mail to conduct drug trafficking and the ability of criminals to track movements of shipments and target letter carriers departing for delivery.  Milke Decl. ¶ 49 & Ex. Milke-12 (John Ingold, *Colorado Post Offices See Increase in Marijuana Packages*, <u>Denver Post</u> (Feb. 28, 2012)).

28.     The United States Postal Service has a history of firearm violence on Postal property and involving Postal Service employees.  Milke Decl. ¶¶ 12-15.

29.     While the Postal Service has implemented many policies to minimize incidents of violence on its property, there continue to be homicides and other violent crimes occurring on postal property and targeting postal employees.  <u>Id.</u> ¶¶ 13-15.

30.     For example, in 2010, two Postal Service employees were killed during a botched robbery of the Henning, Tennessee Post Office.  <u>Id.</u> ¶ 13.  The investigation revealed that a non-employee father and son shot the Postal Service employees out of anger at the limited amount of postal funds to steal.  <u>Id.</u>

31.     Postal Service contractors have also been victims of gun violence, including a Highway Contract Route driver who was shot and killed while loading mail on the back dock of the Camp Hill, Alabama Post Office during the robbery of postal funds in 2009.  <u>Id.</u>

32.     In addition, there have been other incidents involving unlawful use of weapons on postal property over the last several years, including armed robberies, suicides, and other shootings.  <u>Id.</u> ¶ 14.  These incidents have occurred both inside Post Office buildings and

elsewhere on postal property, and they have involved non-employee customers and passersby.

Id.

### E.    Avon, Colorado Post Office

33.    The Avon, Colorado Post Office contains 10,000 Post Office Boxes, with approximately 6,500 currently active.  Ex. A-5 (Defendants' Objections and Responses to Plaintiffs' First Set of Interrogatories) ("Defendants' Interrogatory Responses") at 9.

34.    Qualifying postal customers residing in Avon are entitled to a Post Office box free of charge because the Postal Service does not deliver to residences or most businesses in Avon.  Deposition of Steven Ruehle, March 27, 2012 ("Ruehle Depo.") at 16-17 (relevant portions attached as Ex. A-6); United States Postal Service Domestic Mail Manual ("DMM"), Section 508, 4.6.2-4.6.3 (relevant portions attached as Ex. A-7).

35.    The Avon Post Office has an average of approximately 500 window customers a day, in addition to individuals picking up their mail from the Post Office boxes.  Defendants' Interrogatory Responses at 9.

36.    The Avon Post Office has an adjacent parking lot that is owned and operated by the Postal Service.  Id. at 10.  The lot has 57 spaces, which are for use by Post Office patrons only, as indicated by the sign posted at the front of the parking lot that states:  "US POSTAL PROPERTY / 30 MINUTE PARKING / VIOLATORS WILL BE TOWED AT OWNERS EXPENSE."   Id.  See also 39 C.F.R. § 232.1(k)(5) ("Parking without authority, parking in unauthorized locations or in locations reserved for other persons, or continuously in excess of 18 hours without permission, or contrary to the directions of posted signs is prohibited.  This section may be supplemented by the postmaster or installation head from time to time by the issuance and posting of specific traffic directives as may be required.  When so issued and

posted such directives shall have the same force and effect as if made a part hereof."). The public entrance to the Avon Post Office is adjacent to the parking lot. Ruehle Depo. at 47, 53.

37.     The Avon Post Office offers drive-through service for depositing mail through receptacles located in the parking lot. Id. at 65.

**F.     The Bonidys**

38.     Mr. and Mrs. Bonidy are residents of Avon, Colorado and have a Post Office box at the Avon Post Office. Ex. A-8 (Deposition of Thomas A. Bonidy, Mar. 28, 2012) ("Tab Bonidy Depo.") at 48-49; Ex. A-9 (Deposition of Deborah Bonidy, Mar. 29, 2012) ("Debbie Bonidy Depo.") at 72.

39.     Mr. and Mrs. Bonidy rarely visit the Avon Post Office, as Mr. Bonidy's employee picks up their mail on a regular basis. See Tab Bonidy Depo. at 50-52, 150-51; Debbie Bonidy Depo. at 74-76.

40.     On the few occasions they have visited the Post Office, the Bonidys' visits were less than five minutes in duration. Tab Bonidy Depo. at 52; Debbie Bonidy Depo. at 77.

41.     When they visit the Avon Post Office, both Mr. and Mrs. Bonidy park in the parking lot of a nearby business, rather than in the Avon Post Office parking lot. Tab Bonidy Depo. at 57; Debbie Bonidy Depo. at 77, 80.

42.     Snow restrictions have never prevented Mr. or Mrs. Bonidy from parking on the public street in front of the Post Office. Tab Bonidy Depo. at 54-55; Debbie Bonidy Depo. at 77-78.

43.     Mr. and Mrs. Bonidy hold concealed carry permits issued by the Sheriff of Eagle County, Colorado. Ex. A-10 & A-11 (Debbie and Tab Bonidy Concealed Carry Permits).

44.     The application for a concealed carry permit in Eagle County, Colorado requires that each "applicant must meet the following criteria," including that the applicant "[d]oes not chronically and habitually use alcoholic beverages to the extent that the applicant's normal faculties are impaired."  Ex. A-12 (Debbie Bonidy Concealed Carry Application, Nov. 10, 2008); Ex. A-13 (Eagle County Sheriff's Office Concealed Weapon Permit Application Policy & Procedures).

45.     Mrs. Bonidy signed her application on November 10, 2008 to "certify that I meet all the criteria set out in the application and believe that I am qualified to possess a permit in accordance with Colorado state law."  Ex. A-12.  Mrs. Bonidy further certified that "all statements made by me in the completion of this application are, to the best of my knowledge, accurate and true."  Id.

46.     Mrs. Bonidy's sworn statement on her application that she "[d]oes not chronically and habitually use alcoholic beverages to the extent that the applicant's normal faculties are impaired" was not correct as of the time of her application.  Debbie Bonidy's Responses to Defendants' First Set of Requests for Admissions ("Debbie Bonidy Admissions") (attached as Ex. A-14) ¶ 1; Debbie Bonidy Depo. at 153-54, 158-59, 179.

47.     Mrs. Bonidy did not disclose to the Eagle County Sheriff's Office that she was treated for alcohol abuse at a residential treatment facility in January and February of 2009.  Debbie Bonidy Admissions ¶ 3; Tab Bonidy's Responses to Defendants' First Set of Requests for Admissions ("Tab Bonidy Admissions") (attached as Ex. A-15) ¶ 6.

48.     When Mr. Bonidy resided in Florida, he carried a concealed firearm without the permit required by law.  Tab Bonidy Depo. at 93-94; Tab Bonidy Admissions ¶¶ 8-9.

16

## PROCEDURAL BACKGROUND

On July 22, 2010, counsel for Mr. and Mrs. Bonidy sent a letter to the Postmaster General stating that "[t]he Bonidys intend to exercise their right to bear arms on Postal property, but are prevented from doing so by the Postal Service's regulatory firearms ban, 39 C.F.R. § 232.1(*l*)." Second Am. Compl. ¶ 26 & Ex. 1.  The letter further stated that the Postal Service's "total ban on firearms possession violates 'the individual right to possess and carry weapons in case of confrontation' protected by the Second Amendment." Id. at Ex. 1 (quoting District of Columbia v. Heller, 554 U.S. 570, 592 (2008)).  On August 3, 2010, the Postal Service's General Counsel responded by letter, confirming that "the regulations governing Conduct on Postal Property prevent the Bonidys from carrying firearms, openly or concealed, onto any real property under the charge and control of the Postal Service." Id. ¶ 27 & Ex. 2 (citing 39 C.F.R. § 232.1(*l*)).

Plaintiffs then filed this lawsuit.  After this Court granted defendants' motion to dismiss plaintiffs' First Amended Complaint, plaintiffs filed the instant complaint, alleging that the ban on firearms in the Avon Post Office parking lot and in a private vehicle parked on any real property under the charge and control of the Postal Service is unconstitutional. Id. ¶¶ 30-31. Plaintiffs further allege that the ban on firearms *inside* the Avon Post Office is unconstitutional. Id. ¶¶ 35-36.  Plaintiffs seek a Court Order permanently enjoining the defendants from enforcing 39 C.F.R. § 232.1(*l*).[6]  Following denial of defendants' motion to dismiss plaintiffs' Second Amended Complaint, the parties engaged in discovery pursuant to the Scheduling Order entered by this Court on January 26, 2012.

_____

[6] Like plaintiffs' First Amended Complaint, the Second Amended Complaint refers to alleged injuries suffered by plaintiffs generally; it does not allege specific injuries suffered by the National Association for Gun Rights (NAGR) as an organization.  Plaintiffs therefore have not established that the NAGR has standing to sue in its own right, as opposed to in its representational capacity.  To the extent the NAGR purports to sue on its own behalf, summary judgment should be entered against it on standing grounds.

## STANDARD OF REVIEW

Defendants move for summary judgment under Federal Rule of Civil Procedure 56(a).

Summary judgment is proper when the evidence shows "that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  The Court will grant summary judgment "if the movant establishes entitlement to

judgment as a matter of law given the uncontroverted, operative facts.  Factual disputes that are

irrelevant or unnecessary will not be counted." Diaz v. Paul J. Kennedy Law Firm, 289 F.3d

671, 674 (10th Cir. 2002) (internal punctuation omitted).  Unsupported allegations, conclusory in

nature, are insufficient to defeat a motion for summary judgment.  Gross v. Burggraf, 53 F.3d

1531, 1546 (10th Cir. 1995).

## ARGUMENT

## I.   THE SECOND AMENDMENT RIGHT TO BEAR ARMS

### A.   District of Columbia v. Heller, 554 U.S. 570 (2008)

The Second Amendment provides: "A well regulated Militia, being necessary to the

security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

U.S. Const. amend. II.  In Heller, the Supreme Court held that a "ban on handgun possession in

the home" and "prohibition against rendering any lawful firearm in the home operable for the

purpose of immediate self-defense" violated the Second Amendment.  554 U.S. at 635.

Although the Court found that the text of the Second Amendment "conferred an individual right

to keep and bear arms," the Court repeatedly emphasized that "the right was not unlimited." Id.

at 595 ("[W]e do not read the Second Amendment to protect the right of citizens to carry arms

for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of

citizens to speak for *any purpose*.") (emphases in original) (citation omitted).  Although the

Supreme Court did not purport to define the full scope of the Second Amendment right in <u>Heller</u>, the Court did make clear that laws forbidding firearms in sensitive places, along with other regulatory restrictions on the possession of firearms and conditions on the commercial sale of arms, are presumed not to violate the Constitution.  The Court explained: "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, *or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings*, or laws imposing conditions and qualifications on the commercial sale of arms."  <u>Id.</u> at 626-27 (emphasis added).  And the Court specifically noted that those "presumptively lawful regulatory measures" were merely examples, and that the list "does not purport to be exhaustive."  <u>Id.</u> at 626-27 n.26.

The Supreme Court explained that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." <u>Id.</u> at 635.  <u>See also</u> <u>McDonald v. City of Chicago</u>, 130 S. Ct. 3020, 3044 (2010) (plurality opinion) (stating that the "central holding in <u>Heller</u>" is "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home"); <u>id.</u> at 3047 ("repeat[ing] . . . assurances" stated in <u>Heller</u> that the Court's holding "did not cast doubt on" the constitutionality of the longstanding regulatory measures identified in <u>Heller</u> and noting that "incorporation does not imperil every law regulating firearms").

**B.**     <u>**United States v. Reese**</u>**, 627 F.3d 792 (10th Cir. 2010)**

Interpreting <u>Heller</u> in the context of a Second Amendment challenge to 18 U.S.C. § 922(g)(8), which prohibits the possession of firearms while subject to a domestic protection order, the Court of Appeals adopted "a two-pronged approach to Second Amendment challenges

19

to federal statutes." United States v. Reese, 627 F.3d 792, 800 (10th Cir. 2010), cert. denied, 131 S. Ct. 2476 (2011) (quoting United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010), cert. denied, 131 S. Ct. 958 (2011) (internal alterations omitted)).  "Under this approach, a reviewing court first asks whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." Id.  "If it does not, the court's inquiry is complete." Id. at 800-01.  "If it does, the court must evaluate the law under some form of means-end scrutiny." Id. at 801.  "If the law passes muster under that standard, it is constitutional." Id.  "If it fails, it is invalid." Id.

Applying that approach in Reese, the Court of Appeals found that the statute at issue imposed a burden on conduct that "generally falls within the scope of the right guaranteed by the Second Amendment." Id.  Therefore, the court "proceed[ed] to the second part of the analysis and evaluate[d] § 922(g)(8) under some form of means-end scrutiny." Id.  The court concluded that the statute was "subject to intermediate scrutiny," under which "the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." Id. at 802 (citation omitted); see also id. at 801 (framing intermediate scrutiny inquiry as "whether the challenged law served a significant, substantial, or important governmental interest, and, if so, whether the fit between the challenged law and the asserted objective was reasonable, not perfect") (quoting Marzzarella, 614 F.3d at 98) (internal alterations omitted).

The court noted that "Reese [did] not seriously dispute the assertion" that the government's objective of "keep[ing] firearms out of the hands of people who have been judicially determined to pose a credible threat to the physical safety of a family member, or who have been ordered not to use, attempt to use, or threaten to use physical force against an intimate

20

partner or child that would reasonably be expected to cause bodily injury" was an important one. Id. at 802 (internal quotations omitted).  In finding the restriction imposed by the statute "substantially related" to this objective, the court relied heavily on the Seventh Circuit's *en banc* decision in United States v. Skoien, 614 F.3d 638 (7th Cir. 2010) (en banc), cert. denied, 131 S. Ct. 1674 (2011), which the Reese court found "point[ed] to evidence that is highly relevant to, and supportive of, the government's assertion."  Id. (citing Skoien, 614 F.3d at 643-44).  The court concluded that "the prosecution of Reese under § 922(g)(8) is consistent with the government's intended purpose in implementing that statute."  Id. at 804.[7]

## II.    THE USPS REGULATION DOES NOT BURDEN CONDUCT PROTECTED BY THE SECOND AMENDMENT.

### A.    The USPS Regulation Comports With Historical Understandings of the Second Amendment Right.

Under Reese, the Court must "first ask[] whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee."  627 F.3d at 800 (citation omitted).  "If it does not, the court's inquiry is complete."  Id. at 800-01.  In evaluating this first step, courts presume that longstanding types of regulations do not burden conduct within the scope of the Second Amendment.  As the D.C. Circuit recently explained, the kind of regulation that is "'longstanding,' which necessarily means it has long been accepted by the public, is not likely to burden a constitutional right; concomitantly the activities covered by longstanding regulation are presumptively not protected from regulation by the Second Amendment."  Heller v. Dist. of Columbia, 670 F.3d 1244, 1253 (D.C. Cir. 2011) ("Heller II").  However, as the Seventh Circuit explained in Skoien, the "exclusions need not mirror limits that were on the books in 1791" as "the legislative role did not end in 1791."  614 F.3d at 640, 641.

---

[7] In a footnote, the court noted that, even if it were to apply a strict scrutiny test, the government could satisfy these requirements.  Id. at 804 n.4.

"That *some* categorical limits are proper is part of the original meaning [of the Second Amendment], leaving to the people's elected representatives the filling in of details." Id. at 640-41 (emphasis in original) (noting that the first federal statute disqualifying felons from possessing firearms was not enacted until 1938, 147 years after the ratification of the Second Amendment; that the ban on possession by *all* felons was not enacted until 1961; and that "legal limits on the possession of firearms by the mentally ill," another category the Supreme Court called presumptively lawful, "also are of 20th Century vintage"). "Categorical limits on the possession of firearms" in certain places "would not be a constitutional anomaly." Id. at 641 (observing that the First Amendment "has long had categorical limits: obscenity, defamation, incitement to crime, and others," categories that "are not restricted to those recognized in 1791 when the states approved the Bill of Rights") (citing United States v. Stevens, 130 S. Ct. 1577, 1584 (2010)).

In Robertson v. Baldwin, the Supreme Court declared it to be "perfectly well settled" that the Bill of Rights embodies "certain guaranties and immunities which we had inherited from our English ancestors," and "which had, from time immemorial, been subject to certain well-recognized exceptions, arising from the necessities of the case." 165 U.S. 275, 281 (1897). "In incorporating these principles into the fundamental law, there was no intention of disregarding the exceptions, which continued to be recognized as if they had been formally expressed." Id. This principle governs here. While the Second Amendment did not explicitly address the government's authority to prohibit firearms in sensitive locations such as postal property, it was understood that the government had authority to enact such categorical exclusions. The Supreme Court's acknowledgment in Heller that the government has the authority to ban the possession of

firearms in "sensitive places" is consistent with the history of the right to bear arms as it developed in England and the American colonies.

An examination of the historical record reveals that time, place, and manner restrictions on the possession of firearms were considered permissible exceptions to the Second Amendment right as understood at the adoption of the Bill of Rights.  Early English restrictions on firearm possession make clear that the right to bear arms was always understood to be limited by the need to maintain public safety.  In interpreting the scope of the right conferred by the Second Amendment, courts and scholars often to turn to William Blackstone's Commentaries on the Laws of England, which "constituted the preeminent authority on English law for the founding generation."  Heller, 554 U.S. at 593-94.  Blackstone's volume devoted to Public Wrongs, or criminal law, catalogued a number of common law "Offenses Against the Public Peace" that punished the carrying of weapons in public.  1 William Blackstone, Commentaries, at *142. Blackstone identified a statute of George I, which restricted the manner in which firearms could be carried, making it a crime to "appear armed in any open place by day, or night, with faces blacked or otherwise *disguised*."  Id. (emphasis in original).  Blackstone explained that the damage from this offense was not to private property, but instead "to the breach of the public peace and the terror of his majesty's subjects."  Id.  He also pointed out that "[t]he offence of *riding* or *going armed*, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land."  Id. at *148-49 (emphasis in original).  This common law crime was codified by the Statute of Northampton, a 1328 law, which allowed no man to "ride armed by night nor by day, in fairs, markets, nor in the presence of justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies

to prison at the King's pleasure."  Statute of Northampton, 2 EDW. 3, c 3. (1328); 4 William

Blackstone, Commentaries, at *148-49.

Firearms laws during the Founding era also make clear that time, place, and manner

restrictions on the possession and use of firearms were seen as compatible with the Second

Amendment at the time of its adoption.  A significant public safety concern that prompted

limitations on the right to keep and bear arms at that time was the risk of fire.  Cities, large and

small, restricted the storage and transport of gunpowder and loaded weapons.  See Heller, 554

U.S. at 684-85 (Breyer, J., dissenting).  Several cities during the colonial and revolutionary era

also prohibited the discharging of guns within their limits.  At the time of the Revolution,

Boston, Philadelphia, and New York, the three largest cities in America during that period, all

restricted the shooting of guns within their limits.  Id. at 683 (citing Gun Regulation, the Police

Power, and the Right to Keep Arms in Early America, 25 LAW & HIST. REV. 139, 162 (2007)).

These laws, which restricted the time, place, and manner of firearm possession and use,

were thought by colonial-era legislators to be consistent with the constitutional right to bear

arms.  Although the precise nature of the public safety threat posed by firearms may have

changed over time, see Skoien, 614 F.3d at 640, the notion that the government can impose

limitations on the carrying of firearms has always co-existed with the Second Amendment.

Thus, the regulation prohibiting firearms on Postal Service property in order to promote public

safety and prevent violence on government property does not infringe on a right protected by the

Second Amendment as historically understood.  Plaintiffs' challenge therefore fails under the

first prong of Reese.

**B.    The Second Amendment Does Not Protect a Right to Possess Firearms in Sensitive Places.**

As the Tenth Circuit recently explained, "no right is absolute.  The right to bear arms, however venerable, is qualified by what one might call the 'who,' 'what,' 'where,' 'when,' and 'why.'"  United States v. Huitron-Guizar, 678 F.3d 1164, 1166 (10th Cir. 2012) (citing cases upholding constitutionality of limitations on right to possess firearms).  Relying on Heller, numerous courts have declined to expand the scope of the Second Amendment beyond the core right recognized by the Supreme Court, namely the right of law-abiding, responsible citizens to keep and bear arms for self-defense within the home.  See, e.g., United States v. Masciandaro, 638 F.3d 458, 475-76 (4th Cir.), cert. denied, 132 S. Ct. 756 (2011) (declining to extend "Heller's applicability outside the home environment" absent "direction from the [Supreme] Court itself" and noting that "[i]t is not far-fetched to think the Heller Court wished to leave open the possibility that such a danger would rise exponentially as one moved the right from the home to the public square"); Georgiacarry.org, Inc. v. Georgia, __ F.3d __, 2012 WL 2947817 at *7, *12 (11th Cir. July 20, 2012) (declining to extend Second Amendment to "give an individual a right to carry a firearm on a place of worship's premises against the owner's wishes because such right did not pre-exist the Amendment's adoption" and noting that the Heller Court "went to great lengths to emphasize the special place that the home – an individual's private property – occupies in our society"); Shepard v. Madigan, __ F. Supp. 2d __, 2012 WL 1077146 at *10 (S.D. Ill. Mar. 30, 2012) (concluding that "neither Heller nor McDonald, requires the State of Illinois to extend the right to possess and carry a firearm to the area outside the home"), appeal docketed; Piszczatoski v. Filko, 840 F. Supp. 2d 813, 829 (D.N.J. 2012) ("Given the considerable uncertainty regarding if and when the Second Amendment rights should apply outside the home, this Court does not intend to place a burden on the government to endlessly

litigate and justify every individual limitation on the right to carry a gun in any location for any purpose."); Richards v. County of Yolo, 821 F. Supp. 2d 1169, 1174 (E.D. Cal. 2011) ("Heller cannot be read to invalidate Yolo County's concealed weapon policy, as the Second Amendment does not create a fundamental right to carry a concealed weapon in public."), appeal docketed; Kachalsky v. Cacace, 817 F. Supp. 2d 235, 265 (S.D.N.Y. 2011) (suggesting that there is no Second Amendment right to carry concealed weapons outside the home), appeal docketed; Williams v. State, 10 A.3d 1167, 1176-77 & n.10 (Md.), cert. denied, 132 S. Ct. 93 (2011) (collecting cases upholding restrictions on firearms possession outside the home and remarking, "[i]f the Supreme Court . . . meant its holding to extend beyond home possession, it will need to say so more plainly").[8]

This Court need not address the question how far outside the home, if at all, the Second Amendment extends because it is clear from Heller that the Second Amendment does not provide an unlimited right to carry weapons on government property such as the Postal Service property at issue here. 554 U.S. at 626-27. The Tenth Circuit and numerous other courts have treated the "presumptively lawful regulatory measures" identified in Heller as restricting conduct outside the scope of the Second Amendment altogether. See United States v. Nolan, 342 F. App'x 368, 372 (10th Cir. 2009) (unpublished) (holding that Heller "specifically foreclosed" the argument that possession of a firearm by a convicted felon "was protected by the Second Amendment"); see also, e.g., Marzzarella, 614 F.3d at 91-92 (concluding, after extensive analysis, that the presumptively lawful regulatory measures identified in Heller concern

_____

[8] A few district courts have found that the Second Amendment does extend outside the home. See United States v. Weaver, No. 2:09-cr-00222, 2012 WL 7274488 at *4 (S.D. W. Va. Mar. 6, 2012); Woollard v. Sheridan, __ F. Supp. 2d __, 2012 WL 695674 at *7 (D. Md. Mar. 2, 2012); see also Masciandaro, 638 F.3d at 468 (Niemeyer, J., writing separately) (stating that the Second Amendment provides a right to carry a weapon outside the home, at least "in some form").

"exceptions to the right to bear arms" to which "the Second Amendment affords no protection");

Heller II, 670 F.3d at 1253 ("Heller tells us 'longstanding regulations' are 'presumptively

lawful'; that is, they are presumed not to burden conduct within the scope of the Second

Amendment."); United States v. Rene E., 583 F.3d 8, 12 (1st Cir. 2009), cert. denied, 130 S. Ct.

1109 (2010) (Heller "identified limits" of the Second Amendment based upon "various historical

restrictions on possessing and carrying weapons") (citation omitted); United States v. Chester,

628 F.3d 673, 679 (4th Cir. 2010) (Heller "acknowledged that the scope of the Second

Amendment is subject to historical limitations").

### C.   United States Postal Service Property, Including Post Office Parking Lots, Is a Sensitive Place Under Heller.

Because the USPS regulation is a quintessential "law[] forbidding the carrying of

firearms in [a] sensitive place[]," Heller, 554 U.S. at 626, it addresses conduct that falls outside

the scope of the Second Amendment's protection.

As an initial matter, plaintiffs' challenge to the firearms ban inside the Avon, Colorado

Post Office is expressly foreclosed by Heller's statement regarding government buildings.

Heller, 554 U.S. at 626 ("laws forbidding the carrying of firearms in . . . government buildings"

are "presumptively lawful").  The Avon Post Office is a government building fulfilling a

governmental function, and therefore, the regulation banning firearms inside the building does

not implicate a Second Amendment right.  Similarly, the Post Office parking lot adjacent to the

Avon Post Office (like all Post Office parking lots owned and operated by the Postal Service) is

government property serving an exclusively governmental function.  The parking lot is simply an

extension of and therefore an integral part of the same "government building" as the Post Office

itself.  The parking lot is designated for the exclusive use of Post Office patrons, as evidenced by

the sign posted at the front entrance, and it exists solely to facilitate postal business.  SOF ¶ 36.

The parking lot provides the primary means of access to and egress from the building.  Id.  In addition, like many other postal parking lots, it furthers the postal function by providing drive-through mail services which allow customers to deposit mail without entering the interior of the Post Office building.  SOF ¶ 37.  For all of these reasons, the parking lot should be viewed as part of the "government building" for which restrictions on firearms are presumptively lawful.

But even if this Court were to conclude that the Avon Post Office parking lot does not fall within the express "government buildings" exception, it still qualifies as a "sensitive place" where firearms can be prohibited without implicating the Second Amendment.  As noted above, the Court made clear that the specific "presumptively lawful regulatory measures" identified in Heller serve "only as examples" and do not constitute an exhaustive list.  Id. at 626-27 & n.26.[9] Moreover, the use of the term "such as" before "schools and government buildings" necessarily implies that laws forbidding firearms in places other than the inside of schools and government buildings may be "presumptively lawful" under the sensitive places doctrine.  In fact, numerous courts, relying on Heller, have upheld restrictions on firearms in sensitive places other than the inside of schools and government buildings.

Most relevant here, the Court of Appeals for the Fifth Circuit upheld the precise regulation at issue in this case against a Second Amendment challenge, concluding that an employee parking lot used by the Postal Service as a place of regular government business "falls

---

[9] The Tenth Circuit, like numerous other courts, has taken the Supreme Court at its word, and extended the logic of Heller to conclude that categories of restrictions beyond those expressly enumerated in Heller do not violate the Second Amendment.  See In re United States, 578 F.3d 1195, 1200 (10th Cir. 2009) (unpublished) ("Nothing suggests that the Heller dictum, which we must follow, is not inclusive of § 922(g)(9) involving those convicted of misdemeanor domestic violence."); United States v. Richard, 350 F. App'x 252, 260 (10th Cir. 2009) (unpublished) (holding that the prohibition on possession of firearms by drug users does not violate the Second Amendment); see also United States v. Yanez-Vasquez, 2010 WL 411112 at *4 (D. Kan. Jan. 28, 2010) (applying this reasoning to conclude that the statute prohibiting illegal aliens from possessing firearms does not violate the Second Amendment).

under the 'sensitive places' exception recognized by Heller." United States v. Dorosan, 350 F.

App'x 874, 875 (5th Cir. 2009) (unpublished), cert. denied, 130 S. Ct. 1714 (2010) (quoting

Heller, 554 U.S. at 626).  See also Hall v. Garcia, 2011 WL 995933, at *1, 4 (N.D. Cal. Mar. 17,

2011) (upholding state statute prohibiting possession of a firearm on "the grounds of a public or

private school engaged in kindergarten through twelfth-grade education and areas within 1000

feet of such property" and explaining, "[f]or the same reason that schools are sensitive places –

the presence of large numbers of children either at school or traveling to and from it – possession

of firearms within some distance around such locations similarly presents the risk of danger and

disruption"); Warden v. Nickels, 697 F. Supp. 2d 1221, 1224, 1229 (W.D. Wash. 2010)

(upholding ban on firearms at city-owned park as a "permissible restriction on the possession of

firearms in a 'sensitive' place" and finding "no logical distinction between a school on the one

hand and a community center where educational and recreational programming for children is

also provided on the other.  Just as the Federal Courts do not want civilians entering into

courthouses with weapons, the City does not want those with firearms entering certain parks

where children and youth are likely present.");[10] United States v. Lewis, 2008 WL 5412013, at

*2 (D.V.I. Dec. 24, 2008) ("It is beyond peradventure that a school zone, where Lewis is alleged

to have possessed a firearm, is precisely the type of location of which Heller spoke.  Indeed,

Heller unambiguously forecloses a Second Amendment challenge to that offense under any level

of scrutiny."); United States v. Davis, 304 F. App'x 473, 474 (9th Cir. 2008) (unpublished)

---

[10]  Warden predated the Supreme Court's decision in McDonald, and the court dismissed
plaintiff's Second Amendment challenge on the basis of then-controlling Ninth Circuit precedent
holding that the Second Amendment constrains only the actions of the federal government, not
the states.  697 F. Supp. 2d at 1225-26.  However, the court also analyzed the question whether
the Park rule violated Article I, § 24 of the Washington State Constitution, the state parallel to
the Second Amendment, relying on the Washington Supreme Court's decision to analyze that
provision in light of Heller.  Id. at 1228-29 (citing State v. Sieyes, 225 P.3d 995 (Wash. 2010)).

(upholding conviction for carrying concealed firearms on airplane because "[t]he Supreme Court specified that nothing in that opinion was intended to cast doubt on the prohibition of concealed weapons in sensitive places"), cited in United States v. Huitron-Guizar, 678 F.3d 1164, 1166 (10th Cir. 2012); Digiacinto v. Rector & Visitors of George Mason Univ., 704 S.E.2d 365, 367, 370 (Va. 2011) (dismissing constitutional challenge to state statute prohibiting weapons on university property, including "academic buildings, administrative office buildings, student residence buildings, dining facilities, or while attending sporting, entertainment or educational events" because university "is a 'sensitive place'").

As discussed above, maintaining control over Postal Service property, including its buildings and parking lots, is essential to ensuring that the Postal Service can carry out its statutory duties to "provide prompt, reliable, and efficient services in all areas" and "establish and maintain postal facilities of such character and in such locations, that postal patrons throughout the Nation will . . . have ready access to essential postal services."  39 U.S.C. § 403. There are several characteristics of Postal Service property that qualify it as a "sensitive place" under Heller.

First, as in Dorosan, the Postal Service property at issue here "falls under the 'sensitive places' exception" because it is used "as a place of regular government business."  350 F. App'x at 875.  As noted above, all postal property is United States *government* property, and the United States Postal Service is constitutionally and statutorily obligated to control, administer and protect both its property and the customers and employees on that property.  See U.S. Const. art. IV, § 3, cl. 2; 39 U.S.C. § 403(b); 18 U.S.C. § 3061(c)(4)(A).  The Postal Service fulfills a quintessential governmental function at each of its 32,000 retail and delivery facilities, including providing services such as accepting United States passport applications and Selective Service

registrations, and issuing United States-government guaranteed money orders.  SOF ¶¶ 18, 19.

Indeed, through the provision of money orders and other related services, the Postal Service

provides a valuable service to the "unbanked" – i.e., people without a banking relationship and

who rely on non-bank check cashers or money transfer services.  SOF ¶ 19.  The postal function

is not limited to the inside of Post Office buildings; in many instances, including at the Avon,

Colorado Post Office, customers engage in postal business on property outside of government

buildings through the use of drop boxes and mobile retail units.  SOF ¶¶ 17, 37.  Additionally, as

noted above, many Postal Service facilities are co-located with other federal, state, and local

government entities, including the United States Courts, the Department of Justice, and the

Department of Homeland Security, entities that certainly serve a sensitive governmental

function.  SOF ¶ 15.  Because Postal Property, including Post Office parking lots, is government

property designed to serve an important and sensitive government function, it is a "sensitive

place" under Heller.

Postal Service property is also sensitive both because it is an attractive site for criminal

activity and because it is a place where large numbers of people routinely gather to conduct

business.  As explained in extensive detail in the Declaration submitted by the Inspector in

Charge of Security and Crime Prevention for the United States Postal Inspection Service, the

U.S. Mail and Postal Service Property are frequent targets of unlawful activity, and criminals

often target the Postal Service because of the valuable information and property transmitted

through the mail.  SOF ¶¶ 20-27.  Postal Service parking lots themselves have become the sites

of criminal activity due to the increased use of the U.S. Mail to conduct drug trafficking and the

ability of criminals to track movements of shipments and target letter carriers departing for

delivery.  SOF ¶ 27.  In addition, criminals sometimes target customers carrying valuable items

in and out of post offices, as occurred in several documented incidents in recent years.  SOF ¶ 24.

Because of its governmental function, the sensitive nature of the mail services it provides, and its tendency to serve as a gathering place for large numbers of people, property under the charge and control of the U.S. Postal Service is a sensitive place under <u>Heller</u>.

> **D.     To the Extent the USPS Regulation Imposes a Burden on a Constitutionally-Protected Right, Any Such Burden is Minimal and Does Not Warrant Heightened Scrutiny.**

Even if the Court were to find that the USPS regulation does impose a burden on conduct within the scope of the Second Amendment, it need not engage in heightened constitutional scrutiny because any such burden is *de minimis*.  "[N]ot every limitation or incidental burden on the exercise of" a constitutionally protected right "is subject to a stringent standard of review."  <u>Bullock v. Carter</u>, 405 U.S. 134, 143 (1972) (citing <u>McDonald v. Bd. of Elections Comm'n</u>, 394 U.S. 802 (1969)).  As the Supreme Court has explained, "it is essential to examine in a realistic light the extent and nature of" the restriction at issue.  <u>Id.</u>  The Court has frequently declined to employ elevated constitutional scrutiny when analyzing regulations that do not impose a "substantial" or "significant" burden on a constitutional right.  <u>See, e.g.</u>, <u>Zablocki v. Redhail</u>, 434 U.S. 374, 386 (1978) ("[R]easonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed."); <u>Califano v. Jobst</u>, 434 U.S. 47, 48, 57 (1977) (using minimal rationality standard of review to uphold Social Security law that did not "significantly discourage[], let alone ma[k]e practically impossible" the right to marry), <u>quoted in</u> <u>Zablocki</u>, 434 U.S. at 386; <u>Gonzales v. Carhart</u>, 550 U.S. 124, 157-58 (2007) ("The fact that a law which serves a valid purpose, one not

designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to [exercise a constitutional right] cannot be enough to invalidate it.").[11]

Relying on this body of case law and on the Supreme Court's reasoning in Heller, several federal Courts of Appeals have declined to impose heightened constitutional scrutiny on regulations that may restrict to some degree the purchase or possession of firearms but that do not *substantially* burden the exercise of the Second Amendment right.  As the Second Circuit recently explained, "[g]iven Heller's emphasis on the weight of the burden imposed by the D.C. gun laws, we do not read the case to mandate that any marginal, incremental or even appreciable restraint on the right to keep and bear arms be subject to heightened scrutiny."  United States v. DeCastro, 682 F.3d 160, 166 (2d Cir. 2012), petition for cert. filed.  "Rather, heightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in Heller) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)."  Id.  Accord Heller II, 670 F.3d at 1253, 1260 (laws that have only a "de minimis" effect on the right to bear arms or that do not "meaningfully affect individual self-defense" do not impinge on the Second Amendment right

---

[11] See generally Alan Brownstein, How Rights Are Infringed: The Role of Undue Burden Analysis in Constitutional Doctrine, 45 HASTINGS L.J. 867, 893-908 (1994) (surveying Supreme Court case law examining right to marry, right of political association, property rights, free exercise of religion, and procedural due process to demonstrate how the Court evaluates laws alleged to abridge fundamental rights by analyzing the extent of the burden on the constitutionally protected interest); Adam Winkler, Scrutinizing the Second Amendment, 105 MICH. L. REV. 683, 698 (2007) (noting that Supreme Court "tends to apply lower-level scrutiny (or none at all) absent a 'substantial' burden on the rights" in speech, religion, and privacy cases); Michael C. Dorf, Incidental Burdens on Fundamental Rights, 109 HARV. L. REV. 1175, 1180 (1996) (observing that, although formally, "the Supreme Court requires intermediate scrutiny of laws that impose an incidental burden on free speech, . . . in practice, the standard applied often appears to be quite deferential"); Geoffrey R. Stone, Content-Neutral Restrictions, 54 U. CHI. L. REV. 46, 50-52 (1987) (remarking that, despite the Supreme Court's use of language suggesting heightened scrutiny of time, place, and manner restrictions, the Court often applies a deferential standard of review in such cases).

and therefore do not warrant heightened scrutiny); Nordyke v. King, 644 F.3d 776, 786, 787-88

(9th Cir. 2011) (holding that "only regulations which substantially burden the right to keep and

to bear arms trigger heightened scrutiny under the Second Amendment" and noting that "a law

does not substantially burden a constitutional right simply because it makes the right more

expensive or more difficult to exercise"), superseded by 681 F.3d 1041, 1044 (9th Cir. 2012) (en

banc) (finding ordinance "permissible" under the Second Amendment because it "regulates the

sale of firearms at Plaintiffs' gun shows only minimally, and only on County property");

Marzzarella, 614 F.3d at 94-95 (suggesting that a "*de minimis*" burden on the right to keep arms

for self-defense might not warrant heightened scrutiny).

Similarly, this Court should uphold the USPS regulation without subjecting it to

heightened scrutiny because the regulation imposes, at most, only a *de minimis* burden on

plaintiffs' right to bear arms.  In Dorosan, the Fifth Circuit held that the defendant "fail[ed] to

demonstrate that § 232.1(*l*) has placed any significant burden on his ability to exercise his

claimed Second Amendment right" where, "if Dorosan wanted to carry a gun in his car but abide

by the ban, he ostensibly could have secured alternative parking arrangements off site."  350 F.

App'x at 876 (noting that "Postal Service was not obligated by federal law to provide parking for

its employees, nor did the Postal Service require Dorosan to park in the lot for work").  The

USPS regulation imposes even less of a burden on Mr. and Mrs. Bonidy than it imposed on

Dorosan, an employee of the Postal Service.  Both Mr. and Mrs. Bonidy testified that they rarely

visit the Avon Post Office, as Mr. Bonidy's employee picks up their mail on a regular basis.

SOF ¶ 39.[12]  On the few occasions they have visited the Post Office, their visits were short (less

---

[12] Mr. Bonidy testified that he sent an employee to pick up his mail even prior to 2009 when he
was issued a concealed carry permit and began regularly carrying a handgun with him.  Tab
Bonidy Depo. at 50-52, 142; Tab Bonidy Admissions ¶ 7.

than five minutes).  SOF ¶ 40.  Both Mr. and Mrs. Bonidy voluntarily parked in the parking lot

of a nearby business rather than in the Avon Post Office parking lot.  SOF ¶ 41.  They chose not

to avail themselves of the street parking available on West Beaver Creek Boulevard, the public

street directly in front of the Post Office, or elsewhere in the small town of Avon.  Tab Bonidy

Depo. at 54-55; Debbie Bonidy Depo. at 77-78.  Notwithstanding plaintiffs' allegation in the

Second Amended Complaint that "public parking on West Beaver Creek Boulevard is often

disallowed and is therefore sporadic and unpredictable throughout the winter" due to snow

restrictions, Second Am. Compl. ¶ 22, both Mr. and Mrs. Bonidy testified that snow restrictions

have *never* prevented them from parking on the public street in front of the Post Office.  SOF

¶ 42.

    As in <u>Dorosan</u>, the slight inconveniences of parking on the adjacent street or in a nearby

parking lot rather than the one directly in front of the Avon Post Office, and disarming oneself

for the few minutes one enters the Post Office, do not impose a "substantial" or "severe"

restriction on the Bonidys' exercise of their Second Amendment right.  <u>Cf. Heller</u>, 554 U.S. at

635 (addressing complete ban on handgun possession in the home and total prohibition against

keeping any firearm in the home in operable state).  The fact that the USPS regulation may have

the *incidental* effect of disarming the Bonidys for the few minutes they enter government

property does not impose a substantial burden sufficient to invoke heightened scrutiny.  <u>See</u>

<u>Nordyke</u>, 644 F.3d at 788 ("[A] regulation is particularly unlikely to impose a substantial burden

on a constitutional right where it simply declines to use government . . . property to facilitate the

exercise of that right."); <u>DeCastro</u>, 682 F.3d at 166 ("marginal" or "incremental . . . restraint[s]

on the right to keep and bear arms" are not "subject to heightened scrutiny"); <u>Carhart</u>, 550 U.S.

at 157-58 ("The fact that a law which serves a valid purpose, one not designed to strike at the

right itself, has the incidental effect of making it more difficult or more expensive to [exercise a constitutional right] cannot be enough to invalidate it.").

Because the USPS regulation imposes at most an incidental burden on plaintiffs' claimed Second Amendment right, the Court need not engage in heightened constitutional scrutiny.  It should instead grant summary judgment to defendants on the ground that the *de minimis* effect of the USPS regulation on the Bonidys' ability to carry their firearms does not give rise to a constitutional claim.

### III.   EVEN IF THE USPS REGULATION IMPLICATES PLAINTIFFS' SECOND AMENDMENT RIGHT, IT IS CONSTITUTIONAL.

If the Court were to determine that the USPS regulation imposes a burden on conduct protected by the Second Amendment, it should evaluate that law under some form of means-end scrutiny.  Reese, 627 F.3d at 801.  In determining what level of scrutiny to apply, the Tenth Circuit, like other Courts of Appeals, has recognized that the "Second Amendment can trigger more than one particular standard of scrutiny, depending, at least in part, upon the type of law challenged and the type of Second Amendment restriction at issue."  Id. (quoting Marzzarella, 614 F.3d at 97) (internal alterations omitted).  Here, because the Postal Service was acting in its proprietary capacity when it enacted the challenged regulation, its action is subject to a lower level of constitutional scrutiny.

#### A.   The USPS Regulation Is a Permissible Regulation Enacted by the Postal Service As the Proprietor of Postal Property.

"It is a long-settled principle that governmental actions are subject to a lower level of [constitutional] scrutiny when the governmental function operating is not the power to regulate or license, as lawmaker, but, rather, as proprietor, to manage its internal operations."  United States v. Kokinda, 497 U.S. 720, 725 (1990) (plurality opinion) (quoting Cafeteria & Restaurant

Workers v. McElroy, 367 U.S. 886, 896 (1961)) (internal alterations omitted).  Where, as here, the government is "acting in its proprietary capacity," its action is valid "unless it is unreasonable, . . . 'arbitrary, capricious, or invidious.'"  Id. at 725-26 (quoting Lehman v. City of Shaker Heights, 418 U.S. 298, 303 (1974)); id. at 737, 740 (concluding that Postal Service regulation prohibiting "[s]oliciting alms and contributions on postal premises" "passes constitutional muster under the Court's usual test for reasonableness"); see also Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 679-80, 683 (1992) (noting that "government – like other property owners – has power to preserve the property under its control for the use to which it is lawfully dedicated" and finding "no doubt" that restriction on solicitation in government-operated airport passes muster under "reasonableness" test) (citations omitted).

"A regulation is reasonable if it is consistent with the government's legitimate interest in maintaining the property for its dedicated use."  Initiative & Referendum Inst. v. United States Postal Serv., 685 F.3d 1066, 1073 (D.C. Cir. 2012) (citing Perry Educ. Ass'n v. Perry Local Educators Ass'n, 460 U.S. 37, 50-51 (1983)) (holding that Postal Service regulation banning collection of signatures on interior post office sidewalks did not violate First Amendment's free speech clause).  "And the restriction 'need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation.'"  Id. (emphasis in original) (quoting Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 808 (1985)).

As explained above, the USPS regulation was promulgated pursuant to the Postal Service's constitutional and statutory authority to "prescribe regulations necessary for the protection and administration of property owned or occupied by the Postal Service and persons on the property."  18 U.S.C. § 3061(c)(4)(A).  See Dorosan, 350 F. App'x at 875 (explaining that Postal Service's "restrictions on guns stemmed from its constitutional authority as the property

owner").  While Congress was tasked with "furnish[ing] mail facilities for the people of the

United States, it is also true that mail facilities are not required to be furnished for every

purpose."  Ex Parte Rapier, 143 U.S. at 134.  "Beyond doubt, the Property Clause authorizes the

enactment and enforcement of regulations which . . . are designed to maintain safety and order

on government property."  United States v. Gliatta, 580 F.2d 156, 160 (5th Cir. 1978).  The

USPS regulation protects Postal Service employees, customers, property, and the U.S. Mail,

functions that are clearly not "unreasonable, . . . arbitrary, capricious, or invidious."  Kokinda,

497 U.S. at 726.

This regulation is particularly reasonable in light of the Postal Service's broad statutory

mandate to provide mail services throughout the United States.  As the Supreme Court has

explained, Congress and the Postal Service may, "in exercising [their] authority to develop and

operate a national postal system, properly legislate [or regulate] with the generality of cases in

mind, and should not be put to the test of defending in one township after another the

constitutionality of a statute. . . ."  United States Postal Serv. v. Council of Greenburgh Civic

Ass'ns, 453 U.S. 114, 132-33 (1981) (holding that statute prohibiting deposit of unstamped

mailable matter in letterbox approved by Postal Service did not abridge First Amendment rights).

The Court further explained the Postal Service's need to enact uniform, administrable

regulations:

> If Congress and the Postal Service are to operate as efficiently as possible a
> system for the delivery of mail which serves a Nation extending from the Atlantic
> Ocean to the Pacific Ocean, from the Canadian boundary on the north to the
> Mexican boundary on the south, it must obviously adopt *regulations of general
> character having uniform applicability* throughout the more than three million
> square miles which the United States embraces.  In so doing, the Postal Service's
> authority to impose regulations cannot be made to depend on all of the variations
> of climate, population, density, and other factors that may vary significantly
> within a distance of less than 100 miles.

Id. at 133 (emphasis added).

Similarly, the Second Circuit rejected a First Amendment challenge to the Postal Service regulation proscribing the installation of metal hook devices on insides of mailboxes, finding the regulation "reasonable" and "entirely consistent with the Congressional mandate to the Postal Service to maintain an efficient system of collecting, sorting and delivery of the mail nationwide." Rockville Reminder v. United States Postal Serv., 480 F.2d 4, 7 (2d Cir. 1973). The court emphasized that "[b]road rule-making authority must be allowed a federal agency such as the postal service whose activities are national in scope and are geared to meet varied conditions and circumstances throughout the country." Id. (citation omitted).

Just as it was necessary and reasonable for the Postal Service to enact uniform, easily understandable and administrable regulations governing what is permissible and impermissible inside of mailboxes, so too is it necessary and reasonable for the Postal Service to rely on a uniform policy prohibiting firearms and other dangerous and deadly weapons on all postal property. See Milke Decl. ¶¶ 43-44 (explaining need for uniform, administrable regulation); Granholm Decl. ¶¶ 13, 16, 17 (same). Accordingly, the Court should uphold the USPS regulation as a permissible regulation of the government's use of its own property.

### B. Even If Heightened Scrutiny Were Applicable, Intermediate Scrutiny Would Be the Appropriate Level of Review.

Even if this Court were to apply a more rigorous level of review, the USPS regulation would pass constitutional muster. The Tenth Circuit, like nearly every other federal Court of Appeals, has applied intermediate scrutiny to a firearms restriction involving the government's "power to regulate or license, as lawmaker," Kokinda, 497 U.S. at 725. See Reese, 627 F.3d at 802. Relying on the reasoning of the Third Circuit in Marzzarella, the Court of Appeals explained in Reese that intermediate scrutiny is appropriate where "the burden imposed by the law [does] not severely limit the possession of firearms, as did the District of Columbia's

handgun ban that was at issue in Heller." Id. at 801 (quoting Marzzarella, 614 F.3d at 97); see also Skoien, 614 F.3d at 642 (upholding, under intermediate scrutiny, 18 U.S.C. § 922(g)(9), prohibiting all possession of firearms by persons convicted of a misdemeanor crime of domestic violence); Peterson v. LaCabe, 783 F. Supp. 2d 1167, 1177-78 (D. Colo. 2011) (applying intermediate scrutiny to statute requiring concealed carry permit applicant to be Colorado resident because requirement does not infringe on the "right of self-defense in the home," where the Second Amendment "extends the strongest protection" and because "the statute is even less restrictive than the federal statutes discussed in Reese and Skoien, as it does not completely prevent this class of persons from possessing firearms while in the state"), appeal docketed.

The USPS regulation is, at most, a "time, place, and manner" restriction, a type of regulation that is analyzed under intermediate scrutiny in the First Amendment context. See, e.g., City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 455 (2002) (plurality opinion) ("The comparatively softer intermediate scrutiny is reserved for regulations justified by something other than content of the message, such as a straightforward restriction going only to the time, place, or manner of speech or other expression."); see also Marzzarella, 614 F.3d at 96-97 (drawing analogy between content-neutral restrictions on speech in the First Amendment context and restriction on firearms possession in the Second Amendment context in determining that the latter should be subject to intermediate constitutional scrutiny); Heller II, 670 F.3d at 1257-58 (noting that, "[a]s with the First Amendment, the level of scrutiny applicable under the Second Amendment surely depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right," and applying intermediate scrutiny to District of Columbia gun registration requirements because they do not "prevent[] an individual from possessing a firearm in his home or elsewhere"); cf. Ezell v. City of Chicago, 651 F.3d 684, 708

40

(7th Cir. 2011) (holding that "a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end" but that "laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified").

The Fourth Circuit has applied intermediate scrutiny to a time, place, and manner regulation prohibiting possession of a loaded handgun in a motor vehicle on national park land. Masciandaro, 638 F.3d at 470-71. As that court explained, "[w]hile we find the application of strict scrutiny important to protect the core right of the self-defense of a law-abiding citizen in his home . . . , we conclude that a lesser showing is necessary with respect to laws that burden the right to keep and bear arms outside of the home." Id. at 471. The court noted that, "as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." Id. at 470 (citing Heller, 554 U.S. at 626). By definition, the USPS regulation does not infringe on anyone's ability to possess firearms in their home, or in any other place besides property under the charge and control of the Postal Service. Because the USPS regulation imposes only one discrete limitation on where individuals may possess firearms, this Court should apply no more than intermediate scrutiny. Cf. Reese, 627 F.3d at 802 (upholding, under intermediate scrutiny, 18 U.S.C. § 922(g)(8), which "prohibits the possession of all types of firearms" in every place by persons subject to domestic protection order); Skoien, 614 F.3d at 642 (same with respect to persons convicted of a misdemeanor crime of domestic violence).

To the extent this Court finds that it is necessary to employ any form of heightened constitutional scrutiny, the Court should follow the Court of Appeals' decision in Reese and the

persuasive reasoning of the numerous other courts cited above, and apply no more than intermediate scrutiny.

### C. The USPS Regulation Is Substantially Related to an Important Governmental Objective.

#### 1. Intermediate Scrutiny Review

"To pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." Reese, 627 F.3d at 802 (citation omitted); see also id. at 801 (framing intermediate scrutiny inquiry as "whether the challenged law served a significant, substantial, or important governmental interest, and, if so, whether the fit between the challenged law and the asserted objective was reasonable, not perfect") (quoting Marzzarella, 614 F.3d at 98) (internal alterations omitted).

In applying intermediate scrutiny to the USPS regulation, several relevant factors should influence this Court's review. First, "intermediate scrutiny, by definition, permits [policymakers] to paint with a broader brush than strict scrutiny. . . . As a consequence, the degree of fit between the [regulation] and the well-established goal of promoting public safety need not be perfect; it must only be substantial." Heller v. Dist. of Columbia, 698 F. Supp. 2d 179, 191 (D.D.C. 2010) (citations and internal punctuation omitted), aff'd in relevant part, 670 F.3d 1244; accord Reese, 627 F.3d at 801 (question is whether the "fit between the challenged law and the asserted objective [is] reasonable, not perfect").

Second, in order to advance its compelling interests in combating crime and protecting public safety, policymakers may need to make "predictive judgments" about the risk of dangerous behavior. Turner Broad. Sys. v. FCC, 512 U.S. 622, 665 (1994). Such judgments are entitled to "substantial deference" by the courts. Id. Moreover, the primary role in making such

judgments properly falls to the legislative or executive branches, not the courts, because policymakers are "far better equipped than the judiciary" to collect, weigh, and evaluate the relevant evidence, and to formulate appropriate policy in response.  Id. at 665-66.  In addition, "[s]ound policymaking often requires [policymakers] to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable."  Id. at 665.

Third, under intermediate scrutiny, the government "does not bear the burden of providing evidence that rules out every theory . . . inconsistent with its own."  Alameda Books, Inc., 535 U.S. at 437.  Nor is the government limited to the "least restrictive means" of achieving its end or the "single best disposition" but rather "one whose scope is in proportion to the interest served."  Bd. of Trustees of State Univ. of New York v. Fox, 492 U.S. 469, 480 (1989) (internal citations omitted).  In other words, the government "need not adopt the most narrowly tailored means available."  Initiative & Referendum Inst., 685 F.3d at 1073.  "[T]he Postal Service is free to adopt multiple means to ensure that customers visiting the post office can transact their business unimpeded."  Id.  "[T]he availability of other means of accomplishing a governmental objective does not foreclose the government's ability to pursue its chosen course."  Id. (citation omitted).

Finally, "[t]he Constitution does not mandate a specific method by which the government must satisfy its burden under heightened judicial scrutiny."  United States v. Carter, 669 F.3d 411, 418 (4th Cir. 2012).  As the Supreme Court has explained, the "quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised."  Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377, 391 (2000).  The Court has upheld restrictions on speech, even under

43

a strict scrutiny standard of review, in some cases relying "solely on history, consensus, and 'simple common sense.'"  Florida Bar v. Went For It, Inc., 515 U.S. 618, 628 (1995) (citations omitted); see also Milavetz, Gallop & Milavetz, P.A. v. United States, 130 S. Ct. 1324, 1340 (2010) (rejecting notion that government must adduce evidence to justify restriction on speech and noting "[w]hen the possibility of deception is as self-evident as it is in this case, we need not require the State to conduct a survey of the public before it may determine that the advertisement had a tendency to mislead") (internal alterations and citations omitted).

> **2.    The Fit Between the USPS Regulation and the Postal Service's Important Objectives Satisfies Heightened Review.**

Here, the Postal Service undoubtedly has an important – indeed, compelling – interest in promoting order and public safety on all of its property, and in protecting its employees, customers and the U.S. Mail from the risk of firearm violence.  The Supreme Court has stated repeatedly that "the government's interest in preventing crime . . . is both legitimate and compelling."  United States v. Salerno, 481 U.S. 739, 749 (1987) (citation omitted); see also Schall v. Martin, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted.") (citations and quotation marks omitted); Masciandaro, 638 F.3d at 473 (government has a substantial, even compelling, interest in "providing for the safety of individuals who visit and make use of the national parks," which include "area[s] where large numbers of people, including children, congregate for recreation"); Skoien, 614 F.3d at 642 ("no one doubts that the goal of . . . preventing armed mayhem, is an important governmental objective").

The Postal Service's justification for this important USPS regulation is neither novel nor implausible.  On the contrary, "simple common sense" confirms that the fit between the USPS regulation and the compelling objectives of protecting Postal Service employees and customers

from firearm violence is reasonable.  <u>Florida Bar</u>, 515 U.S. at 628.  The regulation prohibiting

firearms on Postal Property is one of the many tools that the Postal Service uses to secure its

property and protect its employees and customers.  As explained in the Declaration of Keith

Milke, the Inspector in Charge of Security and Crime Prevention for the United States Postal

Inspection Service, the USPS regulation is an essential part of the risk management strategy

relied on by the Inspection Service.  Milke Decl. ¶ 41.  As noted above, the U.S. Mail and Postal

Service Property are often targets of criminal activity.  SOF ¶ 20.  Firearms make any such

activity particularly dangerous.  They also make it more difficult for law enforcement to protect

the public, as it is often impossible to determine quickly whether a particular firearm is possessed

or used for benign or nefarious purposes.  Possession of a firearm or other dangerous and deadly

weapon is therefore a critical risk indicator relied upon by law enforcement.  Milke Decl. ¶ 42.

When the Inspection Service receives reports of threatened violence, the first question asked

regarding threat credibility is whether a firearm is involved.  <u>Id.</u>  The removal of firearm

possession as a factor in threat assessment would significantly impair the Inspection Service's

ability to assess threats and respond immediately to those that pose the greatest risk.  <u>Id.</u>

   Moreover, the Inspection Service has determined based on experience that permitting

storage of firearms in Postal Service parking lots would increase security risks and undermine

law enforcement authority.  <u>Id.</u> ¶ 46.  Postal Service parking lots have become sites for criminal

activity at least in part due to the increased use of the U.S. Mail to conduct drug trafficking and

the ability of criminals to track movements of shipments and target letter carriers departing for

delivery.  <u>Id.</u> ¶¶ 46-50.  Allowing firearms to be stored in Postal Service parking lots would

enable individuals with criminal intent to access their firearms more easily, whether those

individuals use vehicles as temporary storage for firearms during commission of a crime, or

whether firearms stored in vehicles parked on Postal Service property are improperly secured and become the target of theft.  Id. ¶ 46.[13]  Furthermore, if the firearm ban did not cover the full perimeter of Postal Service property, Postal Inspectors and other law enforcement officers would have no authority to apprehend armed suspects before they enter the inside of a postal facility, placing the Inspectors, postal employees, customers, and bystanders at greater risk.  Id. ¶¶ 46, 49-50.

It is sensible for the Postal Service to impose a uniform, administrable regulation. Neither Postal Inspectors nor other Postal Service employees have the resources or ability to make individualized assessments regarding firearm safety.  Id. ¶¶ 43, 44; Granholm Decl. ¶¶ 13, 16.  This uniform regulation is also an important part of the terms of employment of many Postal Service employees, as set forth in the agency's collective bargaining agreements.  Granholm Decl. ¶ 17.  The USPS regulation is substantially related to the government's important objectives and therefore survives heightened constitutional scrutiny.

### 3.	The Fact that the Bonidys Have Concealed Carry Permits Has No Bearing on the Constitutional Analysis.

The fact that some individuals, including the Bonidys, possess state-issued concealed carry permits does not undermine the reasonableness of the USPS regulation.  Even permit holders can, of course, commit crimes or operate firearms in an unsafe manner.  Moreover, as explained above, it is certainly sensible for the United States Postal Service, which is statutorily obligated to provide uniform services throughout the United States, to adopt a single, national policy regarding firearms.  This is particularly true given the vastly divergent state laws

---

[13] In one recent example, a woman attending a disability hearing with her husband at a Department of Veterans Affairs office located in a Postal Service-owned building was arrested for illegal possession of a firearm.  Id. ¶ 45.  She left the hearing to retrieve personal articles for her husband, and upon re-entering the building, was found to be in possession of a loaded handgun.  Id.

46

regarding firearm possession.  Each of the 50 states and the District of Columbia has its own

regime for providing concealed carry permits to its residents.  See United States Government

Accountability Office Report to Congressional Requesters, "Gun Control: States' Laws and

Requirements for Concealed Carry Permits Vary across the Nation" (July 2012) ("GAO Report")

(attached as Ex. A-16).  Eligibility requirements differ substantially from state to state, meaning

that "an individual could obtain a permit in one state but not another."  Id. at 8, 14-16.  In

addition, some states recognize permits issued by another state, while others do not.  Id. at 8, 80-

83.[14]

Postal Service employees – including Inspectors, Postmasters, and other employees – do

not have the resources or experience to be familiar with the licensing regimes of the 50 states in

order to determine whether an individual entering a given Post Office in a particular state is

properly authorized to carry a firearm.  Nor do postal employees have the resources or ability to

make on-the-spot, individualized assessments as to whether a particular individual may safely

possess a firearm.  Milke Decl. ¶¶ 43, 44; Granholm Decl. ¶¶ 13, 16.  Given the widely divergent

standards for issuing permits (including some states that do not even require permits), the Postal

Service may not, as a matter of security policy, agree with the licensing decisions made by

certain states or local authorities.  It is appropriate for the Postal Service to protect its employees

---

[14] Broadly speaking, as of March 2012, 39 states (including Colorado) are considered "Shall-Issue" states, which means that "issuing authorities are required to issue a permit to an applicant that fulfills the objective statutory criteria."  Id. at 8.  Ten states are "May-Issue" states, which allow issuing authorities greater discretion in granting or denying permits.  Id.  For example, issuing authorities in California have discretion to determine if good cause exists for issuance of a permit.  Id. at 13 (citing Cal. Penal Code § 26150(a)(1)-(2)).  Illinois and the District of Columbia do not permit concealed carry at all.  Id. at 73-74.  Four states (Alaska, Arizona, Wyoming and Vermont) do not require a permit to carry concealed within the state, although all but Vermont offer permits for reciprocity purposes in other states.  Id.  In addition, several states permit unlicensed open carry while others do not.  Id. at 33-67.

and customers from firearms violence by adopting a nationwide standard barring all firearms on its property rather than relying on the licensing determinations (or lack thereof) made by various state and local governments.  See Council of Greenburgh Civic Ass'ns, 453 U.S. at 133 (Postal Service "must obviously adopt regulations of general character having uniform applicability throughout the more than three million square miles which the United States embraces").

Mr. and Mrs. Bonidy's own testimony and admissions in this case underscore the sound basis for the Postal Service's uniform policy.  Although both are concealed carry permit holders in the State of Colorado, Mrs. Bonidy's testimony indicates that she was less than candid in submitting her concealed carry permit application to local authorities in Eagle County, Colorado. SOF ¶¶ 46-47; Debbie Bonidy Depo. at 153-54, 158-59, 179.  And Mr. Bonidy has admitted that, although he currently possesses a concealed carry permit in Colorado, he previously violated the firearms laws of the State of Florida by carrying a concealed firearm without a permit.  SOF ¶ 48.  Mr. and Mrs. Bonidy may or may not be "law-abiding individuals," Second. Am. Compl. ¶¶ 30, 35, who could carry their firearms on postal property without imposing an undue risk to themselves or others.  But their failure to comply with concealed weapon permit requirements in Florida and Colorado, respectively, underscores the reasonableness of the Postal Service's decision to impose a uniform firearms policy, rather than to except the Bonidys (or others) from this policy simply because they hold concealed carry permits.[15]

\*     \*     \*     \*     \*

---

[15] According to the GAO Report, as of December 2011, there were 8 million active permit holders throughout the United States.  GAO Report at 1.  The Postal Service obviously does not have the resources to make individualized predictive judgments as to whether each of these 8 million people could safely carry firearms on postal property.

Defendants understand that plaintiffs have a different policy view about the wisdom of the Postal Service's uniform prohibition on firearms on Postal Service property, and that reasonable minds may disagree regarding this and many other firearms policy questions. This Court need not resolve what the Court of Appeals has described as "the long-running debate as to whether allowing individuals to carry firearms enhances or diminishes the overall safety of the community," Ramsey Winch, Inc. v. Henry, 555 F.3d 1199, 1211 (10th Cir. 2009), in order to uphold the USPS regulation – even under heightened constitutional scrutiny. As the Court of Appeals and the Supreme Court have explained, "if a regulation is fairly debatable, the legislative judgment must control." Id. (citing Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 388 (1926)). In this case, the Postal Service has properly exercised its Constitutionally-authorized and Congressionally-delegated authority to enact regulations to protect the millions of employees and customers who enter its property on a daily basis. The law-enforcement and security professionals in the Postal Inspection Service responsible for protecting the customers and employees on Postal Property have made an appropriate determination that the USPS regulation banning all non-official firearms on postal property is a necessary law enforcement and threat management tool. Milke Decl. ¶¶ 41-50. That conclusion is bolstered by the literature regarding workplace violence, criminal justice and public safety. Id. ¶¶ 51-53. This is precisely the kind of "predictive judgment" that is entitled to "substantial deference," even under heightened constitutional scrutiny. Turner Broad. Sys., 512 U.S. at 665. Because the fit between the USPS regulation and the Postal Service's compelling objectives in protecting public safety and preventing armed violence on its property is substantial, this Court should uphold the regulation.

49

## CONCLUSION

The USPS regulation is, at most, a reasonable time, place, and manner restriction on the possession of firearms in a sensitive place.  The USPS regulation does not impose any burden, let alone a substantial burden, on conduct within the scope of the Second Amendment right.  Even if the regulation did implicate conduct protected by the Second Amendment, it passes muster under any applicable level of constitutional scrutiny.  The Court should therefore enter summary judgment for defendants.

Dated: September 28, 2012

Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General

JOHN F. WALSH
United States Attorney

JOHN R. GRIFFITHS
Assistant Branch Director

s/ Lesley R. Farby
LESLEY R. FARBY (DC #495625)
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Telephone:  (202) 514-3481
Fax:  (202) 616-8470
E-mail: Lesley.Farby@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2012, I electronically filed the foregoing with the Clerk of Court using the ECF system, which will electronically send notice to:

James M. Manley, Esq.
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
jmanley@mountainstateslegal.com


s/ Lesley R. Farby
LESLEY R. FARBY