**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 10-cv-02408-RPM

TAB BONIDY, and
NATIONAL ASSOCIATION FOR GUN RIGHTS,

      Plaintiffs,

  v.

UNITED STATES POSTAL SERVICE,
PATRICK DONAHOE, Postmaster General, and
MICHAEL KERVIN, Acting Postmaster, Avon, Colorado,

      Defendants.

---

**PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN**
**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................ 1

BACKGROUND ............................................................................. 3

PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS ................................... 4

PLAINTIFFS' STATEMENT OF DISPUTED FACTS ........................................ 9

ARGUMENT ................................................................................. 13

I.   STANDARD OF REVIEW ........................................................ 13

II.  THE SECOND AMENDMENT GUARANTEES THE RIGHT TO
     CARRY FIREARMS FOR SELF-DEFENSE IN CASE OF
     CONFRONTATION ................................................................ 15

     A.   The Text Of The Second Amendment Protects The Right To
          Carry ..................................................................... 16

     B.   The English Common Law Illustrates The Unreasonableness
          Of The USPS Firearms Ban ............................................ 17

     C.   The Right To Carry Has Long Been Protected In The Several
          States ..................................................................... 19

III. THE POSTAL PROPERTY AT ISSUE IS NOT "SENSITIVE." .............. 22

     A.   Defendants' Rationale For Labeling The Avon Post Office A
          "Sensitive Place" Proves Too Much ................................. 22

     B.   The Avon Post Office And Its Parking Lot Are Open To The
          Public And Have None Of The Indicia Of A "Sensitive Place." ...... 27

     C.   Presumptively Lawful Regulations May Still Be
          Unconstitutional ....................................................... 31

IV.    THE USPS FIREARMS BAN VIOLATES THE SECOND
AMENDMENT ................................................................................   33

    A.    The Breadth Of The USPS Firearms Ban Indicates That Strict
Scrutiny Is Appropriate ....................................................................   33

    B.    At A Minimum, The USPS Firearms Ban Is Subject To
Intermediate Scrutiny ......................................................................   40

    C.    The USPS Firearms Ban Fails Under Either Intermediate Or
Strict Scrutiny .................................................................................   42

CONCLUSION ................................................................................................   49

# TABLE OF AUTHORITIES

## CASES

*Abilene Retail No. 30, Inc. v. Dickinson County*,
492 F.3d 1164 (10th Cir. 2007) ............................................................... 14, 30

*Bateman v. Perdue*, 2012 WL 3068580, *4 (E.D.N.C. 2012) ................................ 21

*Blount v. Rizzi*, 400 U.S. 410 (1971) ..................................................... 38

*Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989) ........................ 41, 43

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)........................................... 13

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
447 U.S. 557 (1980)...................................................................... 34

*City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984)........... 14, 43

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ........................ 14, 30

*City of Las Vegas v. Moberg*, 485 P.2d 737 (N.M. Ct. App. 1971) ........................ 20, 24–25

*Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984)................... 36

*DiGiacinto v. Rector & Visitors of George Mason Univ.*,
704 S.E.2d 365 (Va. 2011)............................................................... passim

*District of Columbia v. Heller*, 554 U.S. 570 (2008).............................. passim

*Elrod v. Burns*, 427 U.S. 347 (1976) ..................................................... 38

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ................................ passim

*Frisby v. Schultz*, 487 U.S. 474 (1988) ................................................ passim

*GeorgiaCarry.Org  v. Georgia*, 764 F. Supp. 2d 1306 (M.D. Ga. 2011)............... 21, 35, 41

*Goodman v. City of Kansas City*, 906 F. Supp. 537 (W.D. Mo. 1995) ................... 36

*Hall v. Garcia*, 2011 WL 995933 (N.D. Cal. Mar. 17, 2011)............................ 27–29, 35

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ........................ 43

*Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977) .................   1

*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988).................................................   48

*In re Brickey*, 70 P. 609 (Idaho 1902)....................................................................   20, 25

*Initiative and Referendum Institute v. U.S. Postal Service*,
417 F.3d 1299 (D.C. Cir. 2005)................................................................................   26, 36, 47

*Kellogg v. City of Gary*, 562 N.E.2d 685 (Ind. 1990)............................................   20

*Lakewood v. Pillow*, 501 P.2d 744 (Colo. 1972)....................................................   20, 24

*Martin v. Struthers*, 319 U.S. 141 (1943) ..............................................................   36

*McDonald v. City of Chicago*, 561 U.S. ___, 130 S.Ct. 3020 (2010) .....................   passim

*Moore v. Madigan*, 842 F. Supp. 2d 1092 (C.D. Ill. 2012)....................................   21

*Muscarello v. United States*, 524 U.S. 125 (1998) ................................................   16

*Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377 (2000) .........................   14

*People v. Nakamura*, 62 P.2d 246 (Colo. 1936)....................................................   19, 20

*People v. Zerillo*, 189 N.W. 927 (Mich. 1922) ......................................................   19, 20

*Peruta v. San Diego*, 758 F. Supp. 2d 1106 (S.D. Cal. 2010)................................   21

*Piszczatoski v. Filko*, 840 F. Supp. 2d 813 (D.N.J. 2012) ......................................   21

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992)......................................................   14, 34, 42

*Rockville Reminder v. United States Postal Serv.*, 480 F.2d 4 (2d Cir. 1973)..........   48

*Simpson v. State*, 13 Tenn. 356 (1833) .................................................................   19

*State v. Blocker*, 630 P.2d 824 (Or. 1981) .............................................................   24

*State v. Christian*, 274 P.3d 262 (Or. Ct. App. 2012)............................................   19

*State v. Huntly*, 25 N.C. 418 (N.C. 1843) ..............................................................   19

*State ex rel. City of Princeton v. Buckner*, 377 S.E.2d 139 (W.Va. 1988) ............... 20

*Stears v. Sheridan County Memorial Hosp. Bd. of Trustees*,
491 F.3d 1160 (10th Cir. 2007) ........................................................ 13–14

*Steffel v. Thompson*, 415 U.S. 452 (1974) ................................................ 1

*United States v. Anderson*, 559 F.3d 348 (5th Cir. 2009) ......................... 32

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ........................... passim

*United States v. Davis*, 304 Fed. Appx. 473 (9th Cir. 2008) .................... 28

*United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012) .......................... 35, 39

*United States v. Dorosan*, No. 08-042 (E.D. La. July 7, 2008) ................ 23–24

*United States v. Dorosan*, 350 Fed. Appx. 874 (5th Cir. 2009) .............. 23–24

*United States v. Frazier*, 314 Fed. Appx. 801 (6th Cir. 2008) ................ 32

*United States v. Kokinda*, 497 U.S. 720 (1990) ...................................... 25–26

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ...................... 34, 38, 41

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) ................. passim

*United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009) .................... 31–32

*United States v. Nolan*, 342 F. App'x 368 (10th Cir. 2009) .................... 31

*United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803 (2000) ........ 38

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010) .......................... passim

*United States v. Skoien*, 587 F.3d 803 (7th Cir. 2009) ........................... 38

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ........................... 34, 41

*United States v. Walters*, 2008 WL 2740398 (D.V.I. July 15, 2008) ...... 32

*United States v. Williams*, 616 F.3d 685 (7th Cir. 2010) ....................... 31–32, 41

*United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson*, 255 U.S. 407 (1921) ..................................................................................... 38

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ...... 1

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ............................................. 3, 14, 40–43

*Warden v. Nickels*, 697 F. Supp. 2d 1221 (W.D. Wash. 2010) ............................... 27–29

*Watt v. Energy Action Educ. Found.*, 454 U.S. 151 (1981) .................................... 1

*Woollard v. Sheridan*, 2012 WL 695674 (D.Md. 2012) ........................................ 20

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. II ............................................................................................ passim

## STATUTES

C.R.S. § 18-9-112 ................................................................................................. 28

C.R.S. § 18-12-201 ............................................................................................... 8

16 U.S.C. § 1a-7b ................................................................................................. 46

18 U.S.C. § 922 .................................................................................................... 26, 31–35

18 U.S.C. § 930 .................................................................................................... 26, 36, 37

18 U.S.C. § 3571 .................................................................................................. 20

39 U.S.C. § 201 .................................................................................................... 4

39 U.S.C. § 401 .................................................................................................... 5

39 U.S.C. § 403 .................................................................................................... 4–5

## RULES AND REGULATIONS

32 C.F.R. § 234.1 ................................................................................................. 36

32 C.F.R. § 234.10 ............................................................................................... 36

32 C.F.R. § 1903.1 ........................................................................... 36

32 C.F.R. § 1903.10 ......................................................................... 36

36 C.F.R. § 2.4 ................................................................................ 35, 37

39 C.F.R. § 232.1 ............................................................................ passim

## **OTHER AUTHORITIES**

William Blackstone's *Commentaries on the Laws of England* ................................ 17–19

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139 (2007) ...................................... 24

Philip J. Cook, et al., *Gun Control After Heller: Threats and Sideshows From a Social Welfare Perspective*, 56 UCLA L. Rev. 1041 (2009) ............................... 45

Gary Kleck & Mark Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. Crim. L. & Criminology 150 (1995) ....... 45–46

Janet Knopp, *State Constitutions and the Right to Bear Arms*, 7 Okla. City U. L. Rev. 177 (1982) ................................................................................ 18

David Kopel, *Pretend "Gun-free" School Zones: A Deadly Legal Fiction*, 42 Conn. L. Rev. 515 (2009) ...................................................................... 45

John R. Lott & David B. Mustard, *Crime, Deterrence and Right-To-Carry Concealed Handguns*, 26 J. Legal Stud. 1 (1997) .................................................. 45

Carlisle E. Moody & Thomas B. Marvell, *The Debate on Shall-Issue Laws*, 5 Econ. J. Watch 269 (2008) ..................................................................... 45

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443 (2009) ................................................................................. 36, 45

Plaintiffs Tab Bonidy and the National Association for Gun Rights ("NAGR"),[1] by and through their undersigned attorney, hereby move for summary judgment.  Pursuant to the Parties' agreement and this Court's January 26, 2012, Scheduling Order (Doc. 25), Plaintiffs file a cross-motion for summary judgment and response in opposition to Defendants' Motion for Summary Judgment (Doc. 31) (hereinafter "Defs.' Mot.").

## INTRODUCTION

Plaintiffs' Second Amended Complaint raises two distinct issues: (1) Whether Defendants may prohibit Mr. Bonidy from storing a firearm in a private vehicle parked on postal property adjacent to the Avon Post Office; and (2) whether Defendants may prohibit Mr. Bonidy from carrying a firearm inside the Avon Post Office.

The United States Postal Service's ("USPS") total prohibition on firearms violates the Second Amendment's explicit guarantee of the right to carry firearms for self-defense.  *District of Columbia v. Heller*, 554 U.S. 570, 584 (2008).  The Second Amendment's protection of the right to carry is consistent with the English tradition of protecting the right of law-abiding citizens to carry arms for peaceable purposes, including self-defense.  Moreover, the Supreme

---

[1] Defendants assert that NAGR lacks standing "in its own right as opposed to in its representational capacity."  Defs.' Mot. at 17 n.6.  As Defendants concede, NAGR has standing in its representational capacity.  *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 342–43 (1977).  Whether NAGR has standing in its own right is largely irrelevant here because the Bonidys have standing to bring this as-applied challenge.  *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).  In cases where, as here, Plaintiffs seek injunctive and declaratory relief, so long as "at least one individual plaintiff . . . has demonstrated standing," a court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit."  *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977); *see also Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981).

1

Court has indicated approval for the majority view adopted by State courts: that outright bans on the carrying of firearms are unconstitutional.

Defendants' Motion for Summary Judgment relies principally on dicta in *Heller*. Their Motion is unpersuasive because it attempts to extrapolate from the dicta a rule of law that is broader than the Court's dicta, at odds with the Court's reasoning, divergent from the historical background, and unsupported by the precedent flowing from *Heller*. As discussed below, the USPS firearms ban does not fit within the "presumptively lawful" regulatory measures identified in the *Heller* dicta. Moreover, even if the *Heller* dicta did apply to the instant case, Defendants would not be relieved of their burden of proving the constitutionality of the USPS ban.

The USPS ban is more than a simple time, place, and manner restriction on possession of firearms, and is therefore subject to strict scrutiny. The USPS firearms ban effects a broad prohibition on law-abiding citizens' right to keep and bear arms for self-defense, and because the ban does not even allow safe storage in a vehicle, it impairs the ability to bear arms before and after visiting postal property. Even driving through postal property to deposit mail in a parking lot mail receptacle would violate the ban.

At a minimum, the USPS ban imposes a burden on the time, place, and manner of constitutionally protected conduct; therefore, binding Tenth Circuit precedent—and the weight of authority from other courts—require the USPS ban to meet at least intermediate scrutiny.

Ultimately, this Court need not determine what level of heightened scrutiny applies here. Under any level of scrutiny, Defendants have failed to marshal evidence to justify their draconian ban, especially in light of the lack of security in the Avon Post Office and its adjacent parking lot. Defendants have failed to show how the USPS ban is tailored to compelling

government interests because "a substantial portion of the burden on [personal security] does not serve to advance its goals." *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989).

Accordingly, because there are no genuine issues of material fact regarding whether the USPS firearms ban prohibits Mr. Bonidy from exercising his Second Amendment right to possess a functional firearm for self-defense when he is on postal property, and because Defendants have failed to carry their burden under either strict or intermediate scrutiny to show that the USPS ban is not unconstitutional, Plaintiffs are therefore entitled to summary judgment with respect to both of their claims:  (1) By prohibiting Mr. Bonidy from possessing a functional firearm for self-defense in a private vehicle parked in the public Avon Post Office parking lot, Defendants violate the Second Amendment; and (2) By prohibiting Mr. Bonidy from carrying a functional firearm for self-defense inside the Avon Post Office, Defendants violate the Second Amendment.

## **BACKGROUND**

On July 22, 2010, Mr. Bonidy contacted the USPS to inquire as to whether he would be subject to prosecution pursuant to 39 C.F.R. § 232.1(*l*) if he carried a firearm on USPS property or stored a firearm in his car while parked on USPS property when picking up his mail.  Second Am. Compl. ¶ 26, Ex. 1 (Doc. 15).  By return letter, Senior Vice President and General Counsel Mary Anne Gibbons, on behalf of then-Postmaster General John Potter, confirmed that "the regulations governing Conduct on Postal Property prevent the Bonidys from carrying firearms, openly or concealed, onto any real property under the charge and control of the Postal Service. . . . There are limited exceptions to this policy that would not apply here."  Second Am. Compl. ¶ 27, Ex. 2.  Thus, 39 C.F.R. § 232.1(*l*) imposes a total ban on law-abiding individuals' possession

of firearms; the USPS ban does not even allow Mr. Bonidy to safely store a firearm in his

vehicle.  This effectively results in a broad ban on possession of firearms—not only on USPS

property—but also when Mr. Bonidy travels to or from USPS property.

On October 4, 2010, Plaintiffs filed the instant action seeking declaratory and injunctive

relief to remedy Defendants' unconstitutional deprivation of their right to keep and bear arms.

Defendants responded by filing a Motion to Dismiss.  This Court granted that Motion and

dismissed Plaintiffs' Complaint with leave to amend.  Plaintiffs filed an amended Complaint

raising two discrete claims for relief:  (1) Defendants violate the Second Amendment by

prohibiting Mr. Bonidy from possessing a firearm in a private vehicle parked in the public USPS

parking lot adjacent to the Avon Post Office; and (2) Defendants violate the Second Amendment

by prohibiting Mr. Bonidy from carrying a firearm inside the Avon Post Office.  On April 25,

2011, Defendants again moved to dismiss Plaintiffs' claims and on November 18, 2011, this

Court denied Defendants' Motion to Dismiss.  The parties then engaged in discovery.

## PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS

For purposes of Plaintiffs' Motion for Summary Judgment only, Plaintiffs submit that the

following facts are undisputed:[2]

1.      The United States Postal Service is "an independent establishment of the

executive branch of the government of the United States . . . ."  39 U.S.C. § 201.  The USPS is

responsible for providing "postal facilities of such character and in such locations, that postal

patrons throughout the Nation will . . . have ready access to essential postal services."  39 U.S.C.

---

[2] Hereinafter "Pls.' SOF ¶ __."

4

§ 403(b)(3).  The USPS is also authorized "to adopt . . . rules and regulations . . . as may be necessary in the execution of its functions."  39 U.S.C. § 401(2).  Scheduling Order, Undisputed Facts ¶ 1 (Doc. 25).

2.      Patrick Donahoe is the Postmaster General of the USPS.  Defendant Donahoe is responsible for the administration of the USPS.  Scheduling Order, Undisputed Facts ¶ 2.

3.      Until September 1, 2012, Steven Ruehle was the Postmaster of the Post Office at 111 West Beaver Creek Boulevard in Avon, Colorado.  Until September 1, 2012, Defendant Ruehle was responsible for the administration of the Post Office at 111 West Beaver Creek Boulevard in Avon, Colorado.  Scheduling Order, Undisputed Facts ¶ 3; Defs.' Mot. at n.1.

4.      Michael Kervin is now the Postmaster of the Post Office at 111 West Beaver Creek Boulevard in Avon, Colorado.  Defendant Kervin is responsible for the administration of the Post Office at 111 West Beaver Creek Boulevard in Avon, Colorado.  Defs.' Mot. at n.1.

5.      The Avon Postmaster is responsible for the safety of his employees and the security of the postal property.  Deposition of Steven Ruehle ("Postmaster Ruehle Dep.") at 26.  (Relevant portions attached hereto as Exhibit 1.)

6.      Mr. Bonidy lives in rural Colorado and he does not have home mail service.  Scheduling Order, Undisputed Facts ¶ 7.

7.      The Avon Post Office—at 111 West Beaver Creek Boulevard in Avon, Colorado—provides Mr. Bonidy and his neighbors with post office boxes at no charge.  Scheduling Order, Undisputed Facts ¶ 8.

8.      The Avon Post Office is a freestanding building, with a public parking lot at the front entrance of the building and a restricted-access employee parking lot at the rear of the

building.  There are sidewalks adjacent to the front entrance of the building and surrounding the outside perimeter of the public parking lot.  Postmaster Ruehle Dep. at 54–56.

9.      The Avon Post Office is not co-located with any other federal, state, or local government entities.  *Id*.

10.     There is 24-hour access to the lobby area of the Avon Post Office where post office boxes are located.  Postmaster Ruehle Dep. at 53.

11.     Areas where the public's access to the Avon Post Office is restricted include the area behind the service counter, which includes the mail sorting area, and an employee-only parking lot, where employees park and mail trucks are staged.  Postmaster Ruehle Dep. at 47, 54.

12.     Security personnel do not electronically screen persons entering the Avon Post Office to determine whether persons are carrying firearms, or weapons of any kind.  Scheduling Order, Undisputed Facts ¶ 9.

13.     Security personnel do not restrict access to the Avon Post Office to only those persons who have been screened and determined to be unarmed.  Scheduling Order, Undisputed Facts ¶ 10.

14.     There are no law enforcement officers employed by the Postal Service working at the Avon Post Office on a regular basis.  Postmaster Ruehle Dep. at 27–28.

15.     There are no employees of the Postal Inspection Service working at the Avon Post Office on a regular basis.  Postmaster Ruehle Dep. at 32–33.

16.     There are no armed security guards working at the Avon Post Office.  Postmaster Ruehle Dep. at 38, 48.

17.     There are no restrictions against carrying pocket knives or tools inside the Avon Post Office.  Postmaster Ruehle Dep. at 40–41.

18.     Packages brought into the Avon Post Office are not screened for explosives or other weapons.  Postmaster Ruehle Dep. at 42–43.

19.     Employees of the Avon Post Office are instructed to call the police, notify their supervisor, call the Postal Inspection Service, and try not to get hurt if someone brings a gun into the Avon Post Office.  Postmaster Ruehle Dep. at 27.

20.     Illegal drugs have been mailed through the Avon Post Office.  Postmaster Ruehle Dep. at 44.

21.     There is a public parking lot adjacent to the Avon Post Office; the parking lot is located on real property under the charge and control of the USPS.  Scheduling Order, Undisputed Facts ¶ 11.

22.     There are signs on portions of West Beaver Creek Boulevard adjacent to the Avon Post Office that state: "Emergency Snow Route. No Parking If Over Two Inches."  Scheduling Order, Undisputed Facts ¶ 12.

23.     It snowed two inches or more at the Avon Post Office approximately every other week in the winter of 2012, and approximately once a week in the winter of 2011.  Postmaster Ruehle Dep. at 19–20.

24.     Public parking on West Beaver Creek Boulevard is regularly unavailable during the winter.  Deposition of Debbie Bonidy ("Debbie Bonidy Dep.") at 78–79.  (Relevant portions attached hereto as Exhibit 2.)

25.     The public USPS parking lot adjacent to the Avon Post Office is the only public parking consistently available to patrons of the Avon Post Office.  Debbie Bonidy Dep. at 78–79; Deposition of Tab Bonidy ("Tab Bonidy Dep.") at 54.  (Relevant portions attached hereto as Exhibit 3.)

26.     Mr. Bonidy lawfully owns handguns, which he is licensed to carry pursuant to Colorado's Concealed Carry Act.  C.R.S. § 18-12-201 *et seq*.  Tab Bonidy Dep. at 87.

27.     Mr. Bonidy is over 21 years old, has no history of substance abuse or a criminal record, is not subject to a protection order, has demonstrated competency with a handgun, and has been approved by the Eagle County Sheriff to carry a concealed handgun almost everywhere in the State.  Tab Bonidy Dep. at 87, 128, 140.

28.     Mr. Bonidy is a member of NAGR.  Tab Bonidy Dep. at 134.

29.     NAGR is a membership organization incorporated to secure—through education, outreach, and litigation—the constitutional and statutory right to privately own, possess, and carry firearms.  Tab Bonidy Dep. at 134–35.

30.     USPS regulations prohibit individuals, including Mr. Bonidy and NAGR's members, from possessing a functional firearm, openly or concealed, on any real property under the charge and control of the USPS, including firearms stored in private vehicles parked in the public parking lot adjacent to the Avon Post Office.  39 C.F.R. § 232.1(*l*); Scheduling Order, Undisputed Facts ¶ 4.

31.     USPS regulations prohibit individuals, including Mr. Bonidy and NAGR's members, from carrying a functional firearm, openly or concealed, onto any real property under

the charge and control of the USPS, including inside the Avon Post Office.  39 C.F.R. § 232.1(*l*);

Scheduling Order, Undisputed Facts ¶ 5.

32.     Violation of 39 C.F.R. § 232.1(*l*) is punishable by fine, imprisonment, or both.  39

C.F.R. § 232.1(p)(2); Scheduling Order, Undisputed Facts ¶ 6.

33.     The USPS regulation prohibiting individuals from possessing a functional firearm

on postal property, 39 C.F.R. § 232.1(l), prevents Mr. Bonidy from picking up his mail while

possessing a firearm.  Tab Bonidy Dep. at 111, 150–51.

34.     On July 22, 2010, Mr. and Mrs. Bonidy, through counsel, contacted the USPS to

inquire as to whether they would be subject to prosecution pursuant to 39 C.F.R. § 232.1(*l*) if

they carried a firearm on USPS property or stored a firearm in their cars when they parked on

USPS property when picking up their mail.  Scheduling Order, Undisputed Facts ¶ 13.

35.     On August 3, 2010, Senior Vice President and General Counsel Mary Anne

Gibbons responded, on behalf of then-Postmaster General John Potter, to the Bonidys' July 22,

2010, letter.  Ms. Gibbons stated, "the regulations governing Conduct on Postal Property prevent

the Bonidys from carrying firearms, openly or concealed, onto any real property under the charge

and control of the Postal Service. . . .  There are limited exceptions to this policy that would not

apply here."  Scheduling Order, Undisputed Facts ¶ 14.

## **PLAINTIFFS' STATEMENT OF DISPUTED FACTS**

For purposes of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment

only, Plaintiffs submit the following statement of disputed facts.  Plaintiffs do not concede the

materiality of any disputed or undisputed facts.  This statement corresponds to the paragraphs in

Defendants' Statement of Undisputed Facts.

1.      Undisputed.

2.      Undisputed.

3.      Undisputed.

4.      Undisputed.

5.      Undisputed.

6.      Undisputed.

7.      Disputed to the extent that Defendants claim to have achieved "a violence-free workplace through comprehensive policies, preventative measures, and threat management strategies."

8.      Undisputed.

9.      Undisputed.

10.      Undisputed that it is Keith Milke's opinion that "[t]he prohibition on firearms on postal property is a critical component of the Postal Service's risk-management and violence prevention strategies."  Undisputed that the Postal Service "has a policy of Zero Tolerance for violence by or against its employees," which functions as described.

11.      Undisputed.

12.      Undisputed.

13.      Undisputed that the Postal Inspection Service considers "[t]he presence of or access to firearms . . . in assessing the credibility of threats, both from within the Postal Service (i.e., employees) and from outside sources."  Disputed that the presence of or access to firearms is a "critical factor" in this assessment.  *See* Ex. Milke-11 to Defs.' Mot. at Ex. 2-6a through 2-6c

and Ex. 3-2.2 (identifying dozens of other factors weighted equally to or greater than access to firearms).

14.     Undisputed.

15.     Undisputed.

16.     Undisputed.

17.     Undisputed.

18.     Undisputed.

19.     Undisputed.

20.     Undisputed.

21.     Undisputed.

22.     Undisputed.

23.     Undisputed.

24.     Undisputed.

25.     Undisputed.

26.     Undisputed.

27.     Undisputed.

28.     Undisputed.

29.     Undisputed that "there continue to be homicides and other violent crimes occurring on postal property and targeting postal employees."

30.     Undisputed.

31.     Undisputed.

32.     Undisputed.

33.     Undisputed.

34.     Undisputed.

35.     Undisputed.

36.     Undisputed.

37.     Undisputed.

38.     Undisputed.

39.     Undisputed that Mr. and Mrs. Bonidy testified that they avoid the Avon Post Office and currently incur the additional expense of sending an architect employed by Mr. Bonidy to pick up their mail, only because the prohibitions contained at 39 C.F.R. § 232.1(*l*) force the Bonidys to choose between exercising their Second Amendment rights and picking up their mail.  Tab Bonidy Dep. at 49–52, 150–51.

40.     Undisputed.

41.     Undisputed that on two occasions when picking up their mail at the Avon Post Office, Mr. and Mrs. Bonidy have parked without permission in private parking lots of nearby businesses, parking lots which are reserved for customers of those businesses.  Debbie Bonidy Dep. at 181–82; Tab Bonidy Dep. at 152.

42.     Disputed that snow accumulation has not limited parking on West Beaver Creek Boulevard.  Debbie Bonidy Dep. at 78–79.  Undisputed that Mr. and Mrs. Bonidy have never been able to park on the public street in front of the Post Office because, whenever they have had occasion to do so, those parking spots were occupied by other vehicles or otherwise unavailable. Debbie Bonidy Dep. at 78–79; Tab Bonidy Dep. at 54.

43.     Undisputed.

44.    Undisputed.

45.    Undisputed.

46.    Disputed.  Mrs. Bonidy never testified that she "chronically and habitually use[d] alcoholic beverages to the extent that [her] normal faculties are impaired."  On the contrary, Mrs. Bonidy testified that she has never handled a firearm after drinking alcoholic beverages, that she has held employment in the medical field for the past 28 years, that she volunteers for Home Care and Hospice of the Valley, that in 2009 she voluntarily sought assistance to achieve her personal goal of quitting drinking alcoholic beverages, and that she has not drank an alcoholic beverage since 2010.  Debbie Bonidy Dep. at 21–22; 152–59; 179–80.

47.    Undisputed.

48.    Undisputed that between 1976 and 1979, on three or four occasions, Mr. Bonidy carried a concealed firearm in the State of Florida for self-defense and that he did not have a permit to carry a concealed firearm in Florida.

## ARGUMENT

### I.    STANDARD OF REVIEW.

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, show there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When reviewing a motion for summary judgment, courts review the pleadings and the documentary evidence in the light most favorable to the nonmoving party and draw all legitimate inferences and resolve all doubts in favor of that party.  *Stears v. Sheridan County Memorial Hosp. Bd. of*

*Trustees*, 491 F.3d 1160, 1162 (10th Cir. 2007).  Defendants bear the burden of producing facts

proving that the USPS firearms ban does not violate the Constitution.  *Nixon v. Shrink Missouri*

*Government PAC*, 528 U.S. 377, 379 (2000) ("This Court has never accepted mere conjecture as

adequate to carry a First Amendment burden."); *Abilene Retail No. 30, Inc. v. Dickinson County*,

492 F.3d 1164, 1173–74 (10th Cir. 2007); *see also City of Los Angeles v. Alameda Books, Inc.*,

535 U.S. 425, 438–39 (2002); *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010) ("[W]e

agree with those who advocate looking to the First Amendment as a guide in developing a

standard of review for the Second Amendment.").

      Under strict scrutiny, Defendants must show that the USPS ban is "narrowly tailored to

serve a compelling governmental interest" and "is necessary to serve the asserted [compelling]

interest."  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992) (substitution in original)

(quotation omitted).  At a minimum, the USPS ban is a time, place, and manner restriction,

subject to intermediate scrutiny, in which case the USPS ban "must be narrowly tailored to serve

the government's legitimate . . . interests but . . . it need not be the least restrictive or least

intrusive means of doing so. . . .  To be sure, this standard does not mean that a time, place, or

manner regulation may burden substantially more [conduct] than is necessary to further the

government's legitimate interests."  *Ward*, 491 U.S. at 798.  In either case, a "complete ban [on

constitutionally protected activity] can be narrowly tailored, but only if each activity within the

proscription's scope is an appropriately targeted evil."  *Frisby v. Schultz*, 487 U.S. 474, 485–86

(1988) (citing *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808–810

(1984)).

There are no genuine issues of material fact regarding whether the USPS firearms ban prohibits Mr. Bonidy from exercising his Second Amendment right to possess a functional firearm for self-defense when he is on postal property.  Moreover, Defendants have failed to carry their burden under either strict or intermediate scrutiny to show that the USPS ban is not unconstitutional.  For the reasons demonstrated below, Plaintiffs are therefore entitled to entry of summary judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56 with respect to each of their claims.

## II.    THE SECOND AMENDMENT GUARANTEES THE RIGHT TO CARRY FIREARMS FOR SELF-DEFENSE IN CASE OF CONFRONTATION.

Defendants incorrectly argue that the categorical ban on carrying a firearm imposed by the USPS ban is "consistent with the history of the right to bear arms as it developed in England and the American colonies."  Defs.' Mot. at 23.  Defendants argue that they are entitled to summary judgment because the Second Amendment is therefore not implicated by Plaintiffs' claims.  *Id*. at 24.  But this argument cannot be reconciled with the text of the Constitution or the history and tradition that defines its meaning.  By its terms, the Second Amendment protects the right to carry.  Defendants attempt to wrench ancient English law out of context, but the historical record offers no support for their argument.  Moreover, Defendants utterly ignore the wealth of state court precedent that confirms that the right to carry is at the core of the self-defense interests protected by the Second Amendment.  Accordingly, Defendants are not entitled to summary judgment on the basis that the USPS ban does not interfere with rights protected by the Second Amendment.

**A.      The Text Of The Second Amendment Protects The Right To Carry.**

The core conduct protected by the Second Amendment explicitly includes the right to

carry firearms for self-defense:

> A well regulated Militia, being necessary to the security of a free State, the right
> of the people to keep and *bear* Arms, shall not be infringed.

U.S. Const. amend. II (emphasis added).   In *Heller*, the Supreme Court concluded in no

uncertain terms that, "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'"  554 U.S.

at 584.  The Court applied this common historical understanding of the term "bear" to conclude

that the Second Amendment protects the "individual right to possess and carry weapons in case

of confrontation."  *Id*. at 592.  In reaching this conclusion, the Court adopted Justice Ginsburg's

definition of the phrase "to bear arms," which she offered in *Muscarello v. United States*, 524

U.S. 125, 143 (1998):

> Surely a most familiar meaning is, as the Constitution's Second Amendment . . .
> indicate[s]: "wear, bear, or carry . . . upon the person or in the clothing or in a
> pocket, for the purpose . . . of being armed and ready for offensive or defensive
> action in a case of conflict with another person."

*Heller*, 554 U.S. at 584 (internal citations omitted) (omissions in original).  Thus, contrary to

Defendants' suggestion, core conduct protected by the Second Amendment is infringed by the

USPS firearms ban because it is a broad prohibition on the possession and carrying of firearms

"in case of confrontation."  *Id*.

The central holding of *Heller* concerns the constitutionality of possessing functional

firearms in the home:  "the District's requirement . . . that firearms in the home be rendered and

kept inoperable at all times . . . makes it impossible for citizens to use them for the core lawful

purpose of self-defense and is hence unconstitutional."  *Id.* at 630.  The facts of that case did not

give the Court occasion to rule on all aspects of Second Amendment law, and its holding is

appropriately narrow.  *See id.* at 635 ("But since this case represents this Court's first in-depth

examination of the Second Amendment, one should not expect it to clarify the entire field, any

more than *Reynolds v. United States*, our first in-depth Free Exercise Clause case, left that area in

a state of utter certainty." (internal citation omitted)).  Yet, the Court made clear that the right to

"possess and carry weapons in case of confrontation" is the core of the right guaranteed by the

Second Amendment.  *Id*. at 592.  In *McDonald v. City of Chicago*, the Court confirmed that the

right protected is "fundamental to *our* scheme of ordered liberty."  561 U.S. ___, 130 S. Ct.

3020, 3050 (2010) (emphasis in original).  *McDonald* emphasized that the Second Amendment

does *not* embody "a second-class right, subject to an entirely different body of rules than the

other Bill of Rights guarantees."  *Id*. at 3045.

**B.**     **The English Common Law Illustrates The Unreasonableness Of The Usps Firearms Ban.**

The right to carry arms for self-defense has roots in the English common law.  *Heller*,

554 U.S. at 592.  Defendants point to discrete limitations on the right, limitations that have long

been recognized, but by wrenching these examples out of context, Defendants illustrate the

unreasonableness of the USPS firearms ban.  Defs.' Mot. at 23–24.  Defendants pick two

passages from Blackstone's *Commentaries on the Laws of England* in an attempt to show that

English law tolerated blanket bans similar to the USPS ban.  *Id*. at 23.  But the laws that

Defendants cite have nothing to do with the USPS ban on lawful self-defense; they are directed

at poaching and limitations on carrying arms for other nefarious purposes.

The first law Defendants cite is a poaching regulation—although Defendants exclude that

context—addressed to bearing arms while in disguise:

> By statute, unlawful hunting in any legal forest, park, or warren, not being the
> king's property, by night, or with painted faces, was declared to be single felony.
> But now by the statute, to appear armed in any open place by day, or night, with
> faces blacked or otherwise disguised, or (being so disguised) to hunt, wound, kill,
> or steal any deer, to rob a warren, or to steal fish, is felony without benefit of
> clergy.  I mention this offence in this place, not on account of the damage thereby
> done to private property, but of the manner in which that damage is committed;
> namely, with the face blacked or with other disguise, to the breach of the public
> peace and the terror of his majesty's subjects.

William Blackstone, 4 *Commentaries* *144 (citations omitted).  To the extent this regulation has

anything to do with the instant case, it illustrates the sort of reasonable regulation that the Second

Amendment tolerates:  regulating not the simple act of carrying weapons, but rather targeting the

mal intent to poach and hide one's identity.  Of course, this case has nothing to do with

poaching, and Mr. Bonidy does not intend to go about Avon in disguise.  Nevertheless,

Blackstone illustrates the sort of minimal reasonableness that regulations of the right to bear

arms must meet; by linking the benign and protected act of carrying arms with some form of mal

intent or bad action, a reasonable fit is achieved between the governmental purpose and the

regulation.  This is in contrast to the USPS ban, which indiscriminately sweeps both

constitutionally protected and unprotected conduct into its ambit.

The second law Defendants lift from Blackstone's *Commentaries*, the Statute of

Northampton, is of a piece with the first.  The Statute of Northampton prohibited "riding or

going armed with dangerous or unusual weapons."  Blackstone, 4 COMMENTARIES *148.  Like

the poaching statute discussed above, it was targeted at "go[ing] armed 'malo animo' (with evil

intent) or 'to terrify the King's subjects.'"  Janet Knopp, *State Constitutions and the Right to

Bear Arms*, 7 Okla. City U. L. Rev. 177, 202 n. 105 (1982) (quoting *Rex v. Knight*, 87 Eng. Rep.

75, 90 Eng. Rep. 330 (KB 1686)).  Early decisions of American state courts confirm that the

18

Statute of Northampton was targeted at preventing affray, i.e., engaging in armed terror.  *State v. Huntly*, 25 N.C. 418, 422–23 (N.C. 1843); *Simpson v. State*, 13 Tenn. 356, 359–60 (1833).  This is also the modern understanding.  *See, e.g., State v. Christian*, 274 P.3d 262, 286 (Or. Ct. App. 2012).  Moreover, even if the Statute of Northampton—or any other aspect of English law—could be read as prohibiting the peaceable carrying of firearms, constitutional protections for the right to bear arms have "completely abrogated" any such prohibitions.  *Simpson*, 13 Tenn. at 359; *Huntly*, 25 N.C. at 422.[3]

Thus, English law did not protect the right to carry for evil purposes, but the historical understanding of the right to bear arms provides no support for Defendants' suggestion that they may extinguish the right of peaceable citizens to carry firearms for self-defense.

### C.    The Right To Carry Has Long Been Protected In The Several States.

*Heller*'s reliance on a number of 19th century state court decisions offers further guidance about the nature of the right to carry.  These cases stand for the proposition that if one manner of carrying a firearm outside the home is restricted, some other means of carrying arms must be preserved.  These cases are of particular importance because "the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right" that can only be fully understood in light of the "historical background."  *Heller*, 554 U.S. at 592.  For example, as the Court noted in *Heller*:

---

[3] English law also tolerated disarming English subjects on the basis of religion, William Blackstone, 4 *Commentaries* *55, a proposition plainly foreclosed by the American commitment to equality under the law, and respect for the right to keep and bear arms.  *See People v. Nakamura*, 62 P.2d 246, 247 (Colo. 1936); *People v. Zerillo*, 189 N.W. 927, 928 (Mich. 1922).  Thus, English law is the starting point for understanding the rights protected by the Second Amendment, but it does not represent the rights' zenith.

> In *Nunn v. State,* [1 Ga. 243, 251 (1846)] the Georgia Supreme Court struck down a prohibition on carrying pistols openly (even though it upheld a prohibition on carrying concealed weapons).  In *Andrews v. State,* [50 Tenn. 165, 187 (Tenn. 1871)] the Tennessee Supreme Court likewise held that a statute that forbade openly carrying a pistol "publicly or privately, without regard to time or place, or circumstances," violated the state constitutional provision (which the court equated with the Second Amendment).  That was so even though the statute did not restrict the carrying of long guns.  *See also State v. Reid,* 1 Ala. 612, 616–617 (1840) ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, [sic] would be clearly unconstitutional").

*Id.* at 629.  Thus, the Court indicated its approval of the longstanding principle that bans on carrying firearms outside the home, or regulations that amount to bans, violate the right to keep and bear arms.  As the Court's discussion of the 19th century authorities above illustrates, this proposition has long been accepted by state courts.[4]  *See, e.g., Kellogg v. City of Gary*, 562 N.E.2d 685, 694 (Ind. 1990); *State ex rel. City of Princeton v. Buckner*, 377 S.E.2d 139, 144 (W.Va. 1988); *Lakewood v. Pillow*, 501 P.2d 744, 745 (Colo. 1972); *City of Las Vegas v. Moberg*, 485 P.2d 737, 738 (N.M. Ct. App. 1971); *Nakamura*, 62 P.2d at 247; *Zerillo*, 189 N.W. at 928; *In re Brickey*, 70 P. 609, 609 (Idaho 1902).  Moreover, the rule that bans on the carrying of firearms by law-abiding individuals violate the right to keep and bear arms has been applied post-*Heller* by at least four federal courts.  *See Woollard v. Sheridan*, 2012 WL 695674, *7

---

[4] The "[f]irearms laws of the Founding era" that Defendants cite, Defs.' Mot. at 24, are essentially "fire-safety laws [that] do not remotely burden the right of self-defense . . . ." *Heller*, 554 U.S. at 632 ("It is inconceivable that [these laws] would have been enforced against a person exercising his right to self-defense . . . ."); *id.* at 633 ("A broader point about the laws that [Defendants] cite[]:  All of them punished the discharge (or loading) of guns with a small fine and forfeiture of the weapon (or in a few cases a very brief stay in the local jail), not with significant criminal penalties.").  Violation of the USPS ban is punishable by "a fine as provided in 18 U.S.C. § 3571 or imprisonment of not more than 30 days, or both."  39 C.F.R. § 232.1(p)(2).  Fines specified in 18 U.S.C. § 3571 vary from $5,000 to $250,000.

(D.Md. 2012), *appeal docketed as, Woollard v. Gallagher*, No. 12-1437 (Apr. 6, 2012) ("[T]he

Court finds that the right to bear arms is not limited to the home."); *Bateman v. Perdue*, 2012

WL 3068580, *4 (E.D.N.C. 2012) ("[T]he Second Amendment right to keep and bear arms, 'is

not strictly limited to the home environment but extends in some form to wherever those

activities or needs occur.'") (quoting *United States v. Masciandaro*, 638 F.3d 458, 468 (4th Cir.

2011) (Niemeyer, J., writing separately as to Part III.B)); *GeorgiaCarry.Org, Inc. v. Georgia*,

764 F. Supp. 2d 1306, 1319 (M.D. Ga. 2011); *Peruta v. San Diego*, 758 F. Supp. 2d 1106, 1114

(S.D. Cal. 2010) (upholding California's concealed-handgun licensing law because the law still

permitted unlicensed citizens to carry handguns in plain view); *but see Moore v. Madigan*, 842 F.

Supp. 2d 1092, 1101 (C.D. Ill. 2012), *appeal docketed*, No. 12-1269 (Feb. 3, 2012) (holding that

the Second Amendment is limited to only the home).[5]

Thus, although the Court has not weighed in on the full contours of the right to carry, it is

clear from *Heller* that the Court views the Second Amendment as explicitly guaranteeing the

right to carry firearms for self-defense. 554 U.S. at 584. *McDonald* teaches that this right is

fundamental, like the rights protected by the First Amendment. 130 S. Ct. at 3050. This is

consistent with the English tradition of protecting the right of law-abiding citizens to carry arms

for peaceable purposes, including self-defense. Moreover, the Court has indicated approval for

the majority view that bans on the carrying of firearms are unconstitutional. Thus, contrary to

---

[5] Defendants cite *Piszczatoski v. Filko*, 840 F. Supp. 2d 813, 820 (D.N.J. 2012), but that case
merely held that a facial challenge to New Jersey's concealed handgun licensing scheme must
fail, because some limitations on the right to carry are permissible and the plaintiffs had not
shown the law to be "invalid as to every set of circumstances to which applied." Any discussion
about the scope of the Second Amendment was thus merely dicta.

Defendants' suggestion, core conduct protected by the Second Amendment is infringed by the

USPS firearms ban because it is a broad prohibition on the possession and carrying of firearms

"in case of confrontation." *Heller*, 554 U.S. at 629. Accordingly, Defendants are not entitled to

summary judgment on the basis that the USPS ban does not interfere with rights protected by the

Second Amendment.

## III.   THE POSTAL PROPERTY AT ISSUE IS NOT "SENSITIVE."

Defendants' primary argument—that the Second Amendment provides no protection for

the right to keep and bear arms on any USPS property (Defs.' Mot. at 30–31)—stretches the

*Heller* "sensitive government buildings" dicta to its breaking point. 554 U.S. at 626, 627 n.26.

As demonstrated below, the USPS firearms ban does not fit within the "presumptively lawful"

regulatory measures identified in the *Heller* dicta. Moreover, even if the *Heller* dicta did apply

to the instant case, Defendants would not be relieved of their burden of proving the

constitutionality of the USPS ban.

### A.   Defendants' Rationale For Labeling The Avon Post Office A "Sensitive Place" Proves Too Much.

There is substantial reason to conclude that the USPS firearms ban is not narrowly

focused on those "sensitive places" the Court had in mind when it referred to "presumptively

lawful" prohibitions on carrying firearms. *See Heller*, 554 U.S. at 626, 627 n.26. The postal

property at issue in this case—a public USPS parking lot and the public area of the Avon Post

Office where Mr. Bonidy picks up his mail—is not "sensitive" in the sense of the *Heller* dicta.

As demonstrated below, Defendants attempt to force the Avon Post Office into the *Heller* dicta

by (1) pointing to the fact that the property is owned by the government; and (2) showing that

postal property is the site of criminal activity. Ultimately, Defendants' arguments prove too

22

much; if application of the Second Amendment depended on these two factors alone, as Defendants argue, then the right to bear arms would have no meaning outside the home, or at least in public places where the need for self-defense is most acute. This result is foreclosed by the text and history of the Second Amendment.

Defendants argue that the mere fact that postal property is owned by the government and used for government business is enough to qualify the Avon Post Office as a "sensitive place" outside the protection of the Constitution.[6] Defs.' Mot. at 30–31. The cases applying the *Heller* dicta have not relied on the mere fact that property is owned by the government to justify firearms regulations. For example, Defendants conceded that the "Fourth Circuit has applied intermediate scrutiny" to a National Park Service firearm regulation, negating their argument that all government property is excluded from the protections of the Second Amendment. Defs.' Mot. at 41 (citing *Masciandaro*, 638 F.3d at 471). Moreover, the only post-*Heller* case to consider the constitutionality of the USPS ban specifically declined to rely on the fact of government ownership alone. *United States v. Dorosan*, No. 08-042 (E.D. La. July 7, 2008) *aff'd*, 350 Fed. Appx. 874 (5th Cir. 2009).

Indeed, in *Dorosan*, restricted access portions of postal property were determined to be "sensitive places," but the district court declined to extend this reasoning to the public areas of postal property:

---

[6] Defendants suggest that this also means the area surrounding any place where mail is collected or delivered is also a "sensitive place," including mail receptacles in postal parking lots and at other locations, and, perhaps, mail trucks driven throughout the community. Defs.' Mot. at 10 (¶ 17), 15 (¶ 37).

> [T]he constitutionality of the regulation's ban on carrying firearms . . . in public
> areas without official purpose—i.e., operating a vehicle [on postal property] while
> . . . armed with a loaded handgun stowed in the glove compartment . . . [is not]
> before the Court in this case, which involves the prohibited conduct of carrying
> and storing firearms without official purpose *in the gated/restricted access
> employee parking, loading and unloading area* of the subject "Postal property."

*United States v. Dorosan*, No. 08-042, Written Reasons for Conviction and Sentence at 9 (E.D.

La. July 7, 2008) (emphasis added).  The Fifth Circuit also noted the peculiarly sensitive nature

of the restricted access postal property at issue in *Dorosan*, which the Post Office used "for

loading mail and staging its mail trucks."  *United States v. Dorosan*, 350 Fed. Appx. 874 (5th

Cir. 2009) (unpublished).

That courts have declined to label all government property exempt from the Second

Amendment is unsurprising.  If the mere fact of government ownership could make property

sensitive, huge swaths of the United States would become Second Amendment-free zones,

including public roads, sidewalks, and parking lots.  This is inconsistent with the historically

recognized right to carry.  *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the

Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 162–63 (2007) (noting that 18th

Century laws in Pennsylvania and New Jersey banned gunfire on or near highways, but

"explicitly protected the carrying of guns on the highways."); *see also, e.g., Pillow*, 501 P.2d at

745 ("possess[ing] a firearm in a vehicle or in a place of business for the purpose of self-defense.

. . . are constitutionally protected."); *accord State v. Blocker*, 630 P.2d 824, 826 (Or. 1981).

The facts of *City of Las Vegas v. Moberg* are instructive.  There, the "defendant went to

the booking room of the city police department of the city of Las Vegas to report the theft of

certain items from his automobile. At the time, defendant was carrying a pistol in a holster." 485

P.2d. at 738.  As a result, he was convicted of violating a municipal ordinance that prohibited the

carrying of deadly weapons. *Id*. The New Mexico Court of Appeals reversed the conviction. *Id*. at 739. The court drew a distinction between bans on concealed carry, which "do not deprive citizens of the right to bear arms; their effect is only to regulate the right," and a ban on both open and concealed carry. *Id*. at 738. The court held that a total ban, "den[ies] the people the constitutionally guaranteed right to bear arms, and to that extent the ordinance under consideration is void." *Id*. Thus, the court explicitly concluded that the right to bear arms extends to government buildings.

Likewise, the Idaho Supreme Court long ago foreclosed total carry bans, even on public property. *In re Brickey*, 70 P. at 609. That case presented a situation similar to *Moberg*, in that the statute at issue banned both open and concealed carry. *Id*. The court held that both the State and Federal constitutions prohibited a total ban on carrying firearms:

> Under these constitutional provisions, the legislature has no power to prohibit a citizen from bearing arms in any portion of the state of Idaho, whether within or without the corporate limits of cities, towns, and villages. The legislature may, as expressly provided in our state constitution, regulate the exercise of this right, but may not prohibit it.

Accordingly, the conviction under review was overturned and the statute struck down. *Id*. Thus, it would be inconsistent with both state and federal precedent to mark all government property "sensitive" and outside the protection of the Second Amendment. That is why courts have required the government to do more than show mere ownership to prove that property is "sensitive."[7]

---

[7] Defendants reprise this argument when they suggest that the USPS ban is subject only to "reasonableness" review, because "the Postal Service was acting in its proprietary capacity when it enacted the challenged regulation . . . ." Defs.' Mot. at 36. Defendants rely on the plurality opinion in *United States v. Kokinda*, Defs.' Mot. at 36, but Justice Kennedy provided the critical

Defendants' second argument borders on the absurd.  Defendants contend that postal property is the site of criminal activity, and therefore they can eliminate the self-defense rights of patrons at the Avon Post Office.  Defs.' Mot. at 11–13, 31–32.  The fact that a particular area is host to criminal activity logically tends to increase, not decrease, the need for effective self-defense in that location.  *See McDonald*, 130 S. Ct. at 3049 (noting the importance of the Second Amendment in "high-crime areas.").  Statistical evidence of crime would provide justification for narrowly tailored carry restrictions focused on prohibiting criminal use of firearms, such as 18 U.S.C. §§ 930[8] or 922(g)[9], but would do nothing to justify an outright ban that swept legitimate self-defense within its reach.  This is especially true in the situation presented here, since the Avon Post Office provides no security guards or any other similar measures to protect the interest in self-defense that is at the heart of Plaintiffs' claims.  Accordingly, Defendants have failed to prove that the postal property at issue in this case—a public USPS parking lot and the public area of the Avon Post Office where Mr. Bonidy picks up his mail—are "sensitive" in the sense of the *Heller* dicta.

---

fifth vote in *Kokinda*, applying intermediate scrutiny to uphold a narrowly tailored USPS time, place, and manner regulation.  *United States v. Kokinda*, 497 U.S. 720, 738 (1990) (Kennedy, J., concurring).  Even under the *Kokinda* plurality's nonpublic forum reasonableness review, courts have acknowledged that an outright ban on constitutional activity on postal property—like that imposed by the USPS firearms ban—would be unconstitutional.  *Initiative and Referendum Institute v. U.S. Postal Service*, 417 F.3d 1299, 1315 (D.C. Cir. 2005) ("It is clear that a broadscale prohibition against asking postal patrons to sign petitions . . . is unconstitutional even if all postal properties are nonpublic forums.").

[8] Prohibiting possession of firearms in Federal facilities, except "the lawful carrying of firearms . . . incident to hunting or other lawful purposes."  18 U.S.C. § 930(d)(3).

[9] Prohibiting possession of firearms by people who "undeniably pose a heightened danger of misusing firearms."  *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010).

**B.     The Avon Post Office And Its Parking Lot Are Open To The Public And Have None Of The Indicia Of A "Sensitive Place."**

Defendants' attempt to label the Avon Post Office and its parking lot as "sensitive" also fails because it defies the facts on the ground.  Defendants point to cases upholding restrictions on firearms in public schools, a children's center, and airplanes to support the USPS firearms ban.  Defs.' Mot. at 29.  These cases are inapposite, and Defendants' argument fails, because the Avon Post Office has none of the characteristics of these other sensitive places.[10]  Moreover, the breadth of the USPS regulation at issue here places it outside the "presumptively lawful" regulatory measures the Court identified in the *Heller* dicta; for example, the public school cases do not present a total ban like that imposed by Defendants.  *See Hall v. Garcia*, 2011 WL 995933, at *1 (N.D. Cal. Mar. 17, 2011) ("The Act contains several statutory exemptions from that general prohibition."); *Warden v. Nickels*, 697 F. Supp. 2d 1221, 1224, 1229 (W.D. Wash. 2010) ("Indeed, Plaintiff may even bring firearms into those parks that are not designated by the Park Rule."); *DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365, 370 (Va. 2011) ("The regulation does not impose a total ban of weapons on campus. . . .  Individuals may still carry or possess weapons on the open grounds of GMU, and in other places on campus not enumerated in the regulation.").

---

[10] Plaintiffs do not quarrel with Defendants' assertion that some Post Offices are "co-located" in sensitive buildings that house other government facilities.  Defs.' Mot. at 31.  At best, Defendants suffer from delusions of grandeur when they attempt to equate the security concerns of the Avon Post Office with those of Federal courthouses or the United States Capitol.  As demonstrated herein, Defendants have taken no actions consistent with the bald assertion that the Avon Post Office is "sensitive."

Unlike genuinely sensitive places, e.g., *United States v. Davis*, 304 Fed. Appx. 473 (9th Cir. 2008) (airplanes), there is no security or law enforcement presence at the Avon Post Office. Pls.' SOF ¶¶ 12–19.  Even though the USPS firearms ban deprives individuals of the means of self-defense, no security or law enforcement officers are regularly employed at the Avon Post Office to protect the personal security of postal patrons.  *Id*. ¶¶ 14–16.  Nor do security personnel electronically screen persons entering the Avon Post Office to determine whether persons are carrying firearms, or weapons of any kind.  *Id*. ¶ 12.  Security personnel do not restrict access to the Avon Post Office to only those persons who have been screened and determined to be unarmed.  *Id*. ¶ 13.  No packages are screened to determine if they contain explosives or other weapons.  *Id*. ¶ 18.  Even public schools provide a greater level of security than the Avon Post Office, by restricting the general public's access to school buildings.  *See, e.g.,* C.R.S. § 18-9-112; Denver Public Schools Policy KI, Visitors to Schools, *available at* http://tinyurl.com/68h9rx3.  Indeed, the public is free to come and go as they please, 24 hours a day, in the lobby area of the Avon Post Office.  Pls.' SOF ¶ 10.  The postal parking lot adjacent to the Avon Post office is similarly unsecured and open to the public.  *Id*. ¶¶ 8, 21.  And Defendants make no serious attempt to argue that the Avon Post Office is a place "where children and youth predominantly recreate."  *Warden*, 697 F. Supp. 2d at 1227.

It is on this final point that Defendants' attempt to apply the cases dealing with sensitive places falls particularly flat.  In the cases Defendants rely on, the courts have noted that the justification for regulating firearms on school property is the predominate presence of children. *Hall*, 2011 WL 995933, at *4 (noting "the presence of large numbers of children" at or near schools); *Warden*, 697 F. Supp. 2d at 1230 ("The Park Rule's findings cite the fact that in 2008

over 108,000 children and youth visited city-owned wading pools and over 59,000 youth events were scheduled at sports fields."); *DiGiacinto*, 704 S.E.2d at 367 ("Approximately 50,000 elementary and high school students attend summer camps at the University. . . . [B]oth the libraries and the Johnson Center . . . are regularly frequented by children ages two to five years old."). Moreover, in those cases the courts have noted that the regulations do not impose a total ban on possession of firearms, but are instead "narrowly tailored . . . to include only those [areas] where children and youth predominantly recreate," *Warden*, 697 F. Supp. 2d at 1227, and include exceptions for licensed concealed carry and/or car carry. *Hall*, 2011 WL 995933, at *1; *DiGiacinto*, 704 S.E.2d at 370. Defendants gain nothing from their reliance on these cases, because they do not argue that the Avon Post Office is a place "where children and youth predominantly recreate" or gather, *Warden*, 697 F. Supp. 2d at 1227, and the USPS ban totally prohibits possession of firearms at the Avon Post Office, including the adjacent public postal parking lot.

Additionally, as noted above, public schools are not open to the public in the same way that the Avon Post Office is. Defendants only prevent the public from entering restricted access portions of the Avon Post Office property. Pls.' SOF ¶ 11. These include the area behind the service counter, which includes the mail sorting area, and an employee-only parking lot, where employees park and mail trucks are staged. *Id*. But these areas are of no moment in this case, because Mr. Bonidy claims no right to access these areas, let alone the right to carry there. *Id*. ¶¶ 30–31. Here, Mr. Bonidy claims only a right to possess firearms in public, non-restricted areas of postal property, including the public postal parking lot adjacent to the Avon Post Office. *Id*.

It is easy enough to assert that a place is sensitive.  But Defendants must be required to *prove* that the Avon Post Office is sensitive, based on the objective character of that building and precautions Defendants have actually taken to ensure security.  Unless the Second Amendment is subject to cancellation by bureaucratic whim, the evidence that could justify a total carry ban would necessarily focus on actions already being taken to ensure security, not *post hoc* determinations about whether a particular facility is sensitive.[11]  *See Abilene Retail No. 30, Inc.*, 492 F.3d at 1173 ("[T]he Board must show that, in passing the Second Ordinance, it relied on "'evidence that is reasonably believed to be relevant for demonstrating a connection between speech and a substantial, independent government interest.'") (quoting *Alameda Books*, 535 U.S. at 438); *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("The courts may not accept appellate counsel's post hoc rationalizations for agency action . . . ."); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").  Defendants have taken no active steps to protect customers of the Avon Post Office from criminals, yet they have denied law-abiding postal customers the ability to protect themselves.  Accordingly, there is substantial reason to conclude that the USPS firearms ban is not narrowly focused on those "sensitive places" the Court had in mind when it referred to "presumptively lawful" prohibitions on carrying firearms.  *Heller*, 554 U.S. at 626, 627 n.26.

---

[11] All of the justifications for the USPS firearms ban offered by Defendants post-date the codification of the ban at 39 C.F.R. § 232.1(*l*).  *See* Defendants' Objections And Responses To Plaintiffs' First Set Of Requests For Production Of Documents at 5. (Attached hereto as Exhibit 4.)  Defendants have produced no findings or studies that were relied on by the Postal Service prior to the promulgation of 39 C.F.R. § 232.1(*l*).  *Id*.

### C.    Presumptively Lawful Regulations May Still Be Unconstitutional.

Even if the USPS firearms ban could be crammed into the *Heller* dicta, this would

not result in a free pass, as Defendants suggest.  Defs.' Mot. at 26–28.  As the Seventh

Circuit explained in a case challenging the felon-in-possession prohibition of 18 U.S.C. §

922(g)(1):

> [T]he government does not get a free pass simply because Congress has
> established a "categorical ban"; it still must prove that the ban is constitutional, a
> mandate that flows from *Heller* itself.  *Heller* referred to felon disarmament bans
> only as "presumptively lawful," which, by implication, means that there must
> exist the possibility that the ban could be unconstitutional in the face of an as-
> applied challenge.  Therefore, putting the government through its paces in proving
> the constitutionality of § 922(g)(1) is only proper.

*United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010); *see also United States v. Chester*,

628 F.3d 673, 679 (4th Cir. 2010) ("In fact, the phrase 'presumptively lawful regulatory

measures' suggests the possibility that one or more of these 'longstanding' regulations 'could be

unconstitutional in the face of an as-applied challenge.'") (quoting *Williams*, 616 F.3d at 692).

Indeed, if the *Heller* dicta absolved the USPS of the burden of proving the constitutionality of its

firearms ban as applied here, then *Heller* would impose something approximating the rational

basis test; that approach was explicitly rejected by *Heller*.  554 U.S. at 628 n.27 ("If all that was

required to overcome the right to keep and bear arms was a rational basis, the Second

Amendment would be redundant with the separate constitutional prohibitions on irrational laws,

and would have no effect."); *see also Chester*, 628 F.3d at 679.

Defendants are incorrect that Tenth Circuit precedent post-*Heller* absolves them of the

burden to prove the constitutionality of the USPS firearms ban.  Defs.' Mot. at 26 (citing *United*

*States v. Nolan*, 342 F. App'x 368, 372 (10th Cir. 2009) (unpublished)).  In *United States v.*

31

*McCane*, the Tenth Circuit rejected a challenge to the felon-in-possession prohibition of 18 U.S.C. § 922(g)(1) because the law of the circuit already foreclosed such a challenge. 573 F.3d 1037, 1047 (10th Cir. 2009). A number of courts have applied a similar approach to § 922 challenges post-*Heller*. *See United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009); *United States v. Frazier*, 314 Fed. Appx. 801, 807 (6th Cir. 2008); *United States v. Walters*, 2008 WL 2740398 (D.V.I. July 15, 2008).

*United States v. Anderson* is instructive of this trend. In that case, the Fifth Circuit held that a challenge to § 922(g)(1) "was foreclosed in this circuit by *United States v. Darrington*. . . . *Heller* provides no basis for reconsidering *Darrington*. We therefore reaffirm *Darrington* and the constitutionality of § 922(g)." *Anderson*, 559 F.3d at 352 (internal citations omitted). The Tenth Circuit explicitly took the same approach in *McCane*. 573 F.3d at 1047 (citing *Anderson*).

Unlike § 922, no court has analyzed the USPS firearms ban as it applies in this case, *i.e.*, to law-abiding citizens exercising the right to carry on public, non-sensitive postal property. Moreover, as applied to Mr. Bonidy, the ban places a heavy burden on the right of law-abiding citizens "to possess and carry weapons in case of confrontation" protected by the Second Amendment. *Heller*, 554 U.S. at 592. Accordingly, even if all postal property could be uniformly labeled "sensitive" within the *Heller* dicta, Defendants would not be absolved of the burden of proving the constitutionality of the USPS firearms ban as applied here. *Williams*, 616 F.3d at 692.

IV.     **THE USPS FIREARMS BAN VIOLATES THE SECOND AMENDMENT.**

A.      **The Breadth Of The USPS Firearms Ban Indicates That Strict Scrutiny Is Appropriate.**

The USPS firearms ban effects a broad prohibition on law-abiding citizens' right to keep and bear arms for self-defense.  Because the ban extends to firearms stored in vehicles in the Avon Post Office parking lot, the burden on the Second Amendment is not just on postal property, but everywhere a law-abiding individual travels before and after visiting postal property.  Thus, the USPS ban prohibits core conduct protected by the Second Amendment: lawful possession of firearms for self-defense.  Accordingly, the USPS ban is subject to strict scrutiny.  *See Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) ("[A] severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end.").

No court has applied *Heller* and *McDonald* to analyze such a broad ban.  Defendants cite a number of cases in support of the proposition that intermediate scrutiny applies, but these cases involve either:  (1) regulations that apply only to people who "undeniably pose a heightened danger of misusing firearms," *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010); or (2) regulations that are less burdensome.  *See Chester*, 628 F.3d at 682 ("In the analogous First Amendment context, the level of scrutiny we apply depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right.").  A more narrowly tailored regulation might be subject to intermediate scrutiny—such as a regulation that did not render the interest in personal security nugatory on postal property, or that did not impair the ability of law-abiding citizens to carry firearms before and after visiting postal property—but the USPS firearms ban incorporates no such moderating limitations.  *Cf. Masciandaro*, 638 F.3d at

33

474.  Accordingly, Defendants must show that the USPS ban is "narrowly tailored to serve a compelling governmental interest" and "is necessary to serve the asserted [compelling] interest." *R.A.V.*, 505 U.S. at 395.

Defendants' reliance on cases involving 18 U.S.C. § 922 is unavailing.  Courts reviewing the prohibitions contained in § 922, including the Tenth Circuit, have ruled that intermediate scrutiny applies in those cases only because the various subsections of § 922 "prohibit the possession of firearms by narrow classes of persons who, based on their past behavior, are more likely to engage in . . . violence.  Based upon these characteristics, we conclude that § 922(g)(8), like the statutes at issue in *Marzzarella* and *Skoien*, is subject to intermediate scrutiny."  *Reese*, 627 F.3d at 802 (citing *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) and *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010)); *see also Chester*, 628 F.3d at 683.  A criminal's violent history makes his claim of Second Amendment rights "of less constitutional moment," *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563 n.5 (1980), and thus it is logical that the Circuit Courts have applied intermediate scrutiny in cases challenging § 922.

Mr. Bonidy has nothing in common with the felons and misdemeanants disarmed by § 922.  Mr. Bonidy is over 21 years old, has no history of substance abuse or a criminal record, is not subject to a protection order, has demonstrated competency with a handgun, and has been approved by the Eagle County Sheriff to carry a concealed handgun almost everywhere in the State.  Pls.' SOF ¶¶ 26–27.  There is simply no basis for drawing a connection between *Reese* and Mr. Bonidy's case.  *See Ezell*, 651 F.3d at 708 ("Here, in contrast [to *Skoien*], the plaintiffs are the 'law-abiding, responsible citizens' whose Second Amendment rights are entitled to full

34

solicitude under *Heller*, and their claim comes much closer to implicating the core of the Second

Amendment right.").  Accordingly, this Court should apply strict scrutiny.

Moreover, unlike other limitations on the right to keep and bear arms that have been

analyzed under intermediate scrutiny, the USPS ban leaves no room for "the right to 'possess and

carry weapons in case of confrontation.'"  *Masciandaro*, 638 F.3d at 474 (quoting *Heller*, 554

U.S. at 592) ("[B]y permitting [National Park] patrons to carry unloaded firearms within their

vehicles, [36 C.F.R.] § 2.4(b) leaves largely intact the right to 'possess and carry weapons in case

of confrontation.'"); *DiGiacinto*, 704 S.E.2d at 370 ("Individuals may still carry or possess

weapons on the open grounds of GMU . . . ."); *GeorgiaCarry.Org*, 764 F. Supp. 2d at 1320

("[T]he statute would allow [the plaintiff CEO of the Tabernacle] to keep a firearm in his office

if he obtained permission from security or management personnel of the Tabernacle and kept it

secured or stored as directed."), *aff'd*, 687 F.3d 1244 (11th Cir. 2012); *United States v. Decastro*,

682 F.3d 160, 170 (2d Cir. 2012) ("[18 U.S.C.] §922(a)(3) by its terms did not preclude Decastro

from acquiring the handgun . . . all that the federal statute effected were minor limitations on the

channels through which that handgun was to be shipped from Florida to New York."); *see also*

*Hall*, 2011 WL 995933, at *1.

As discussed above, the USPS firearms ban prohibits possession of firearms not only "in .

. . government buildings," *Heller*, 554 U.S. at 626, but also in the parking lots adjacent to those

buildings.  Even driving through postal property to deposit mail in a parking lot mail receptacle

would violate the ban.  This is why the USPS ban is more than a simple time, place, and manner

restriction on possession of firearms.  It would be akin to the Postal Service prohibiting not only

political protests inside Post Offices, but also prohibiting possession of political materials in the

glove compartment of a car parked on postal property.  Such a "broadscale prohibition" on

constitutionally protected conduct is undeniably subject to exacting scrutiny.  *Initiative and

Referendum Institute*, 417 F.3d at 1315; *see, e.g., Martin v. Struthers*, 319 U.S. 141, 145–146

(1943) (striking down ban on all door-to-door solicitation); *Goodman v. City of Kansas City*, 906

F. Supp. 537, 539 (W.D. Mo. 1995) (striking down prohibition on display of political bumper

stickers in a parking lot controlled by the City).[12]

     The USPS ban is also broader than most other regulations of firearms on federal property,

which allow law-abiding citizens to possess firearms in some capacity.  *See* Defs.' Mot. at 5 n.4

(listing examples of regulations that do not prohibit storage of a firearm).[13]  For example, 18

U.S.C. § 930 strikes a balance between the need for security in federal courthouses—evidenced

by the robust security in place throughout those buildings—and the constitutional right to carry.

Possession of a firearm "in a Federal court facility" is prohibited.  18 U.S.C. § 930 (e)(1).  But

inside other federal facilities, Congress did not prohibit "the lawful carrying of firearms . . .

---

[12] The typical justification for time, place, and manner regulations—"that they leave open ample alternative channels for communication of the information," *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)—is often hollow in the Second Amendment context, because "[s]ome rights, such as free speech, may be only slightly burdened by laws that bar speech in some places but allow it in many other places.  But self-defense has to take place wherever the person happens to be."  Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1515 (2009).  Where the government provides no security measures to maintain public safety, self-defense is all that is left to vindicate the interests protected by the Second Amendment.

[13] It should come as no surprise that the Central Intelligence Agency, 32 C.F.R. §§ 1903.1, 1903.10, or Department of Defense, 32 C.F.R. §§ 234.1, 234.10, may have more substantial security needs than the Avon Post Office, especially since, unlike the Postal Service, the core functions of these entities do not require them to open their property to the public.

incident to hunting or other lawful purposes."  18 U.S.C. § 930(d)(3).[14]  Likewise, the National

Park Service regulation addressed in *Masciandaro*, 36 C.F.R. § 2.4(b), "permit[ed] [National

Park] patrons to carry unloaded firearms within their vehicles, leav[ing] largely intact the right to

'possess and carry weapons in case of confrontation.'"  638 F.3d at 474 (quoting *Heller*, 554

U.S. at 592).  The USPS firearms ban is not nearly so narrow as 18 U.S.C. § 930, 36 C.F.R. §

2.4(b), or the comparable regulations cited by Defendants, because it prohibits all firearms

without exception, both inside and outside the Avon Post Office, with no consideration for the

objective character of that building or its parking lot.

In a significant way, the USPS ban imposes a greater burden than even the handgun bans

at issue in *Heller* and *McDonald*; at least in those cases self-defense with a long gun was still

possible, whereas the USPS ban applies to all firearms.  *See Heller*, 554 U.S. at 629; *McDonald*,

130 S. Ct. at 3106 (Stevens, J., dissenting).  The overwhelming burden imposed by the USPS

ban, both on Mr. Bonidy's right to possess a firearm on postal property and when traveling to

and from postal property, demonstrates that strict scrutiny is the appropriate standard.  *See*

*Chester*, 628 F.3d at 682 ("'A severe burden on the core Second Amendment right of armed self-

defense should require strong justification.  But less severe burdens on the right, laws that merely

regulate rather than restrict, and laws that do not implicate the central self-defense concern of the

Second Amendment, may be more easily justified.'") (quoting *United States v. Skoien*, 587 F.3d

803, 813–14 (7th Cir. 2009), *vacated*, 614 F.3d 638 (7th Cir. 2010)).

---

[14] The statute also explicitly recognizes the federal courts' inherent authority to regulate the courthouse and punish for contempt any violations of court rules.  18 U.S.C. § 930(f).

Defendants try to portray the burden of the USPS ban as minimal or incidental, Defs.'
Mot. at 35–36, but the facts of this case show just the opposite.  Presumably, Defendants would
not contest the importance of receiving one's mail.  *See Blount v. Rizzi*, 400 U.S. 410, 416 (1971)
("'The United States may give up the Post Office when it sees fit, but while it carries it on the
use of the mails is almost as much a part of free speech as the right to use our tongues . . . .'")
(quoting *United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson*, 255 U.S. 407,
437 (1921) (Holmes, J., dissenting)).  It is undisputed that the USPS ban has totally deprived Mr.
Bonidy of the right to carry both inside the Avon Post Office and in its parking lot when he picks
up his mail.  Pls.' SOF ¶¶ 30–31, 33.  Defendants suggest that the duration of this deprivation is
relevant, but "[t]he loss of [constitutional] freedoms, for even minimal periods of time,
unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see
also United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 812 (2000) ("The distinction
between laws burdening and laws banning speech is but a matter of degree."); *Marzzarella*, 614
F.3d at 94 ("infringements on protected rights can be, depending on the facts, as constitutionally
suspect as outright bans").  Moreover, Mr. Bonidy has gone to the extent of paying an architect
employed by his firm to pick up his personal mail so that Mr. Bonidy can avoid regularly giving
up his Second Amendment rights.  Tab Bonidy Dep. at 49–52, 150–51.  Yet, even that
arrangement has not prevented Mr. Bonidy from having to go to the Avon Post Office to pick up
his mail.  Pls.' SOF ¶¶ 30–31, 33.  The impact of the USPS ban may be swift or seldom, but
when he is subjected to the USPS ban, the burden on Mr. Bonidy's Second Amendment rights is
complete; his right to possess a firearm for self-defense is not "incremental[ly] . . . restrain[ed],"

*Decastro*, 682 F.3d at 170, it is extinguished entirely.  *Cf. id.*; *Masciandaro*, 638 F.3d at 474;

*DiGiacinto*, 704 S.E.2d at 370.

Defendants suggest that Mr. Bonidy can park off-site if he wishes to exercise his Second

Amendment rights.  Defs.' Mot. at 34.  However, the facts do not show this to be true.

Moreover, this accommodation does nothing to address the Bonidys' second claim for relief, the

right to carry inside the public areas of the Avon Post Office.

Mr. and Mrs. Bonidy testified that the only public parking consistently available to

patrons of the Avon Post Office is under the charge and control of the USPS.  Debbie Bonidy

Dep. at 78–79; Tab Bonidy Dep. at 54.  The only other public parking available to patrons of the

Avon Post Office is on West Beaver Creek Boulevard; however Mr. and Mrs. Bonidy have never

been able to park on West Beaver Creek Boulevard because, whenever they have had occasion to

do so, those parking spots were occupied by other vehicles.  Debbie Bonidy Dep. at 78–79; Tab

Bonidy Dep. at 54.  Moreover, parking on West Beaver Creek Boulevard is prohibited whenever

snow accumulation exceeds two inches.  Debbie Bonidy Dep. at 78–79.  Because of this

restriction, public parking on West Beaver Creek Boulevard is regularly unavailable during the

winter.  *Id.* ("You could pretty much ride by here any time in the winter and . . . you're not able

to park. . . .  Because the parking is limited in the winter because of the snow restriction.").  The

right to keep and bear arms is not subject to seasonal hiatus.

Nor is it any answer to say, as Defendants do, that if Mr. Bonidy wishes to exercise his

Second Amendment rights, he can park without permission in the private parking lots of nearby

businesses, parking lots that are reserved for customers of those businesses.  Defs.' Mot. at 35;

Debbie Bonidy Dep. at 182; Tab Bonidy Dep. at 152.  Mr. Bonidy could likewise park in the

middle of the street, or on the sidewalk, or in some other unpermitted fashion, but that would not change the fact that the "public USPS parking lot adjacent to the Avon Post Office is the only public parking consistently available to patrons of the Avon Post Office."  Second Am. Compl. ¶¶ 22–23; Debbie Bonidy Dep. at 182; Tab Bonidy Dep. at 152.

Defendants ignore the breadth of the USPS firearms ban and the facts of this case. Instead, they argue that the rigorous review employed by courts in the First Amendment context is inapplicable to the Second Amendment, and thus intermediate scrutiny, or perhaps something less, should apply in Second Amendment challenges.  Defendants wrongly urge this Court to relegate the Second Amendment to the status of "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees."  *McDonald*, 130 S. Ct. at 3045.

## B.     At A Minimum, The USPS Firearms Ban Is Subject To Intermediate Scrutiny.

Because the USPS ban imposes a burden on the time, place, and manner of constitutionally protected conduct, at a minimum, this Court must apply intermediate scrutiny. *See Ward v. Rock Against Racism*, 491 U.S. 781, 798–800 (1989) (citing *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)); *Chester*, 628 F.3d at 682 ("[W]e agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment.").  Defendants suggest that the USPS firearms ban imposes only a minimal burden on Mr. Bonidy's constitutional rights, and therefore argue that the ban should not be subject to heightened scrutiny.  Defs.' Mot. at 32.  Defendants are wrong on both the law and the facts; heightened scrutiny applies here.

The majority of courts to consider Second Amendment challenges post-*Heller* have applied heightened scrutiny, i.e., at least intermediate scrutiny.  *Masciandaro*, 638 F.3d at 474;

40

*Chester*, 628 F.3d at 679; *Reese*, 627 F.3d at 802; *Williams*, 616 F.3d at 692; *Skoien*, 614 F.3d at

638; *Marzzarella*, 614 F.3d at 97; *GeorgiaCarry.Org, Inc.*, 764 F. Supp. 2d at 1319 ("In the

absence of clearer guidance as to what the Supreme Court meant to capture within the net of

'sensitive places,' however, the Court concludes that the safer approach for now is . . . applying

intermediate scrutiny."); *but see Ezell*, 651 F.3d at 708 ("All this suggests that a more rigorous

showing than that applied in *Skoien* should be required, if not quite 'strict scrutiny.'").  Indeed,

the Tenth Circuit has acknowledged that it is required to apply at least intermediate scrutiny:

> [T]here is little doubt that the challenged law imposes a burden on conduct, i.e.,
> Reese's possession of otherwise legal firearms, that generally falls within the
> scope of the right guaranteed by the Second Amendment.  Thus, we must apply
> some level of heightened scrutiny and, in doing so, must look to analogous cases
> for guidance on precisely what level to apply."

*Reese*, 627 F.3d at 801.  In fact, Defendants conceded that the "Fourth Circuit has applied

intermediate scrutiny to a time, place, and manner regulation," Defs.' Mot. at 41, albeit to a more

narrowly tailored firearms regulation that addressed only loaded firearms possessed within

vehicles inside the National Parks.  *Masciandaro*, 638 F.3d at 471 (citing *Ward*, 491 U.S. at 791

and *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989)).  Thus, binding

Tenth Circuit precedent, and the weight of authority from other courts, mandate that heightened

scrutiny apply.

Factually, Defendants turn a blind eye to the breadth of the USPS ban, which, as

demonstrated above, imposes a significant burden on the right to carry, even in comparison to

other regulations of firearms on federal property.  As explained in detail above, because the

USPS ban extends outside government buildings—and thus outside the *Heller* dicta—law-

abiding citizens are effectively prohibited from exercising the right to carry when traveling to,

from, or through USPS property; the USPS ban does not even allow safe storage of a firearm in a vehicle. *Cf. Masciandaro*, 638 F.3d at 474. Accordingly, the USPS ban imposes a "severe burden on the core Second Amendment right of armed self-defense," which requires "an extremely strong public-interest justification and a close fit between the government's means and its end." *Ezell*, 651 F.3d at 708.

Thus, binding Tenth Circuit precedent, the weight of authority from other courts, and the significant burden on Second Amendment rights imposed by the USPS ban all require this Court to apply at least intermediate scrutiny.

### C.     The USPS Firearms Ban Fails Under Either Intermediate Or Strict Scrutiny.

Ultimately, this Court need not determine what level of heightened scrutiny applies here. Under any level of heightened scrutiny, Defendants have failed to proffer evidence to justify their draconian ban, especially in light of the lack of security in the Avon Post Office and its adjacent parking lot. Under strict scrutiny, Defendants must show that the USPS ban is "narrowly tailored to serve a compelling governmental interest" and "is necessary to serve the asserted [compelling] interest." *R.A.V.*, 505 U.S. at 395. Under intermediate scrutiny, the Supreme Court has described the standard thusly in the First Amendment context:

> "[R]egulation of the time, place, or manner of protected speech <u>must be narrowly tailored to serve the government's legitimate, content-neutral interests</u> but that it need not be the least restrictive or least intrusive means of doing so. . . . To be sure, <u>this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests</u>. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals."

*Ward*, 491 U.S. at 798–800 (emphasis added) (citing *Frisby*, 487 U.S. at 485). In either case, a "complete ban [on constitutionally protected activity] can be narrowly tailored, but only if each

activity within the proscription's scope is an appropriately targeted evil." *Frisby*, 487 U.S. at 485–86 (citing *Taxpayers for Vincent*, 466 U.S. at 808–810); *Heller v. District of Columbia*, 670 F.3d 1244, 1258 (D.C. Cir. 2011) ("[T]he District must establish a tight 'fit' between the registration requirements and an important or substantial governmental interest, a fit 'that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective.'") (quoting *Fox*, 492 U.S. at 480). Defendants have done nothing to show how the USPS ban meets either intermediate or strict scrutiny. Indeed, the USPS ban is not narrowly tailored because "a substantial portion of the burden on [personal security] does not serve to advance its goals." *Ward*, 491 U.S. at 800.

Defendants claim the Postal Service has an interest in "promoting order and public safety on all of its property, and in protecting its employees, customers and the U.S. Mail from the risk of firearm violence" and "preventing crime."[15] Defs.' Mot. at 44. Certainly this is a compelling governmental interest. But Defendants concede that the USPS ban is not tailored to these interests, because it targets all gun possession on all postal property indiscriminately.

The USPS firearms ban fails to incorporate the qualitative difference between a gun possessed in a restricted-access area of a government building and gun possessed in the lobby or parking lot of a building that is open to the public. *See* Postmaster Ruehle Dep. at 59–63 ("The employee parking area I believe is more sensitive than the public parking area. . . . As I stated before, I think the further away you get from the facility, the less sensitive it would become.").

---

[15] As already noted, *infra* n.11, all of the justifications for the USPS firearms ban offered by Defendants post-date the codification of the ban at 39 C.F.R. § 232.1(*l*). *See* Exhibit 4. Defendants have produced no findings or studies that were relied on by the Postal Service prior to the promulgation of 39 C.F.R. § 232.1(*l*). *Id*.

The ban also ignores the qualitative difference between a gun possessed with criminal intent, and a gun possessed for lawful purposes. *Heller*, 554 U.S. at 636 (Stevens, J., dissenting). The former is an appropriately targeted evil that the government may prohibit; the latter is a fundamental constitutional right. *McDonald*, 130 S. Ct. at 3050. Yet, Defendants have made no attempt to prove that the USPS firearms ban is tailored to account for these dramatic distinctions between protected and unprotected conduct. Instead, Defendants contend that the fact that postal property is a site of criminal activity is justification for the USPS ban. Defs.' Mot. at 11–13, 31–32, 45. Defendants' logic turns the Second Amendment on its head, by justifying a prohibition on the right to effective self-defense because the need is greater. The fact that crime occurs in a particular area logically tends to increase, not decrease, the need for effective self-defense in that area. *See McDonald*, 130 S. Ct. at 3049 (noting the importance of the Second Amendment in "high-crime areas."); Defs.' Mot. at 12 ("Robberies can and do occur in Post Office parking lots; in some instances customers returning to their vehicles with valuables obtained through the U.S. Mail  or retail postal services may be subject to predation from armed perpetrators surveilling the lot from their vehicles. This occurred in several recent incidents."). Indeed, Defendants concede that the Avon Post Office has seen its share of criminal activity. Pls.' SOF ¶ 20; *see also* Defs.' Mot. at 13.

Defendants have done nothing to prove that prohibiting lawful gun possession is a reasonable means of achieving their stated goal of crime reduction. This is because, in fact, such

a means-ends connection does not exist.[16]  Statistics show a clear lack of evidence to support any

connection between the government's interest in public safety and disarming law-abiding

individuals such as Mr. Bonidy.  *See* Volokh, 56 UCLA L. Rev. at 1520 n.323 (citing National

Academy of Sciences and Centers for Disease Control reports showing no net increase in crime

or death associated with licensed concealed carry); Philip J. Cook, et al., *Gun Control After*

*Heller: Threats and Sideshows From a Social Welfare Perspective*, 56 UCLA L. Rev. 1041,

1082 (2009) ("Based on available empirical data, therefore, we expect relatively little public

safety impact if courts invalidate laws that prohibit gun carrying outside the home."); David

Kopel, *Pretend "Gun-free" School Zones: A Deadly Legal Fiction*, 42 Conn. L. Rev. 515,

564–69 (2009) (examining the low crime rates for concealed carry licensees across several

States).  Defendants take on the mantra "more guns, more crime," but offer no evidence to

support this claim and there exists much to contradict it.  Carlisle E. Moody & Thomas B.

Marvell, *The Debate on Shall-Issue Laws*, 5 Econ. J. Watch 269, 288 (2008) (concluding public

gun carrying decreases crime); John R. Lott & David B. Mustard, *Crime, Deterrence and Right-*

*To-Carry Concealed Handguns*, 26 J. Legal Stud. 1 (1997) (same); Gary Kleck & Mark Gertz,

---

[16] Factually, the USPS firearms ban has not been necessary to reduce crime, since nationwide, in
the past five years, in all but three "incidents involving the unlawful possession of firearms or
other dangerous and deadly weapons while on Postal Service property [the suspect] was arrested
and/or charged pursuant to another provision of law, or . . . arrest and/or charge did not result."
Defendants' Objections And Responses To Plaintiffs' First Set Of Interrogatories at 6. (Attached
hereto as Exhibit 5.)

   Additionally, Defendants have developed an extensive procedure for identifying potential
threats that incorporates dozens of behavioral and psychological factors they deem probative of
threat assessment, severely undercutting Defendants' argument that lawful possession of a
firearm is a "critical factor" in identifying potential threats.  Defs.' Mot. at 1; Ex. Milke-11 to
Defs.' Mot. at Ex. 2-6a through 2-6c and Ex. 3-2.2.

*Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. Crim. L. & Criminology 150, 184–86 (1995) (same).

Mr. Bonidy's possession of a firearm in the public area of the Avon Post Office where he picks up his mail or in a private vehicle parked in a public parking lot is not "an appropriately targeted evil," *Frisby*, 487 U.S. at 485, it is a constitutionally protected fundamental right. Defendants assert it would be difficult for Postal Service law enforcement to distinguish between lawful and unlawful firearms, Defs.' Mot. at 45, but local, state, and federal law enforcement does this everyday in every State in the Union, including Colorado. *See* Ex. A-16 to Defs.' Mot. at 29–32; Credit Card Act of 2009, § 512, 16 U.S.C. § 1a-7b (2009) (applying state gun laws to National Park and National Wildlife Refuge lands). Thus, the USPS ban fails under intermediate and strict scrutiny because it is not tailored to achieve the Postal Service's interest in reducing crime and protecting public safety. While the connection between preventing violent crime and disarming violent felons may be "simple common sense," Defs.' Mot. at 44, the correlation in the instant context falls short of the precision required by the Constitution. *See Heller*, 554 U.S. at 628.

Under Defendants' reasoning, any law intended to limit firearm possession with the intent of reducing crime would be constitutional. But the assertion of the crime prevention interest is not an excuse to override the requirement that the regulation be tailored to the interest. Indeed, the same argument was rejected by the Court in *Heller* and *McDonald*, where the District of Columbia and the City of Chicago, respectively, argued that it was necessary to ban all handguns in those cities in order to reduce crime and gun violence. *McDonald*, 130 S. Ct. at 3056–57 (Scalia, J., concurring); *Heller*, 554 U.S. at 636. Defendants treat firearm possession as

46

an inherent social harm, but that is inconsistent with empirical studies and, more important, the

constitutional guarantee of an individual right to keep and bear arms.  It may be that enshrining

the right to keep and bear arms in the Constitution makes it more difficult for Defendants to

impose their "risk management strategy," Defs.' Mot. at 45, but the Constitution requires

Defendants to conform to its standards, not the other way around.

      As the Supreme Court noted in *McDonald*, every right enshrined in the Constitution "has

controversial public safety implications":

> All of the constitutional provisions that impose restrictions on law enforcement
> and on the prosecution of crimes fall into the same category.  *See, e.g., Hudson v.
> Michigan*, 547 U.S. 586, 591 (2006) ("The exclusionary rule generates
> 'substantial social costs,' *United States v. Leon*, 468 U.S. 897, 907 (1984), which
> sometimes include setting the guilty free and the dangerous at large"); *Barker v.
> Wingo*, 407 U.S. 514, 522 (1972) (reflecting on the serious consequences of
> dismissal for a speedy trial violation, which means "a defendant who may be
> guilty of a serious crime will go free"); *Miranda v. Arizona*, 384 U.S. 436, 517
> (1966) (Harlan, J., dissenting); *id.*, at 542 (White, J., dissenting) (objecting that
> the Court's rule "[i]n some unknown number of cases . . . will return a killer, a
> rapist or other criminal to the streets . . . to repeat his crime").

*McDonald*, 130 S. Ct. at 3045 (parallel citations omitted).  But these public safety implications

have not prevented courts from insisting on these other important constitutional rights.  The right

to keep and bear arms should be no different.  *Id.*

      The Second Amendment does not prevent Defendants from regulating firearm possession

on postal property, "but the enshrinement of constitutional rights necessarily takes certain policy

choices off the table."  Heller, 554 U.S. at 636.  One of the choices removed is "a broadscale

prohibition against" lawful possession of a firearm for self-defense, especially where the

government provides no security measures to protect the interest in personal security that is at

the heart of the Second Amendment.  *Initiative and Referendum Institute*, 417 F.3d at 1315.  The

Postal Service may still enforce generally applicable rules, but unlike mailboxes, its Post Offices

fall into qualitatively different categories.  *Cf. Rockville Reminder v. United States Postal Serv.*,

480 F.2d 4, 7 (2d Cir. 1973).  While the Postal Service can develop a general rule, it must be

tailored to protect the interest in personal security that is at the heart of the Second Amendment.

Just as the First Amendment protects the freedom of speech in order to protect the strong public

interest in "the free flow of ideas," *Hustler Magazine v. Falwell*, 485 U.S. 46, 50 (1988), the

Second Amendment protects the right to keep and bear arms in order to protect the strong public

interest in personal security, *McDonald*, 130 S. Ct. at 3040.  That interest will be protected in

different ways at different Post Offices.  A Post Office that is inside a sterile area, such as an

airport, the United States Capitol, or a Federal courthouse, would obviously have an easy time

justifying a ban on firearms because the interest in personal security is honored by disarming all

individuals and providing a substantial law enforcement presence.  Similarly, a Post Office that

does not screen all patrons, but that regularly provides armed security, would face a lesser

burden.  However, a Post Office that provides no security, no screening, and no restrictions on

access to its public areas, such as the Avon Post Office, fails to honor the commitment to

personal security enshrined in the Second Amendment; such an application of the USPS firearms

ban denies law-abiding postal customers the ability to protect themselves and renders nugatory

the interest in personal security protected by the Second Amendment.  The Constitution will not

countenance Defendants' broadscale approach to regulation of the interest in self-defense

protected by the Second Amendment, no more than it allows a similarly unnuanced approach to

the First Amendment.

## CONCLUSION

For the foregoing reasons, summary judgment should be entered for Plaintiffs and against Defendants with respect to both of Plaintiffs' claims:  (1) By prohibiting Mr. Bonidy from possessing a functional firearm for self-defense in a private vehicle parked in the public Avon Post Office parking lot, Defendants violate the Second Amendment; and (2) By prohibiting Mr. Bonidy from carrying a functional firearm for self-defense inside the Avon Post Office, Defendants violate the Second Amendment.

DATED this 29th day of October 2012.

Respectfully submitted,


/s/ James M. Manley
James M. Manley, Esq.
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
jmanley@mountainstateslegal.com

Attorney for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of October 2012, I filed the foregoing document electronically through the CM/ECF system, which caused the following to be served by electronic means:

Leslie Farby
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW, Room 7220
P.O. Box 883
Washington, DC 20044
Lesley.Farby@usdoj.gov

 /s/ James M. Manley
James M. Manley