IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

```
TAB BONIDY                         )
and NATIONAL ASSOCIATION FOR       )
GUN RIGHTS,                        )
                                   )
                Plaintiffs,        )
                                   )
        vs.                        )        10-cv-02408-RPM
                                   )
UNITED STATES POSTAL SERVICE,      )
PATRICK DONAHUE, and               )
MICHAEL KERVIN,                    )
                                   )
                Defendants.        )
```
_____

MOTION HEARING
TRANSCRIPT OF PROCEEDINGS
_____

Proceedings held before the HONORABLE RICHARD P.

MATSCH, U.S. District Judge for the District of Colorado,

beginning at 9:58 a.m. on the 18th day of June, 2013, in

Courtroom A, United States Courthouse, Denver, Colorado.


APPEARANCES

For the Plaintiffs:        James M. Manley, Esq.
                           Mountain States Legal Foundation
                           2596 South Lewis Way
                           Lakewood, Colorado 80227

For the Defendant:         Lisa Ann Olson, Esq.
                           U.S. Department of Justice-DC
                           20 Massachusetts Avenue, N.W.
                           Washington, DC  20530

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES: (continued)

Amy L. Padden, Esq.
U.S. Attorney's Office-Denver
1225 17th Street East
Seventeenth Street Plaza, #700
Denver, Colorado  80202

1                   P R O C E E D I N G S

2       (At 9:58 a.m. on June 18, 2013, in the United States

3   District Court at Denver, Colorado, before the HONORABLE

4   RICHARD P. MATSCH, U.S. District Judge, with counsel for the

5   parties present, the following proceedings were had:)

6       THE COURT:  Please, be seated.

7           Good morning.  We're convened in Civil No. 10-cv-

8   02408, Tab Bonidy against the United States Postal Service

9   and officials of the Postal Service to hear cross-motions for

10  summary judgment.

11          So, Mr. Manley here for the plaintiffs and Ms.

12  Olson and Ms. Padden for the defendants.  And, there has been

13  full briefing here and a number of exhibits.  My

14  understanding is that we're here to consider Postal

15  Regulation 39 CFR 232.1--I guess that's an L--providing

16  weapons and explosives, notwithstanding the provisions of any

17  other law, rule, or regulation.  No person while on Postal

18  property may carry firearms or other dangerous or deadly

19  weapons or explosives either openly or concealed or store the

20  same on Postal property except for official purposes.

21          I think the core facts here are not in dispute that

22  Mr. Bonidy lives outside of Avon, Colorado.  We're dealing

23  with the post office in Avon, Colorado which does not provide

24  for delivery of mail.  It requires persons receiving mail

25  through that post office to obtain their mail through a post

1   office box which is provided.  Mr. Bonidy has a concealed

2   carry permit to carry a handgun issued by the sheriff and

3   under applicable Colorado statute that he would be under the

4   Colorado law and under Avon ordinances able to go anywhere--

5   well, I wouldn't say anywhere--go in and about Avon, Colorado

6   carrying a concealed handgun except for the post office.

7            And, my understanding here is that there are three

8   areas of the post office--four areas, I guess, that are

9   relevant.  One is a restricted area within the post office

10  building for functions being performed by the Postal Service

11  employees, that there's also a Postal Service employee

12  parking lot, and then there is the public area of the post

13  office building and an adjacent parking lot that is owned by

14  the Postal Service.  And, as I understand this case, Mr.

15  Bonidy has asked whether he could have an exception to the

16  general rule or regulation to permit him under some

17  circumstances to park in the parking lot, at least, with this

18  firearm.  And, also, I guess it's still contended that he

19  could access the public area of the post office building,

20  although I think we have a distinction here to discuss

21  between that access and the parking lot with respect to the

22  definition of a sensitive place under applicable Supreme

23  Court precedent here.  And, as I understand it, there's

24  limited public parking on the street in front of the post

25  office and then there are other parking lots in the general

1    area for, I think, a municipal parking lot and some

2    recreation building for use for people attending those

3    buildings for functions therein.

4           But, the focus of this case, as I understand it, on

5    these cross-motions is--well, under 10th Circuit law now, the

6    Peterson against Martinez case, we're obliged to take two

7    steps here in analyzing the challenged constitutionality of

8    the regulation under the Second Amendment and, as I

9    understand it, we're talking about as applied to Mr. Bonidy

10   that does this regulation impose a burden on conduct falling

11   within the scope of what the Circuit referred to as the

12   guarantee of the Second Amendment and then second is it

13   constitutional meaning is it burdened?  Is that protection or

14   right burdened by this regulation?  And, I think that

15   although there's argument in favor of adopting strict

16   scrutiny, I think that we're looking at intermediate scrutiny

17   in this analysis and I think that's consistent with what the

18   10th Circuit has said.  And, of course, ever since the

19   Supreme Court has changed the jurisprudence of the Second

20   Amendment to recognize that contrary to what we all thought

21   was the law before Heller, there is an individual right to

22   possess a firearm for self-defense, at least.

23          So, that's my understanding of where we are this

24   morning and since this is a--the plaintiff has filed a

25   motion, as well as the defendant, I'll hear from Mr. Manley

1   on behalf of the plaintiff's motion.

2          Mr. Manley?

3      MR. MANLEY:  As you pointed out, Your Honor, the facts

4   aren't in dispute.  I don't know that there's much dispute

5   either about the question of whether or not the Second

6   Amendment protects the right to carry.  The Peterson case

7   addressed whether the Second Amendment, in particular,

8   protects the right to carry concealed.  The plaintiff in

9   Peterson was only asking for that relief.  He was not

10  challenging a ban on both open and concealed carry.

11     THE COURT:  Well, and also to a non-resident.

12     MR. MANLEY:  Yes.

13     THE COURT:  I mean it is important that the plaintiff in

14  that case was not a resident of Colorado and a part of the

15  justification for the determination by the Court that the

16  restriction was valid was--and I think it becomes clear in

17  Judge Lucero's concurring opinion that there showed

18  justification for the distinction between a resident seeking

19  to carry concealed under a Washington carry and conceal

20  permit because a lot of the information concerning whether

21  you should be permitted to have a concealed carry permit is

22  local.  So, I think that's the limit of the case.  As far as

23  the holding is concerned, there are some broader

24  implications.

25     MR. MANLEY:  Yes, and that's obviously correct.  And, I

1    think that whatever application Peterson has to this case,

2    it's limited by the fact that in Peterson, he was not

3    challenging a blanket ban; he was challenging simply the ban

4    on concealed carry, in particular.

5        THE COURT:  Right.

6        MR. MANLEY:  And so, looking at the property issue here

7    and looking at the cases that have applied to Heller dicta,

8    conscious of the fact that Heller itself warns against

9    reading too much into a footnote to--the Court says in Heller

10   at Note 25 that it would be inconceivable that we would rest

11   our interpretation of a basic meaning of any guarantee of the

12   Bill of Rights upon such a footnote of dictum in a case where

13   the point was not at issue and was not argued.  So, to the

14   extent that the Heller dicta is relevant here, the Postal

15   property issue is not sensitive.  All of the cases that have

16   looked at the sensitive places dicta have looked at property

17   that has one of four factors; either that there's security,

18   there's screening, there's restricted access, or it's a place

19   where children congregate.  All the cases dealing with the

20   sensitive places dicta have at least one, if not more, than

21   one of those factors and none of those factors are present

22   here.  The public is free to come and go 24 hours a day for

23   the Avon Post Office.  There are no security guards, no

24   Postal police.  The protocol for an emergency situation is

25   simply for the Postal employees to call the police and try

1   not to get hurt.  The public is left on their own.  And,

2   frankly, outside of business hours, there's no one there to

3   protect that interest in personal security that is at the

4   core of the Second Amendment.

5        THE COURT:  But, the doors are open?

6        MR. MANLEY:  The doors are open 24 hours a day.

7        THE COURT:  So, you can go to your post office box?

8        MR. MANLEY:  Exactly.

9        THE COURT:  Well, you know, as I mentioned this, you see

10  a distinction also though between the building where there

11  are more public, more persons coming and going--I don't know,

12  there's an estimate here of, what, 500 or something like that

13  daily--versus the parking lot.  And, I've mentioned this

14  before, I think, when we are on the motion to dismiss that

15  to--as I understand this parking lot, there are no gates or

16  any barriers.  Anybody can drive in there.  But, there's a

17  sign that says 30 minute parking and it's for Postal patrons

18  or something like that.  Is that right?

19       MR. MANLEY:  The sign says 30 minute parking, property

20  of the post office.

21       THE COURT:  Property of the post office, yeah.  Okay.

22       MR. MANLEY:  And, yes, it's certainly--one of the

23  factors that the defendants have pointed to for defining

24  sensitive place is whether the government owns it and then

25  whether it's a target for crime which the second factor sort

1    of turns the Second Amendment on its head and says where

2    you're most vulnerable to crime, you don't have a right to

3    protect yourself.  And, the examples of crime that they

4    pointed to are those that occur in parking lots where Postal

5    patrons who are mailing sensitive materials, valuable

6    materials are attacked in the parking lot.  People coming

7    back to their car with a credit card statement could equally

8    be a target of a criminal.  So, certainly, where people are

9    coming and going from the parking lot with their mail, that's

10   a place where they need to be able to defend themselves.

11   It's also a place where the Postal employees generally are

12   not present.  There's certainly not--there's no evidence that

13   they are in Avon.  And, it's also a place where someone could

14   just incidentally park, drop something off at the blue box

15   without even getting out of their car, and thereby violate

16   the Postal ban.

17       THE COURT:  Well, there are different levels of impact

18   of this regulation as it affects Mr. Bonidy because one would

19   be--and I guess this is what you're advocating--that he could

20   have this firearm holstered and concealed and walk into the

21   Postal building and get his mail and come out.  You advocate

22   for that, right?

23       MR. MANLEY:  Yes.

24       THE COURT:  The second, though, would be leave the gun

25   in the car.  And, I guess the third would be leave the gun in

1   the car in a locked compartment, glove compartment, or with a

2   trigger lock or some other mechanism for preventing quick

3   access.  Now, all three of those things have to be analyzed,

4   I think, at different levels of how extensive his self-

5   defense protection right is affected by this regulation.  So,

6   what if we took it in reverse and what is your position with

7   respect to a regulation that would permit him to drive into

8   the parking lot and lock his gun in the glove compartment?

9       MR. MANLEY:  Well, I don't think that Mr. Bonidy would

10  have any problem with that with respect to his parking lot

11  claim.  I think he would be perfectly happy as a responsible

12  gun owner to lock his gun in his car when he's not present.

13  It is important to note that we have to look at the

14  regulation as it exists today and it is--

15      THE COURT:  Well, it prohibits that.

16      MR. MANLEY:  Yes.  And, my point being that the Court

17  need not reformulate the regulation--

18      THE COURT:  No, I'm not suggesting that I would.  I'm

19  not suggesting that I'm reading it to do that.  I'm simply

20  saying that this should not be just a debate between

21  absolutes.  That is I can walk in there carrying my gun

22  versus you can't come anywhere near anything we own with a

23  firearm in any vehicle or any other way.  Those are the two

24  extremes.

25      MR. MANLEY:  Certainly.  And, we do not take the first

1    extreme that there can be no regulation of the Second

2    Amendment right even in the parking lot.  An accommodation

3    such as requiring a gun to be locked--

4         THE COURT:  Yeah.

5         MR. MANLEY:  --would like to pass constitutional

6    scrutiny under the appropriate standard.  So we're not--and

7    we're not taking the position either that all post offices

8    across the nation have to allow people to carry their guns

9    inside.

10        THE COURT:  Well, this is as applied.  That's what I

11   said in the beginning and that's my understanding of what

12   you're arguing.  But what has happened here is Mr. Bonidy

13   essentially asked for some kind of accommodation and the

14   response was this is the regulation; live with it.  Right?

15        MR. MANLEY:  We wrote a letter on behalf of Mr. Bonidy

16   saying that we believe the constitution protects his right to

17   carry, does the Postal regulation allow me to carry, and the

18   answer was a flat no.

19        THE COURT:  Yeah.

20        MR. MANLEY:  And, furthermore, in terms of reasonable

21   accommodation, the post office can regulate who can carry

22   inside, as well, even if the Second Amendment protects that

23   right to carry inside.  They can tailor the regulation to

24   those with criminal intent.  They can tailor the regulation

25   to exclude those who do not have a concealed carry permit.

 1    They can even tailor the regulation to include those who

 2    haven't been specifically approved by the post office

 3    assuming that their approval process is constitutional.  So,

 4    there's certainly plenty of room for regulation within the

 5    confines of the Second Amendment.

 6        THE COURT:  Yeah.  Well, what you're asking me to do is

 7    strike this one down saying it's too absolute and then the

 8    Postal Service can decide what to do next in terms of whether

 9    there's a way to balance these interests which, I guess,

10    might include some type of permit being issued by them to

11    persons who have a lawful concealed carry permit in Colorado.

12    Right?

13        MR. MANLEY:  Absolutely.  And, we would--if the post

14    office decided to reregulate it and had a favorable opinion,

15    we would want to participate in that process and help them to

16    come to a reasonable accommodation.

17        THE COURT:  Yeah, but--but, you know, it wouldn't be for

18    me in this case to monitor any such thing.  In this case,

19    there would be a judgment saying your regulation is invalid.

20        MR. MANLEY:  Yes.

21        THE COURT:  Right.  Okay.  So, I didn't mean to

22    forestall your argument, but--

23        MR. MANLEY:  No, not at all.  I think we've covered a

24    lot of it.  I will point out that the defendants' purpose for

25    the--the stated purpose for the regulation is to prevent

1    crime and--

2         THE COURT:  Well, it said helps law enforcement protect

3    Postal Service employees and the public on Postal Service

4    property by facilitating efficient and effective responses to

5    threats and perceived threats.

6         MR. MANLEY:  Right.  And, the--

7         THE COURT:  The only thing is it doesn't say who's going

8    to provide the efficient and effective response.

9         MR. MANLEY:  Well, and in the case of the Avon Post

10   Office, it's no one from the Postal Service.  It's the Avon

11   Police coming from whatever other matters they're attending

12   to.

13        THE COURT:  Yeah.  I don't--the police station is not

14   next door, is it?

15        MR. MANLEY:  No, I don't believe it is.

16        THE COURT:  Okay.

17        MR. MANLEY:  And, you know, the 7th Circuit addressed

18   this a little bit in its--in the Moore v. Madigan decision

19   and essentially pointed out that this argument that banning

20   everyone from carrying in order to ferret out criminals is

21   what they called a weak argument because, obviously, we're

22   talking about concealed carry.  There isn't going to be a lot

23   of opportunity to see a concealed firearm.  But, even if

24   there were police officers at the Avon Post Office who were

25   trained in detecting a concealed firearm, striking down this

1   ban does not prevent them from engaging individuals who they

2   think or they have a reasonable suspicion that they're

3   engaged in criminal behavior, even someone who is just simply

4   carrying--appears to be carrying a concealed weapon, nothing

5   prevents the police from engaging with that person,

6   confirming that they have a concealed carry permit, engaging

7   in a consensual conversation to determine if they're a

8   threat.  That's all obviously hypothetical because there are

9   no police officers stationed at Avon--at the Avon Post

10  Office.  But, the reason that the post office has this ban is

11  necessary in order to determine who's carrying legally and

12  who's not is simply not true.

13      THE COURT:  The building is open 24 hours, you said, at

14  least that part of the building wherein you can go and get

15  your mail from your box.  And, I take it the parking lot is

16  open, as well.

17      MR. MANLEY:  It is.  There's--

18      THE COURT:  There's no closure anywhere.

19      MR. MANLEY:  There are no gates, no chains.  It's open.

20  It's essentially open to the public.  There's nothing--and

21  there's no indication that someone who is not conducting

22  business at the post office couldn't park there.  The sign

23  says 30 minute parking--

24      THE COURT:  It's sort of you're on your honor that

25  you're going to the post office and you're not going to be

1    here more than 30 minutes.

2         MR. MANLEY:  Yes.  And, the postmaster there testified

3    that one of the problems they've had is folks parking cars

4    there that are for sale and leaving them there for long

5    periods.  He said the policy on that is to sort of, you know,

6    take a more casual approach to it until it becomes a

7    nuisance.  So, people do park there who are not conducting

8    Postal business.

9         THE COURT:  Okay.  I think I have your position.

10        MR. MANLEY:  Okay, thank you.

11        THE COURT:  Ms. Olson?

12        MS. OLSON:  Thank you, Your Honor.  May it please the

13   Court?

14        THE COURT:  Counsel?

15        MS. OLSON:  We're here today because the plaintiffs

16   challenge a regulation that prohibits carrying firearms not

17   in the home, but on Federal United States Postal Service

18   property.  It doesn't affect the plaintiffs' ability to carry

19   firearms where they live, but only where by their own

20   account--

21        THE COURT:  Well, I know.  But the Supreme Court has not

22   limited the Second Amendment to the home.

23        MS. OLSON:  I think the holding in Heller was that

24   there's a right to possess firearms--

25        THE COURT:  They didn't limit it to the home.  Are you

1  saying they limited it to the home?

2      MS. OLSON:  That the holding was limited to the right to

3  possess firearms in the home.  They didn't preclude the

4  possibility that in the future rights outside the home might

5  be allowed.  So far, they're--

6      THE COURT:  Yes.  And, Circuit courts have not

7  restricted it to the home.

8      MS. OLSON:  I think there are two things to focus on

9  here.  First of all, we've been through a great deal of

10  discovery on the question of whether there's a burden, and as

11  the Court has observed, the burden informs any standard

12  that's applied here.  And, as the Court knows from our

13  briefs, it's not clear to us that the challenged regulation

14  falls within the Second Amendment, at all, given the language

15  in Heller, but--

16      THE COURT:  Well, let's stop right there.  Is that your

17  argument?

18      MS. OLSON:  It is.  We believe--

19      THE COURT:  That there's no Second Amendment protection

20  for carrying a gun outside your home?

21      MS. OLSON:  No.  That in this case under these

22  circumstances, there's no Second Amendment protection for

23  carrying a gun on Postal Service property.  And, the reason

24  for that is that--

25      THE COURT:  Well, no, that--the question becomes whether

1    the right protected by the Second Amendment to have a

2    concealed carry firearm outside of your home is--that's a

3    right.  Is that right affected by the Postal regulation?

4    And, it is.

5         MS. OLSON:  If we assume--I mean, as we've said in our

6    briefs that it's our position that the right is not, in fact,

7    protected by the Second Amendment because Postal Service

8    property is a sensitive place--

9         THE COURT:  Well, I know, but that's a question of the

10   justification for the burden, not the right.

11        MS. OLSON:  Well, the discovery in this case has shown--

12        THE COURT:  I'm not talking about the discovery.  I'm

13   talking about the legal principle.

14        MS. OLSON:  Excuse me, I'm sorry.  That there isn't a

15   burden and that the plaintiffs rarely visit the post office.

16   They have an employee who picks up the mail who began doing

17   that even before Mr. Bonidy got his concealed carry license.

18   That there is street parking available.  That the Bonidy's

19   don't wait for a spot on the street or they haven't ever

20   waited for a spot on the street.  That snow has never

21   prevented them from parking.  And that they could look for

22   (inaudible) observe parking elsewhere.

23        THE COURT:  What is the interest of the Postal Service

24   that is protected by this prohibition at least in the parking

25   lot?

1      MS. OLSON:  The undisputed evidence in this case

2 contained in the declaration of Keith Mielke (phonetic) and

3 all of the exhibits attached to that is--and he's the

4 inspector in charge of security and crime prevention for the

5 U.S. Postal Inspection Service.  He has 21 years of

6 experience as a Postal inspector.  He's responsible for

7 conducting--

8      THE COURT:  Well, tell me what about the parking lot?

9 What is--

10      MS. OLSON:  That the prohibition is a critical component

11 of the Postal Service's risk management and violence

12 prevention strategies.

13      THE COURT:  All that's conclusory.  What is it that's

14 being protected in the parking lot?

15      MS. OLSON:  The public safety; the safety of Postal

16 Service customers, employees, and the mail.  And, as we

17 explained in our brief, Postal Service--and this applies, as

18 well, to the parking lot--it is a magnet for crime because

19 there are valuables being sent through the mail--

20      THE COURT:  What crime has ever been committed in this

21 parking lot?

22      MS. OLSON:  All of the exhibits to Mr. Mielke's

23 declaration explain there are robberies committed, there have

24 been homicides--

25      THE COURT:  What crime has ever been committed in the

1  Avon Postal Service parking lot?

2       MS. OLSON:  I don't know that--I don't recall, Your

3  Honor, but I don't think that there were any of note which is

4  all the more reason--

5       THE COURT:  There's been no evidence that there was ever

6  any crime committed by anybody in this parking lot, is that

7  right?

8       MS. OLSON:  Your Honor, I'm sorry, I don't believe that

9  we submitted evidence that there have been crimes.  May I

10  confer with my--

11       THE COURT:  No, you're arguing the case.

12       MS. OLSON:  I'm sorry, I just don't recall.  There have

13  been crimes if not in this parking lot, in others.  There

14  have been crimes at the Avon Post Office.  I don't recall

15  specifically what they were or where they were, but it is the

16  judgment of--the government of the United States is not

17  required under the case law to provide specific evidence.  It

18  is required and it has done so in an un-refuted way.  The

19  plaintiff has not shown a shred of evidence--

20       THE COURT:  Well, we're not talking about the events

21  that have been very well-publicized as the "go Postal" where

22  Postal employees kill each other or a superintendent or the

23  secured area of the Postal Service employees' parking lot or

24  the secured area of the building.  But, here, we have a

25  building open to the pub--the public part of the building

1  open to the public 24/7, right?

2      MS. OLSON:  Right.

3      THE COURT:  And, a parking lot open 24/7?

4      MS. OLSON:  Right.

5      THE COURT:  Who is out there protecting this area?

6      MS. OLSON:  The Postal Service has a uniform policy of

7  banning firearms--

8      THE COURT:  I understand the policy.  The issue is

9  whether that policy violates the United States Constitution

10  and the Second Amendment.  I don't just yield to some policy

11  that the Postal Service says this is it; live with it.

12  That's why we have courts.

13      MS. OLSON:  The conclusion that the Postal Service has

14  drawn is that--

15      THE COURT:  What is the conclusion based on?

16      MS. OLSON:  It is based on the observations and

17  experience of the Postal Inspection Service which controls

18  the security of more than 30,000 Postal Service offices--

19      THE COURT:  We're not talking about 30,000; we're

20  talking about Avon, Colorado, a specific place, a specific

21  citizen of the United States.

22      MS. OLSON:  But, as the Court said--the 10th Circuit

23  said in In Re: United States, the government is not required

24  to make individualized assessments of security and the Postal

25  Service doesn't have the resources to go around to every post

1  office and check every individual--

2     THE COURT:  They don't provide any protection to the

3  public, do they?

4     MS. OLSON:  Their protection, yes, is the policy that

5  they have in place.

6     THE COURT:  How does the policy work?

7     MS. OLSON:  The policy says there will be no firearms on

8  Postal Service property.

9     THE COURT:  How does it work?  Does anybody monitor it?

10     MS. OLSON:  Yes, the Postal Inspection Service has

11  hundreds of individuals nationwide to monitor--

12     THE COURT:  I'm not talking about nationwide.  I'm

13  talking about a specific property in Avon, Colorado.  What do

14  they do to provide security to the public?

15     MS. OLSON:  The Postal Service--the Postal Inspection

16  Service monitors the safety on that--in that location.

17     THE COURT:  How?  In Avon, Colorado, how is it done?

18     MS. OLSON:  I believe they assign Postal inspectors to

19  keep--to monitor--they don't have armed guards.

20     THE COURT:  Is that your argument?  The Postal Service

21  says we need to do this, forget about it, dismiss the case?

22     MS. OLSON:  No, the Postal Service, Your Honor, isn't

23  saying we just need to do this.  The Postal Service has

24  examined these questions at its facilities.  It serves seven

25  million customers a day.  It can't be in a position of making

1    individualized assessments of personal safety and security.

2    That's why it has a uniform policy--

3         THE COURT:   Okay.   Why do they have a Postal--why do

4    they have a person in charge, the postmaster?  Doesn't the

5    postmaster that's in charge have something to do with how

6    this post office functions?

7         MS. OLSON:   It may have to do--and that isn't really the

8    issue in this case, but it may have to do with the fact that

9    there's a need for heightened security with respect to the

10   Postal inspector himself.   I don't know if he even has any

11   particular security.   That's a speculative question and I

12   couldn't answer.

13        THE COURT:   It isn't speculative, at all.   You seem to

14   fail to recognize what's at issue in this case which is an as

15   applied challenge to how this affects Mr. Bonidy.

16        MS. OLSON:   Well, I think the issue is whether there's

17   any burden imposed on the plaintiffs in this case and whether

18   the Postal Service's conclusion that there is--whether the

19   fit between this regulation and the Postal Service's

20   compelling objective of protecting Postal Service employees

21   and customers from firearm violence is reasonable.   That is

22   the question in this case under the intermediate scrutiny

23   standard.

24        THE COURT:   Okay.   I've heard you.   Thank you.

25        MS. OLSON:   And, Your Honor, may I just respond to a

1   couple of points that Mr.--

2       THE COURT:  Well, yeah, if you can respond more

3   pertinent than you have.

4       MS. OLSON:  Well, I think that, first of all, there's--

5   as I say, there's no evidence that the plaintiff has offered

6   to refute the Postal Service's findings that this is an

7   essential measure to protect the safety of Postal facilities

8   nationwide in addition to the Avon Post Office.  The evidence

9   is un-refuted.  And, in In Re: United States--I believe it

10  was In Re: United States, one of the 10th Circuit case--

11      THE COURT:  What prevents the post office from having

12  this regulation and then permitting a specific postmaster to

13  provide for limited discretion permits with respect to what

14  Mr. Bonidy wanted to do?

15      MS. OLSON:  Because the Postal Inspection Service

16  manages 30,000 facilities nationwide and the Postal Service

17  needs to have a uniform policy--

18      THE COURT:  And, there cannot be any difference among a

19  New York City post office and Avon, Colorado or Swink,

20  Colorado?

21      MS. OLSON:  This is part of the assessment that the post

22  office makes and it has concluded needs a baseline of no

23  firearms present on Postal Service property.

24      THE COURT:  Well, the Postal Service is going to lose on

25  that position.  Now, do you have anything else to say?

1          MS. OLSON:  Well, only that we believe that the fit

2     between this regulation and these compelling objectives is

3     reasonable and it's based on the 20 years of experience of

4     the inspector in charge of security and crime prevention for

5     the United States Postal Inspection Service.  It's his

6     conclusion that firearms make criminal--

7          THE COURT:  All right.  I don't need to hear any more

8     from you.

9          MS. OLSON:  Thank you, Your Honor.

10          THE COURT:  Your arguments are unpersuasive.

11          MS. OLSON:  If I--

12          THE COURT:  What you're saying is the government says

13     this is how it is and you live with it.

14          MS. OLSON:  Well, the government isn't--you know, the

15     cases--

16          THE COURT:  That's what you're saying.

17          MS. OLSON:  No, that's not--I'm sorry, Your Honor.

18          THE COURT:  Well, what's different?  What are you saying

19     that's different from that?

20          MS. OLSON:  We're saying that based on experience and

21     expertise which it is the prerogative of the executive to

22     make and if the Court isn't in a position to make this

23     judgment based--

24          THE COURT:  And, citizens be damned.

25          MS. OLSON:  No, Your Honor, based on evidence that's

1   un-refuted by the plaintiffs, based on the fact that they

2   have not offered any--

3         THE COURT:   Look, I've been trying to suggest to you

4   that there's a difference between all of this broad, general

5   restriction and an individual situation.

6         MS. OLSON:   It was--the Postal Service found that having

7   firearms on Federal property increases the possibility of

8   violence--

9         THE COURT:   I don't want to hear any more from you.   You

10  don't address the issue in the case, at all.

11          There will be a written opinion.

12          Mr. Manley, do you have anything further?

13        MR. MANLEY:   Not unless the Court has any further--

14        THE COURT:   Yeah.   You know, this is more of what we are

15  seeing, regulatory authority prevails, period.   It isn't

16  going to happen in this District.

17          Court's in recess.

18        (Whereupon, at 10:34 a.m., the hearing was concluded.)

19

20

21

22

23

24

25

1                    TRANSCRIBER'S CERTIFICATE

2           I hereby certify that the foregoing has been

3    transcribed by me to the best of my ability, and constitutes

4    a true and accurate transcript of the mechanically recorded

5    proceedings in the above matter.

6           Dated at Aurora, Colorado, this 27th day of June,

7    2013.

8

9

10

11

12                              /s/ Doneita Gitzen

13                              Doneita Gitzen

14                              Federal Reporting Service, Inc.

15                              17454 East Asbury Place

16                              Aurora, Colorado  80013

17                              (303) 751-2777

18

19

20

21

22

23

24

25